

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | |
|---|---|
| Lincoln Memorial University ) | |
| Duncan School of Law ) | Case No. 3:11-CV-608 |
| 601 West Summit Hill Drive ) | |
| Knoxville, Tennessee 37902 ) | |
| Plaintiff ) | Judge Varlan/Shirley |
| ) | |
| v. ) | JURY DEMAND |
| ) | |
| The American Bar Association ) | |
| 321 North Clark Street ) | |
| Chicago, Illinois 60654 ) | |
| ) | |
| Defendant ) | |
| ) | |
| ) | |

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

1.     Plaintiff Lincoln Memorial University Duncan School of Law ("DSOL"), complaining of Defendant The American Bar Association ("ABA"), alleges as follows:

### INTRODUCTORY STATEMENT

2.     DSOL has been forced to bring this action because the ABA has arbitrarily and capriciously denied DSOL provisional accreditation. In addition to being unreasonable and arbitrary, the ABA's decision was motivated by a desire to restrain trade and limit competition among law schools. This anti-competitive intent is patently clear from the ABA's own rationale for denying accreditation. The ABA cites as a reason for denying accreditation the average LSAT scores of DSOL students, yet granted full accreditation to no fewer than eight (8) law

1

schools with **lower** average LSAT scores. The only reasonable inference from this disparate treatment is that the ABA desires to restrain trade.

3.      DSOL seeks judicial review of the ABA's egregious actions pursuant to federal common law as embodied in the standards of judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the common law of the State of Tennessee. These standards of judicial review require that an accreditation decision by Defendant ABA be in accord with due process, that is, the decision must be rationally connected to the facts on the record and not arbitrary and capricious. This is also an action under Section 1 of the Sherman Act, 15 U.S.C. § 1, which proscribes agreements and conspiracies in restraint of trade, Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits the abuse of monopoly power, and the Clayton Act, which provides a private right of action for violations thereof.

4.      Plaintiff DSOL is a school of law located in Knoxville, Tennessee and is a part of Lincoln Memorial University ("LMU"). LMU is a not-for-profit university established in 1888 and chartered by the State of Tennessee in 1897. LMU was first accredited by the Southern Association of Colleges and Schools – Commission on Colleges ("SACS-COC") in 1936. LMU is accredited to award associate, baccalaureate, master's, educational specialist and doctoral degrees. LMU and DSOL are committed to the Appalachian geographic region in which they are located and to providing access to a legal education to this demographic population, one that has long suffered educational, occupational and economic challenges. DSOL first admitted students in the Fall of 2009. These students were Part-Time students. In the Fall of 2010, DSOL admitted its first Full-Time students.

5.      Defendant ABA is a voluntary membership association and an Illinois corporation. It is exempt from federal income taxation as a business league under Section 501(c)

2

(6) of the Internal Revenue Code. Defendant ABA provides law-related services to lawyers, law students, law schools and the general public. Defendant ABA has been delegated authority by the Department of Education ("DOE") to accredit law schools.

6.      A law school must be approved by Defendant ABA in order to participate in most federal loan and other programs, 34 C.F.R. § 668.13(a), and for its graduates to sit for examination to be licensed to practice law by the supreme court of forty-eight (48) states. And whether appropriate or not, in the marketplace for legal education ABA accreditation has become a proxy that is relied upon by law school applicants, law students, employers, judges, government personnel, and others to identify a "quality" legal education of sufficient thoroughness and rigor. Failing to secure ABA accreditation can entail tremendously negative consequences for a law school's students, who may not be able to sit for the bar examination in most states and may find the value of their degrees impaired, and for law schools themselves, which may be unable to attract law students, faculty, and staff, fail to secure financial donations and the support of the legal community, and may ultimately be forced to close as the result of a failure to secure ABA accreditation.

7.      In Defendant ABA's capacity as an accrediting agency of the DOE, Defendant ABA's Council of the Section of Legal Education and Admissions to the Bar of the American Bar Association ("Council") denied the accreditation application of DSOL for provisional approval. The Council denied accreditation to DSOL on December 20, 2011.

8.      The ABA Council's decision to deny provisional approval to DSOL was arbitrary and capricious and violated due process. There is no factual basis for the Council's decision. Indeed, this decision is actually contradicted by the undisputed facts in the record as found by the ABA's own Site Evaluation Team ("ABA Site Team"). The Council's decision is

3

also contradicted by the findings and decisions of two other accrediting agencies—SACS-COC and the Tennessee Board of Law Examiners ("TBLE")—one recognized by the United States Secretary of Education and the other an arm of the Tennessee Supreme Court. These accrediting authorities applied substantially similar standards as did the ABA's Council to the same facts. DSOL was subjected to two separate and independent examinations, each as complete and thorough as the ABA's. SACS-COC not only found DSOL to be in compliance but made **no** recommendations for improvement.

9. In approving DSOL, TBLE and SACS-COC each reached a decision that contradicts and refutes the Council's decision. Given that the Council's decision is untethered to the record evidence and is in conflict with the considered and thorough assessment of two other accrediting authorities, DSOL respectfully submits that the Council's decision is arbitrary and capricious.

10. The Council found deficiencies with three Standards: 203, 303 and 501. However, the overwhelming evidence demonstrates that DSOL is in substantial compliance with each Standard. In fact, the ABA Site Team articulates findings of fact that unequivocally establish DSOL's compliance. With the ABA Site Team's findings of fact standing in stark contrast to the Council's conclusions, it was incumbent upon the Council to provide a basis for its rejection of its own Site Team's findings. As the Council has articulated no reason why it has ignored the ABA Site Team's findings, its conclusions are arbitrary and capricious. Furthermore, the ABA Site Team—like the SACS-COC On-Site Team and the Evaluation Committee of the TBLE—had firsthand knowledge of the facts, thus warranting substantial weight within the record evidence.

4

11.    The Council's decision, however, was not based on firsthand information.  It was removed and much more cursory than the investigation and decision making by TBLE, SACS-COC and the ABA Site Team.  The fact that the ABA's decision is so disconnected from the factual record and arbitrary and capricious will compel the Court to reject it as a violation of common law due process.  It will also compel the Court to conclude that this arbitrary and capricious decision was not made in a vacuum.  Rather, on information and belief, Defendant ABA has denied DSOL accreditation as the result of an agreement and understanding with certain accredited law schools that will benefit from the denial of accreditation to DSOL – not only law schools that may specifically compete with DSOL in the legal marketplace, but also law schools that would favor the denial of accreditation to new law schools in general even when accreditation would otherwise be mandated by the ABA Standards and Rules.

12.    In short, DSOL has been the victim of a group boycott orchestrated by Defendant ABA in concert with these interested accredited law schools, to the detriment of DSOL, its students, and the public at large.  Defendant ABA's actions also constitute an intentional misuse of its dominant market power as the gatekeeper for accreditation of law schools and the benefits that accompany that status.

13.    DSOL brings this action in lieu of pursuing an appeal of Defendant ABA's Council's decision as provided by the ABA Standards and Rules.  Neither those rules nor the Higher Education Act mandate an appeal as a condition precedent to filing a lawsuit.  DSOL also believes that such an appeal would be futile.  The complete and utter disregard by the Council of the factual material presented by DSOL in evidence of its substantial compliance with ABA Standards and Rules unquestionably indicates that the ABA would not reverse its Council and grant provisional approval to DSOL in the course of such an appeal.

5

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337, and 1367, and 20 U.S.C. § 1099b(f).  This Court also has diversity jurisdiction over this matter under 28 U.S.C. § 1332(a) because DSOL is not a citizen of any state of which the ABA is a citizen, and the amount in controversy exceeds $75,000.

15.     Under 28 U.S.C. § 1391(a), venue for this action is proper in the Eastern District of Tennessee, Knoxville Division. Plaintiff DSOL is located in Knoxville, Tennessee, and in ruling on DSOL's application for provisional approval, Defendant ABA's Site Evaluation Team visited DSOL's campus in conducting a site evaluation of DSOL.  Therefore a substantial part of the events or omissions giving rise to the claims herein arose in Knoxville, Tennessee.  Venue is also proper under 15 U.S.C. § 22 because the ABA is a corporation, and it transacts business in this District.

## THE PARTIES

16.     Defendant ABA is an Illinois corporation whose headquarters and principal place of business are located in Chicago, Illinois.

17.     Plaintiff DSOL is a division of LMU and is located in Knoxville, Tennessee.

## DUNCAN SCHOOL OF LAW SEEKS TO PROVIDE LEGAL EDUCATION TO THE UNDERSERVED AND ECONOMICALLY DISADVANTAGED OF SOUTHERN APPALACHIA

18.     In founding Plaintiff DSOL, LMU sought to further achieve the principles for which the university was established – the principles of Abraham Lincoln, seeking a dedication to individual liberty, responsibility and improvement of self, as well as a respect for citizenship and high moral and ethical standards.  LMU has adopted a purpose of providing educational

6

opportunities, developing community leaders, and expanding economic and social forces within the southern Appalachian region.

19.     The genesis of DSOL dates to the 1990's when LMU commenced planning for and began expansion beyond its liberal arts mission to include professional and post-baccalaureate education. In July of 2007, LMU faculty and administration discussed establishing a juris doctorate ("J.D.") degree program at an annual LMU strategic planning retreat.   In November of 2007, LMU formed a preliminary steering committee to further explore the establishment of a J.D. program.

20.     The Steering Committee hired a former dean of two law schools as a consultant to work on this proposal in March of 2008.  In April of 2008, LMU notified SACS-COC, as its regional accrediting body, of its intent to offer a J.D. degree.  In May of 2008, the LMU Board of Trustees approved the development and implementation of DSOL.   In June of 2008, the administration of LMU designed an organizational structure, position profiles and an initial budget pro forma for DSOL. In July of 2008, LMU created a board of advisors for LMU to be chaired by a Knoxville attorney and consisting of members of the bar from different regions within Tennessee. Also in July of 2008, plans for DSOL were reviewed during a LMU Strategic Planning Retreat. LMU named Sydney Beckman as founding Dean of DSOL.

## THE TENNESSEE BOARD OF LAW EXAMINERS ACCREDITS DSOL BASED UPON STANDARDS THAT MIRROR THOSE OF DEFENDANT ABA

21.     In January of 2008, LMU informed the TBLE that it would consider seeking approval of a new law school that would be located in Knoxville, Tennessee. In February of 2008, LMU administration met via telephone conference with TBLE concerning LMU's letter of inquiry and on the following day, LMU submitted a written document entitled: "Lincoln Memorial University – Overview and Statement of Intent" to TBLE for review. In April 2008,

7

LMU administrative officials, the LMU Steering Committee and the LMU consultant met in Nashville, Tennessee with TBLE board members to discuss LMU's submitted proposal addressing Section 7 of the Rules of the Tennessee Supreme Court regarding the licensing of attorneys and the approval of law schools. In June of 2008, TBLE informed LMU that it would hire an additional consultant to work on the DSOL approval application.

22.     In September of 2008, Dean Beckman met in Nashville, Tennessee with the Executive Director of TBLE to discuss the progress of the DSOL application for TBLE approval. That September, LMU was notified that two consultants would work on DSOL's TBLE application and that the deadline for submission was November 21, 2008. LMU submitted the required report to TBLE by the stipulated date in preparation for a TBLE site visitation.

23.     In December of 2008, TBLE conducted a site visit of DSOL with the TBLE evaluation committee indicating that it would recommend approval of DSOL. In February of 2009, LMU submitted a report to TBLE responding to the findings of the TBLE on-site review committee.

24.     On February 24, 2009, TBLE notified LMU that it had decided to grant approval for DSOL graduates to take the Tennessee Bar Exam. TBLE based this decision upon its finding that DSOL was in compliance with the Rule 7, Article II, Sec. 2.03 of the Rules of the Supreme Court of the State of Tennessee. Section 2.03 imposes requirements upon law schools seeking approval that mirror those of Defendant ABA.

## THE SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS – COMMISSION ON COLLEGES ACCREDITS DSOL BASED UPON STANDARDS THAT MIRROR THOSE OF DEFENDANT ABA

25.     In April of 2008, LMU notified SACS-COC, as its regional accrediting body, of its intent to offer a J.D. degree. In November of 2008, LMU President Dr. Nancy Moody, Vice

8

President for Academic Affairs Dr. Sherilyn Emberton, DSOL Dean Sydney Beckman and SACS Accreditation Liaison Dr. Clayton Hess met with Vice President of the Commission on Colleges Dr. Cheryl Cardell to discuss development of DSOL and submission of the LMU Substantive Change Prospectus.

26.    In February of 2009, Dr. Cardell visited DSOL to review its progress.  In March of 2009, LMU submitted the LMU Substantive Change Prospectus to SACS-COC with a feasibility study. ("SACS-COC Feasibility Study").  In April of 2009, LMU received approval from SACS-COC to offer a J.D. degree.  Subsequent to the commencement of classes at DSOL in the Fall of 2009, SACS-COC conducted a Substantive Change Committee site team visitation of DSOL in March of 2010 to evaluate the compliance of LMU and DSOL with SACS-COC accreditation standards following the beginning of the J.D. program. In June of 2010, SACS-COC issued a SACS-COC Report of the Substantive Change Committee notifying LMU that its establishment of DSOL would in no way require a change in its accreditation status and that it was making no recommendations as to the structure and administration of DSOL.

27.    Like TBLE, the findings made by SACS-COC prove that DSOL is in substantial compliance with Defendant ABA's standards for provisional approval.  SACS-COC based its finding that DSOL could continue in operation without a change in the accreditation of LMU in the SACS-COC Report of the Substantive Change Committee upon its conclusion that DSOL was in compliance with the requisite Comprehensive Standards it imposes.  These standards, like those of the TBLE, mirror Defendant ABA's Standards.

## IN ADDITION TO TBLE AND SACS-COC, THE ABA'S OWN SITE EVALUATION TEAM FOUND DSOL IN COMPLIANCE WITH ALL ABA STANDARDS

28.    DSOL submitted an application for provisional approval pursuant to ABA Standard 102 and Rule 4 on January 10, 2011.  DSOL submitted letters providing updating

9

material on February 21, 2011 and March 9, 2011. The application included an Annual Questionnaire for 2010, a Self-Study for 2010-2011 and a Site Evaluation Questionnaire. In total, the application exceeded 400 pages.

29. On March 13-16, 2011, the ABA Site Team conducted a visit of DSOL. The Report of the ABA Site Team was issued to Dr. B. James Dawson, President of LMU, and Dean Beckman in a letter of July 14, 2011 from ABA Consultant Hulett H. Askew. The report extensively praised both LMU and DSOL.

30. The ABA Site Team found DSOL to be in compliance with all ABA Standards.

## EVEN THOUGH THE TBLE, SACS-COC AND THE ABA'S SITE EVALUATION TEAM ALL FOUND DSOL COMPLIANT, THE ABA ACCREDITATION COMMITTEE DID NOT

31. After the ABA Site Team evaluation and report, the next step in the ABA accreditation process is a review and recommendation of the ABA Accreditation Committee. While TBLE and SACS-COC and the Site Team all had firsthand knowledge of DSOL by virtue of each having visited the school, examined the physical facilities and questioned the students, facility and administrators, the Accreditation Committee did none of these things.

32. Defendant ABA's Accreditation Committee met on September 29-30, 2011, to discuss the proposed provisional ABA approval of DSOL in light of a record which included DSOL's application, the site evaluation report and supplemental letters. At no time did the Accreditation Committee ever visit the law school, examine the physical facility or interview students, faculty or administration.

33. Defendant ABA's Accreditation Committee reached the decision that DSOL had "not established that it [was] in substantial compliance with each of the ABA Standards for Approval of Law Schools and [had] not presented a reliable plan for bringing itself into full

compliance with the Standards within three years after receiving provisional approval."
(Recommendation of the Accreditation Committee Regarding The Application of Lincoln
Memorial University, Duncan School of Law, September 2011, p. 22, accompanying the Letter
of Hulett H. Askew, Consultant on Legal Education to the ABA, to Vice President and Dean
Sydney A, Beckman, Lincoln Memorial University, Duncan School of Law, dated October 12,
2011) ("Consultant Askew Letter of October 12, 2011"). Substantial compliance with Defendant
ABA's Standards is required in order to receive provisional approval pursuant to ABA Standard
102.

34.    Defendant ABA's Accreditation Committee inexplicably found that DSOL was
not in substantial compliance with four ABA Standards: 1) Standard 203 was not met because
DSOL did not demonstrate that it regularly identifies specific goals for improving its program,
identifies means of achieving established goals, assesses its success in realizing established
goals, and periodically re-examines and revises the established goals as appropriate; 2) Standards
303(a) and (c) and Interpretation 303-3 were not met because DSOL did not demonstrate that it
adheres to sound academic standards, including its obligation to not continue the enrollment of
students whose inability to do satisfactory work is evident as well as its obligation to provide
necessary academic support; 3) Standard 501(b) and Interpretation 501-3 were not met because
DSOL had not maintained sound academic policies with respect to admission credentials and
attrition rates; and 4) Standard 511 was not met because DSOL had not shown that it provided
active career counseling services to students. (Accreditation Committee Report, pp. 22-23).

35.    The Accreditation Committee's conclusions are arbitrary, capricious and
irrational because they are precisely the opposite of the facts as developed and found by the
ABA's own Site Evaluation Team:

11

a. With respect to the subject matter of Standard 203, the ABA Site Team found:

> **DSOL regularly identifies specific goals for improving itself,** identifies the means to achieve these goals, assesses the success in realizing these goals by assessing its activities daily, weekly, monthly, and annually, and uses this information to re-examine and revise its means and goals.

And when addressing strategic planning, the ABA Site Team found:

> [f]rom its inception DSOL has been driven by its goal to attain provisional ABA approval. The candid and rigorous Self-Study appears to be driven by that goal; its organization is formatted using the ABA standards themselves. Moreover, **a culture of assessment at every level**—institutional, programmatic, curricular, teaching, student --(indeed every aspect of the law school operation)—appears to place DSOL, in its very short lifetime, **at the forefront of outcomes-based and assessment-driven legal education, using methods of evaluation that in the near future will likely become an integral part of ABA accreditation standards.**

b. With respect to the subject matter of Standard 303, the ABA Site Team found:

> **DSOL adheres to clearly defined academic standards for good standing.**

The ABA Site Team further addressed the curriculum by finding,

> [t]o assist students in successfully completing its academic program, DSOL has created a formal Academic Success Program … The Academic Success Program has five (5) main components – Bridge Week, non-credit bearing coursework, the Bar Review Course, individual tutoring, and skills workshops. In addition, the faculty members are required to serve as advisors for the students,…thus making academic advising, including support and counseling, available for all students.

c. With respect to the subject matter of Standard 501(b) and Interpretation 501-3, the ABA Site Team found:

12

As a new law school seeking provisional accreditation, it is apparent that the qualitative aspects of the admissions profiles for [DSOL's] first two entering classes are somewhat low. This might be due, in part, to the fact that DSOL's Mission Statement contemplates that DSOL focus its recruitment efforts on the geographic area of eastern Tennessee and the surrounding southern Appalachian region, and particularly on applicants who have a desire to stay in the region and serve underserved populations and areas.

With respect to the academic attrition of students and the readmission of those subject to involuntary academic dismissal, the ABA Site Team found that **"[t]here appear to be adequate policies and procedures in place to determine whether such students possess the ability to successfully complete law school studies."**

d.  With respect to the subject matter of Standard 511, the ABA Site Team found:

**Despite being a young institution, DSOL appears to be providing to its students adequate services regarding . . . career services.**

. . .

**The large contingent of students that attended the scheduled team meeting with the students was uniformly positive in its assessment of the adequacy of such student services.**

The recommendation of the Committee flies in the face of these specific findings of fact by the ABA Site Team. The Committee's recommendation is also contradicted and undermined by the accreditation decisions of SACS-COC and TBLE. Given the fact that the Committee's recommendation is so disconnected from the facts as developed by the ABA Site Team and other accrediting authorities, it is not supported by the evidence and is arbitrary and capricious.

36.  In direct contradiction of these facts and its own Site Team, Defendant ABA's Accreditation Committee did not recommend to Defendant ABA's Council that it grant provisional ABA approval to DSOL. (Accreditation Committee Report, p. 22).

13

## ABA COUNCIL ON LEGAL EDUCATION ACCEPTED THE ACCREDITATION COMMITTEE'S RECOMMENDATION, THEREBY DENYING DSOL PROVISIONAL ACCREDITATION

37.     After the Accreditation Committee makes its recommendation, the next step in the ABA accreditation process is for the Council to consider the recommendation of the Accreditation Committee pursuant to ABA Rule 8. Defendant ABA's Council met to rule upon the application of DSOL for provisional approval in light of the findings and recommendation of Defendant ABA's Accreditation Committee at 10:45 a.m., December 2, 2011 in San Juan, Puerto Rico. DSOL was permitted to appear but given only 15 minutes to make its presentation. Several weeks prior to the Council Hearing, DSOL had requested more time to make a presentation. This request was rejected. Given the voluminous nature of the record before the Council, this decision to limit DSOL to a 15-minute presentation denied DSOL a meaningful opportunity to be heard. The Council Hearing was also procedurally defective because members of the Accreditation Committee were present during the entire hearing and during the Council's deliberation after the Hearing. In other words, the very entity whose decision was being appealed had input into whether or not its decision should be upheld. Prior to the hearing, DSOL submitted a written Hearing Brief for review by Defendant ABA's Council in which DSOL presented its argument in favor of the Council's rejection of the recommendation of the Accreditation Committee and grant of provisional approval to DSOL. The Brief is attached hereto as Exhibit A.

38.     Defendant ABA's Council adopted the recommendation of Defendant ABA's Accreditation Committee and denied the application of DSOL for provisional approval. The only part of the Committee's Report and Recommendation not adopted by the Council was with respect to Standard 511.

14

**THE ABA COUNCIL'S DECISION IS ARBITRARY AND CAPRICIOUS BECAUSE THERE IS NO RATIONAL CONNECTION BETWEEN THAT DECISION AND THE UNDISPUTED FACTUAL RECORD; INDEED, THE COUNCIL'S DECISION STANDS IN STARK CONTRAST TO AND IS CONTRADICTED BY THE FACTS**

39.     The recommendation of Defendant ABA's Accreditation Committee and the decision of its Council, both not in favor of granting ABA provisional approval to DSOL, are contrary to the prior findings of TBLE and SACS-COC as well as the explicit facts found by Defendant ABA's Site Team that reviewed DSOL. The findings of the Accreditation Committee and the Council are unfair, arbitrary and capricious.

40.     The ABA Site Team was the only body or personnel of Defendant ABA to visit and evaluate DSOL first-hand. The Accreditation Committee was obligated to base its recommendation and the Council was obligated to base its decision upon factual record developed by the Site Team. Instead, they ignored and contradicted the undisputed factual record as developed by their own Site Team. In doing so, the Committee and Council acted in an arbitrary and capricious manner.

**THE COUNCIL'S DECISION REGARDING STANDARD 203 IS ARBITRARY AND CAPRICIOUS.**

41.     In direct contradiction to the conclusion by both Defendant ABA's Council and its Accreditation Committee that DSOL was not in substantial compliance with Standard 203 with respect to self-study and evaluation, Defendant ABA's Site Team expressly found that: "DSOL regularly identifies specific goals for improving itself, identifies the means to achieve these goals, assesses success in realizing these goals by assessing its activities daily, weekly, monthly, and annually, and uses this information to revise its means and goals set forth in its strategic plan," (Site Evaluation Report, p. 6), and that DSOL is "at the forefront of outcomes-based and assessment-driven legal education, using methods of evaluation that in the near future

15

will likely become an integral part of ABA accreditation standards." (Site Evaluation Report at p. 65).

42.     TBLE imposes a standard that mirrors ABA Standard 203.  Having reviewed DSOL's report, including the feasibility study, TBLE concluded that DSOL's rigorous and candid self-study, assessment, and strategic planning processes comply with this standard.

43.     SACS-COC also reviewed DSOL's strategic planning and evaluation processes to ensure that the DSOL comports with SACS-COC Comprehensive Standard 2.5, which also mirrors ABA Standard 203.  SACS-COC determined that LMU has an "effective, comprehensive planning and evaluation process" and that "DSOL has been integrated into these processes and will follow LMU's Planning, Budgeting, and Assessment Schedule for planning, assessment and documentation for improvement." (SACS-COC Report of the Substantive Change Committee, Sec. 2.5).

44.     The undisputed facts on the record demonstrate DSOL's compliance with ABA Standard 203.

45.     DSOL's on-going assessment and strategic planning processes clearly satisfy each element of ABA Standard 203 requiring that DSOL:  (1) regularly identifies specific goals for improving its program, (2) identifies means to achieve its established goals, (3) assesses success in realizing the established goals, and (4) periodically re-examines and appropriately revises established goals.

46.     DSOL faculty and administration issued a five-year Strategic Plan (2011-2016) on May 12, 2010.  The Strategic Plan sets forth DSOL's mission, vision, and three strategic goals: (1) DSOL shall be a premier, practice-based institution, affirmatively integrating practice with legal theory; (2) DSOL shall provide access to legal education for underserved

16

demographics; and (3) DSOL shall become a premier teaching institution, focusing its resources on training better teachers and thus better students. (Strategic Plan, pp. 2, 8, 11). Under the terms of the Strategic Plan, each strategic goal is followed by enumerated means to achieve the stated goal, the time frame for implementation, and the means assessing review of the goal. (Id., *passim*).

47.     Defendant ABA's Site Team specifically found that as a constituent of LMU, DSOL is required to, and does, routinely identify means to achieve its established goals. (Site Evaluation Report, p. 6). The Site Evaluation Team noted in detail DSOL's annual assessment process for 2011. DSOL presented a very comprehensive process for goal achievement. In January of 2011, faculty members individually assessed "DSOL's strengths and weaknesses, identified areas for potential improvement and set goals and strategies to achieve them." (*Id.*). These faculty responses formed the agenda for the annual DSOL Strategic Planning Retreat in February. (*Id.*); (*See also*, Self –Study, p. 13).

48.     As noted previously, all LMU academic programs, including DSOL, participate in a comprehensive academic program review and self-study process every 3-5 years.  Thus, during the review and assessment cycle, DSOL must also adhere to the LMU University Guidelines and Schedule for Program Review Form, which requires DSOL to assess and report on various program elements related to program effectiveness, including relevance to LMU's Mission, learning outcomes, teaching, scholarship, service, organization, curricula, size, and resources. The LMU Guidelines and Schedule for Program Reviews (Revised 5/30/2006) requires that a department or program "[g]ive the goals for the program ... along with rationale and plan of actions for achieving each goal." (LMU Guidelines and Schedule for Program Reviews (Revised 5/30/2006), p. 6).

17

49.     All LMU academic units, including DSOL, must complete Outcomes Assessment forms that are used by the University at its annual July Strategic Planning Retreat to formulate programmatic and budgetary plans for presentation to LMU's Board of Trustees. This involves the completion of three forms: the Program Assessment Information Form (assessing relation of program mission to LMU's mission and goal attainment); The Program Assessment Summary Form (assessing results and recommending improvements); and the Use of Prior Year Assessment Form (identifying areas sought to be improved from prior years and evaluating improvements). This evaluation process assesses program goals and objectives, as well as intended outcomes, including student learning goals, how these outcomes are measured, and how the outcomes are related to both institutional and strategic goals.

50.     Overwhelming record evidence clearly demonstrates that DSOL regularly re-examines and revises its established goals. As discussed above, in its annual Strategic Planning Retreat, DSOL reviews established goals and revises the methods adopted to achieve them as set forth in the DSOL Strategic Plan (2011-2016). As Defendant ABA's Site Team found:

> DSOL's reliance on an extensive feasibility study and on-going assessment materials suggests that the faculty is willing to be flexible in adapting the means to accomplish its goals. Through its regular retreats and planning processes, **DSOL is continuously assessing and adjusting the processes and policies by which to deliver the program of legal education as articulated in earlier feasibility documents.** Flexibility is evident by the use of unanticipated changes . . . to re-evaluate, re-assess, and re-adjust its means to fulfill its mission. **DSOL's self study reveals that it is a mission- and assessment-driven institution.**

(Site Evaluation Report, p. 7, § B)(emphasis added).

18

**THE COUNCIL'S DECISION REGARDING ABA STANDARDS 303(a) AND (c) AND INTERPRETATION 303-3 IS ARBITRARY AND CAPRICIOUS.**

51.     Defendant ABA's Council's decision regarding the substantial compliance of DSOL with ABA Standard 303 is directly contradicted by the findings of Defendant ABA's Site Team. The ABA Site Team expressly found that **DSOL adheres to clearly defined academic standards** for good standing and offers a formal Academic Success Program with five main components, as well as a Faculty Advisor Program for all students in order to assist students in successful completion of the DSOL academic program. (Site Evaluation Report at pp. 21-22).

52.     TBLE also found that DSOL has adopted and adheres to sound standards of academic achievement which include clearly stated standards for good standing, advancement, and graduation, and also provide for termination of any student whose inability to do satisfactory work is sufficiently manifest such that the student's continuation in school would inculcate false hopes, constitute economic exploitation, or detrimentally affect the education of other students. Rule 7, Article II, Sec. 2.03(f)(3). These requirements are equivalent to Defendant ABA's Standard 303, and TBLE's determination that DSOL was entitled to approval is clearly based on its determination that DSOL is in compliance with this standard.

53.     SACS-COC also imposes standards that mirror ABA Standard 303. SACS-COC explicitly found that DSOL's published requirements for the J.D. degree as set forth in the *DSOL Student Handbook and Catalog*, "conform to commonly accepted standards and practices among law schools accredited by the American Bar Association and adhere to standards required by the Tennessee Board of Law Examiners (TBLE)." (SACS-COC Report of the Substantive Change Committee, Sec. 3.6.4). As evidence of DSOL's dedication to provide support to students admitted from an underserved population, SACS-COC found DSOL in compliance with SACS-COC Comprehensive Standard 3.4.9. requiring "appropriate academic support services in

19

that it has numerous programs in place to support students in their academic pursuits, notably, the Academic Success Program, including individualized tutoring, an Academic Advising Program, and the use of technology, including MediaSite, permitting capture of classes for on-line review of lectures and coursework." (SACS-COC Report of the Substantive Change Committee, Sec. 3.4.9).

54.     The undisputed facts on the record demonstrate DSOL's compliance with ABA Standard 303:

- DSOL has a Director of Lawyering Skills and Academic Success Programs who coordinates the Lawyering Skills (LS) and Academic Success Programs (ASP). These programs stress aiding all students and especially high risk students in academic difficulty, and those for whom English is a second language in their orientation to law school and legal methods. The Director arranges individual tutoring and counseling as well as group study sessions. The Director also directs the Academic Probation Program, developing student profiles through one-on-one meetings, self-evaluations, and professors' feedback. It is currently being proposed that the Director maintain an individual portfolio for each student that would include graded writing assignments from matriculation until graduation. (Strategic Plan (2011-2016), p. 6); (March 9, 2011 Update Letter). The Accreditation Committee criticizes the current Director of Lawyering Skills and Academic Success, David Walker, for having past experience teaching legal writing but no prior academic experience in academic support. (Finding of Fact (42)). The Accreditation Committee's Recommendation ignores the fact that the position description for the Director of Lawyering Skills and Academic Success calls for collaboration with the Associate Dean for Academics, April Meldrum, and Associate Dean Gordon Russell.   In addition, faculty members teaching Lawyering Skills and Academic Success in the 2011-12 academic year include Dean Hash, Asst. Dean for Students; Asst. Prof. David Walker, Director of Lawyering Skills and ASP; Assoc. Prof. Barbara Szweda; Professor and Dean Gordon Russell; and Visiting Asst. Professor Charles McLean. DSOL also offers faculty training sessions for the faculty members who will be teaching ASP courses, including adjunct faculty.

- "Bridge Week" is conducted the week preceding first year classes each Fall to introduce students to critical lawyering skills and  the art of legal methods such as reading legal opinions and statues; synthesizing rules; analyzing problems; and writing essay answers in preparation for law school and bar exams. (Bridge Week Syllabus of Professor Heather Zuber Fall 2010, p. 1

20

(100% attendance required)). At the Strategic Planning Retreat on Feb. 12 and 13, 2011, the faculty voted to expand Bridge Week by a day.

- The Academic Success Programs (ASP) are offered to all students at no charge. (Site Evaluation Questionnaire 2010, p. 35). ASP I is a mandatory course first year. (DSOL Student Handbook and Catalog 2011-2012, p. 25). Students with a GPA of less than 2.33 are required to enroll in ASPII. (Agenda for Strategic Planning Retreat, Feb. 12 and 13, 2011). ASP II, III and IV are required courses for all students on academic probation and elective courses for other students. The ASP courses are designed to enhance skills necessary to succeed in law school with increased emphasis on applying law through essay exam writing, providing insight into multiple-choice exam questions and improving study techniques. (Self-Study 2010-2011, p. 101). ASP Workshops were conducted in 2010-2011 on the following topics: midterm exam preparation, final exam preparation, bar review and exam tips, mock midterm exam, final exam strategies, and a mock final exam.

- The Lawyering Skills ("LS") courses I, II, III and IV are required for all students. These courses are taught in small-group format with a maximum of 30 students in LS I, and 20 in LS II, III, and IV. (Site Evaluation Questionnaire 2010, p. 39). LS I seeks to introduce students to the law library and basic legal research. By the end of the semester, students are expected to understand the authoritative value of documents created by the three branches of government and other private institutions, and competently conduct legal research and cite to legal authority in conformity with the rules of *The Bluebook*. (Lawyering Skills 1 Syllabus of Professor David C. Walker, Fall 2010, p. 1). LS II begins the first of three rigorous writing assignments required of students for graduation which must be a graded draft in excess of 20 pages. LS III requires two graded drafts of a text of 5,000 words exclusive of headings, footnotes, endnotes, etc.

- A Bar Examination Skills preparation course will begin in spring 2013. (Site Evaluation Questionnaire 2010, p. 35). It is mandatory for students who fail to achieve a 3.0 cumulative GPA. (October 6, 2011 DSOL Letter in Response to Site Evaluation Report of July 14, 2011). DSOL has an institutional goal that 75% of its students pass the bar exam and MPRE in the first administration. (2009-10 Outcomes Assessment Summary (O.A. Form 2), pp. 2, 22).

- An Adjunct Professor/Tutor assists DSOL faculty and administration in indentifying students eligible for the tutoring program, conducts tutoring appointments and counsels and advises participants about academic skills. This grammatical tutoring is free to all students. (Site Evaluation Questionnaire 2010, p. 35). It is anticipated that this person would have either a Master's or Doctorate in a field related to English and Writing. (Adjunct Professor/Tutor Job Description).

55.     In addition to the curriculum offerings DSOL has designed to support students facing academic challenges, DSOL has also formulated academic support that demonstrates its commitment to both extensive academic assistance and being at the forefront of scholarly technology:

- DSOL has promulgated a Faculty Advisor Handbook to assist faculty who are asked to undertake an advisory role with students. (Submissions 1-6, Ex. 128). The Handbook outlines the philosophy of academic advising and the goals of the program which include assisting students to establish and evaluate career goals, and assist them in developing an educational plan consistent with achieving their stated goals. (Id.).

- DSOL utilizes a computer program named TurningPoint which permits faculty to ask questions during a lecture and evaluate student answers so that student performance may be monitored on an ongoing basis. (Strategic Plan (2011-2016), p. 14). DSOL provides each student with a laptop computer.

- All students may access the Center for Computer-Assisted Learning Instruction (CALI) which has both substantive law and skills tutorials available online and disk. (Site Evaluation Questionnaire 2010, p. 99).

- DSOL Faculty members are assigned to many DSOL committees and those for year 2010-2011 included: Academic Standards, Admissions, Externship/Clinic, and Diversity.

- DSOL initiated academic counseling for students who received grades equivalent to 2.0 or less on their mid-term exams. All such students were contacted by either the Dean for Academics or the Dean for Assessment and were asked to attend a presentation on test-taking conducted by the Director of Lawyering and Academic Success. Only 12 students attended. Subsequently, the Law School passed an initiative requiring the Academic Dean to meet with students after mid-terms who are identified as "at-risk." (Minutes from the February 12 and 13 DSOL Strategic Planning Retreat).

56.     Defendant ABA Council's conclusions with respect to Standard 303 are based on the Accreditation Committee's unstated assumption that LSAT scores correlate directly to a student's academic success and ability to complete a law school course of study, and serve as a benchmark for determining whether a law school has established appropriate standards for good standing and graduation. There is no evidence in the record, much less substantial evidence, to

22

support such a leap in logic. The empirical record evidence refutes the Council's "logic" and inference.

### THE COUNCIL'S DECISION REGARDING STANDARD 501(b) AND INTERPRETATION 501-3 IS ARBITRARY AND CAPRICIOUS

57.     The decision by ABA's Council that the DSOL is not in substantial compliance with ABA Standard 501 is in direct contradiction with the conclusion of Defendant ABA's Site Team, which expressly found that:

> the qualitative aspects of the admissions profiles for [DSOL's] first two entering classes are somewhat low. This might be due, in part, to the fact that DSOL's Mission Statement contemplates that DSOL focus its recruitment efforts on the geographic area of eastern Tennessee and the surrounding southern Appalachian region, and particularly on applicants who have a desire to stay in the region and serve underserved populations and areas."
>
> ...
>
> There appear to be adequate policies and procedures in place to determine whether [academically dismissed] ... students possess the ability to successfully complete law school studies.

(Site Evaluation Report, pp. 41-42).

58.     TBLE similarly requires standards for admission, as well as the retention, advancement, and graduation of students in Sec. 2.03 (g) and Sec. 2.03 (b)(1) respectively. TBLE found DSOL to be in compliance.

59.     SACS-COC evaluated the adequacy of DSOL's admission policies with regard to its Comprehensive Standard 3.4.3, which mirrors the requirements of ABA Standard 501(b)

23

and Interpretation 501-3 in its requirement that DSOL publish "admissions policies consistent with its mission." SACS-COC specifically found that:

> Consistent with its mission, the DSOL seeks to attract applicants from eastern Tennessee and the surrounding southern Appalachian region who have a desire to practice law in underserved populations in the region. In evaluating applicants for admission, the DSOL considers a number of factors, including community service, high ethical standards, and career aspirations, in addition to considering the **more traditional LSAT scores and undergraduates program of study**, in keeping with the school's mission.

(SACS-COC Report of the Substantive Change Committee, Sec. 3.4.3)(emphasis added).

60.     The Council based its decision about Standard 501-1 on the belief that DSOL experienced a "decline" in LSAT scores from the DSOL inaugural class of 2009. This belief is mistaken, arbitrary and capricious. The so-called "decline" is barely perceptible and utterly de minimus. At the 75th percentile the "decline" is all of 1 point from 2008 to 2010 and absolutely no decline from 2010 to 2011: 2009/152, 2010/151, 2011/151. At the 50th percentile, the decline is all of 2 points from 2009 to 2010 and absolutely no decline from 2010 to 2011: 2009/149, 2010/147, 2011/147. Similarly, at the 25th percentile, the "decline" is 2 points from 2009 to 2010 and absolutely no decline from 2010 to 2011: 2009/146, 2010/144, 2011/144. (Accreditation Letter, p. 13). No rational mind can believe that such a minor decline establishes that DSOL admits applicants who are not capable of completing law school and passing the bar.

61.     To the contrary, Defendant ABA's Council has previously determined that LSAT scores at the same level and substantially lower than DSOL's scores do, in fact, fully comply with Standard 501(b). It is blatantly arbitrary and capricious for Defendant ABA to find that DSOL's LSAT scores evidence a lack of compliance with Standard 501(b) while at the same

time finding that the same scores, and indeed **lower scores**, comply with Standard 501(b). The following school by school comparison demonstrates just how arbitrary and capricious it is for the Council to adopt the Accreditation Committee's recommendation that DSOL is not in substantial compliance based on LSAT scores while finding other schools with the same scores fully compliant.

#### Table 1: Entrance Credential Comparison[1]

| LAW SCHOOL | LSAT | | | GPA | | |
|---|---|---|---|---|---|---|
| | 25th | Med | 75th | 25th | Med | 75th |
| **Duncan School of Law** | **144** | **147** | **151** | **3.31** | **3.38** | **3.50** |
| Inter American University | 135 | 139 | 142 | 3.09 | 3.32 | 3.57 |
| Pontifical Catholic Univ. | 132 | 135 | 138 | 2.97 | 3.30 | 3.58 |
| Univ. of Puerto Rico | 142 | 146 | 150 | 3.34 | 3.59 | 3.80 |
| Appalachian School of Law | 146 | 147 | 151 | 2.69 | 3.01 | 3.36 |
| Florida A&M Univ. | 144 | 147 | 150 | 2.71 | 3.03 | 3.30 |
| North Carolina Central Univ. | 143 | 146 | 150 | 2.91 | 3.26 | 3.55 |
| Southern Univ. Law Center (LA) | 143 | 145 | 148 | 2.56 | 2.69 | 3.08 |
| Thomas M. Cooley (MI) | 144 | 146 | 151 | 2.61 | 2.99 | 3.35 |

62.     The Accreditation Committee and Council also noted as probative a "decline" in entering undergraduate grade point averages ("UGPA"), which is similarly as insignificant as the "decline" in LSAT scores. The UGPA in the 75th percentile evidences a decline of merely 0.19 points from 2009 to 2011 – 2009/3.5, 2010/3.38, 2011/3.31 – not even two tenths of a point. The 50th percentile UGPA declined merely .06 from 3.05 to 2.99 – six hundredths of a point: 2009/3.05, 2010/2.97, 2011/2.99. For the 25th percentile, the decline was from 2.8 to 2.66 – a mere .14 – fourteen hundredths of a point: 2009/2.8, 2010/2.7, 2011/2.66. (Accreditation Letter, p. 13).

---

[1] Law School Admission Council, 2012 ABA-LSAC Official Guide to ABA-Approved Law Schools 89, 289, 381, 521, 601, 605, 701, 749 (2011) (reporting LSAT and GPA percentiles for the Fall 2010 entering class).

63.     As is presented above with respect to a readily available comparison of LSAT scores, the UGPAs of DSOL students also positively compare with the UGPAs of many schools approved by Defendant ABA. Nothing could be more arbitrary and capricious than denying the DSOL accreditation based on low UGPA scores, yet granting full accreditation to several other schools where entering students have **lower** UGPAs.

64.     The undisputed factual record—as developed by TBLE, SACS-COC and the ABA Site Team—unequivocally establishes DSOL's substantial compliance with Standard 501(b) and Interpretation 501-3. Defendant ABA's Council and its Accreditation Committee acted in an arbitrary and capricious manner in finding DSOL to be not in substantial compliance with Standard 501.

## EXHAUSTION OF FURTHER ADMINISTRATIVE REMEDIES NOT REQUIRED. ASSUMING *ARGUENDO* THAT EXHAUSTION WAS MANDATORY, IT WOULD BE FUTILE.

65.     Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

66.     Plaintiff is a school of law approved by TBLE and SACS-COC.

67.     Plaintiff is in substantial compliance with the ABA Standards and Rules and specifically: Standard 203, Standards 303(a), (c) and Interpretation 303-3 and Standard 501(b) and Interpretation 501-3.

68.     Defendant ABA's finding that Plaintiff is not in substantial compliance with the ABA Standards and Rules and its denial of provisional approval as a school of law to Plaintiff is expressly contradicted by the evidentiary record presented by DSOL.

69.     Rule 10(a) of the ABA Rules of Procedure for the Approval of Law Schools provides: "A law school **may** appeal the adverse decisions of the Council." (emphasis added). This appeal is heard by an ABA Appeals Panel. Rule 10(g) provides that the members of the

26

Appeals Panel be appointed by the Chair of the Council. All Panel members must be "former members of the Council or Accreditation Committee" or experienced site team evaluators. The Chair of the Council has sole discretion to select the Panel members.

70.      This rule makes two points about exhaustion: 1) it is optional, not mandatory, and 2) assuming *arguendo* that it were mandatory, exhaustion would be futile.

71.      Under the APA, 5 U.S.C. § 704, the availability of the doctrine requiring exhaustion of administrative remedies is limited to that which the statute or rule clearly mandates. *Califano v. Sanders*, 430 U.S. 99, 107 (1977). Where the APA applies, a district court cannot require a party to exercise an optional administrative appeal process as a prerequisite to judicial review. *Id.* The HEA grants accrediting authority to the ABA and provides for exclusive jurisdiction in federal court of actions challenging an accreditation decision. *See* 20 U.S. C. § 1099b(f). However, nowhere in the statute or its enabling regulations does the HEA require exhaustion with respect to a law school's appeal of an adverse accreditation decision. *See* 34 C.F.R. § 602.25 (due process provisions of regulations for accrediting bodies). As noted above, the ABA Rules of Procedure for the Approval of Law Schools make clear that an appeal of an adverse decision by the Council to the Consultant and the Appeals Panel is an optional process.

72.      The complete and utter disregard by Council of the evidentiary record in this case is a certain indication that any Appeals Panel hand selected by the Chair of the Council would blindly follow the Chair and Council's lead and also act in an arbitrary and capricious manner. An appeal to such a panel would be futile.

73.      In light of the certain negative reception an appeal by Plaintiff would receive and the time required to prepare yet another presentation to Defendant ABA, Plaintiff and its

27

students would be irreparably harmed. Plaintiff would be further injured by any time it would devote to an appeal to Defendant ABA prior to bringing this action in the number of accepted applicants it hopes will become matriculating students in the 2012-2013 academic year who would decide to matriculate elsewhere. An expeditious resolution of the matter is necessary to avoid damage to plaintiff's reputation and this requires speedy resolution of this case.

## DEFENDANT ABA'S ACCREDITATION POLICIES AND PRACTICES HAVE PREVIOUSLY BEEN CONSIDERED ANTICOMPETITIVE AND INAPPROPRIATE

74. Plaintiff realleges the foregoing paragraphs as if fully re-written herein. These facts amply demonstrate the arbitrary manner in which the ABA denied to DSOL the accreditation and recognition that would allow DSOL to compete in the legal educational marketplace and with other professional law schools.

75. This is not the first time that Defendant ABA's accreditation policies and practices have appeared to operate in an anticompetitive manner to keep new law schools from obtaining accreditation, or to frustrate the efforts of already-approved law schools from seeking re-accreditation.

76. Most significantly, on June 27, 1995, the United States Department of Justice filed a complaint against Defendant ABA that accused the ABA and various unnamed co-conspirators of violating Section 1 of the Sherman Act as early as 1973 by entering into an agreement, or engaging in concerted action, "the substantial terms of which [were] to restrain trade and hinder competition among professional law school personnel in delivering legal educational services." (1995 ABA Compl. ¶ 36, Civil Action No. 95-1211 (D. D.C.)).

77. The United States alleged that Defendant ABA and its co-conspirators, among other actions: (a) fixed the compensation and benefits of law school faculty and staff; (b) collected and disseminated salary information; (c) used such data in connection with the review

28

and accreditation process; (d) prevented ABA-approved law schools from operating as for-profit institutions; and (e) disallowed ABA-accredited law schools from enrolling in an LL.M. program graduates of law schools that were only accredited by state authorities, or accepting transfer credits therefrom. (1995 ABA Compl. ¶ 37.)

78. According to the United States, the effect of these actions was to fix, stabilize and raise the salaries of law school faculty and staff; and to subject law schools that had obtained only state-level accreditation – and their students – from a group boycott by ABA-accredited law schools. (1995 ABA Compl. ¶ 38.)

79. On the same day the United States filed its complaint, Defendant ABA consented (without admitting to liability) to the entry of a proposed judgment (the "Final Judgment") to resolve the claims against it. That Final Judgment was entered by the United States District Court for the District of Columbia on June 25, 1996.

80. The Final Judgment prohibited and enjoined Defendant ABA from, among other actions: (a) adopting or enforcing any standard, interpretation, or rule that would set requirements as to the compensation of law school faculty or staff as a condition of accreditation; (b) using salary data in the accreditation process; (c) collecting or disseminating salary data; and (d) adopting or enforcing any standard, interpretation, or rule that would have the purpose or effect of prohibiting a law school from (i) enrolling a student in a post-J.D. program who graduated from a law school only accredited by a state authority, (ii) offering transfer credits for any courses completed at a state-approved law school, or (iii) being organized as a for-profit entity. (1995 Final Judgment at IV.)

81. The Final Judgment also required Defendant ABA to revise the membership of the Accreditation Committee, the Council, the Standards Review Committee, and ABA Site

29

Teams to limit the participation of law school deans and faculty members; to make the activities of the Council more open to the ABA's Board of Governors; to publicize in a more effective manner proposed new rules and interpretations that would be used to evaluate law schools for accreditation; and to maintain an antitrust compliance program, including the hiring of an Antitrust Compliance Officer. (1995 Final Judgment at VI, VIII.)

82. By its terms, the Final Judgment expired ten years from its date of entry, or approximately on June 25, 2006. (1995 Final Judgment at XI.)

83. But the obvious desire to continue to dominate the law school accreditation process and thereby limit competition led Defendant ABA to run afoul of the requirements of the Final Judgment.

84. On the eve of the expiration of the Final Judgment, on June 23, 2006, Defendant ABA consented to a Stipulation for Entry of an Order in which Defendant ABA admitted that, in violation of the requirements of the Final Judgment, it had allowed law school deans and faculty greater participation in the accreditation process than the Final Judgment had allowed, further had failed to give the Department of Justice notice of proposed and adopted changes to the rules and standards governing law school accreditation, and had failed to effectuate certain elements of the mandated antitrust compliance program. (2006 Stipulation.)

85. As a result, Defendant ABA agreed to pay the United States $185,000 in attorneys' fees and costs related to the government's investigation of these violations.

86. Defendant ABA's violations of the Final Judgment support the allegations contained herein that Defendant ABA is acting in an anticompetitive manner in connection with DSOL's application for accreditation. Even when it was under the aegis of the Final Judgment that mandated specific behavior to ensure that Defendant ABA's accreditation policies and

30

practices were disclosed, disseminated, and monitored, Defendant ABA refused to comply. And even when it had specifically agreed to limit the participation of legal academics in the accreditation review process – legal academics who could have an incentive to deny accreditation to new entrants into the legal education market – Defendant ABA refused to comply and instead improperly allowed oversized influence by the legal academy into the accreditation process. Now, at this time, when the ABA is not operating under such explicit strictures, those same tendencies and influences are again exercising an inappropriate influence on the accreditation process, and DSOL's application for accreditation specifically.

## COUNT I
### Due Process—Federal Common Law

87.     Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

88.     Plaintiff is a school of law approved by TBLE and SACS-COC.

89.     Plaintiff is in substantial compliance with the ABA Standards and Rules and specifically: Standard 203, Standards 303(a), (c) and Interpretation 303-3 and Standard 501(b) and Interpretation 501-3.

90.     Defendant ABA's decision that Plaintiff is not in substantial compliance with the ABA Standards and Rules is arbitrary and capricious and a denial of due process. The denial of provisional approval is not rationally related to the facts in the record as required by federal common law as embodied in the APA, 5 U.S.C. § 701 *et seq.*

91.     DSOL was denied both procedural and substantive due process. Procedural due process was denied because DSOL was not given a meaningful opportunity to be heard before the Council.

31

## COUNT II
## Due Process – Tennessee Common Law

92.     Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

93.     Plaintiff is a school of law approved by TBLE and SACS-COC.

94.     Plaintiff is in substantial compliance with the ABA Standards and Rules and specifically: Standard 203, Standards 303(a), (c) and Interpretation 303-3 and Standard 501(b) and Interpretation 501-3.

95.     Defendant ABA's decision is arbitrary and capricious and not rationally related to the facts on the record as required by Tennessee common law and is consequently a violation of due process.


## COUNT III
## Antitrust – 15 U.S.C. § 1

96.     Plaintiff realleges the foregoing paragraphs as if rewritten fully herein.

97.     Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits contracts, combination, or conspiracies in restraint of trade. A violation of Section 1 is punishable as a felony, and is subject to a private right of action for treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

98.     ABA-accredited law schools, through their faculty and staff, serve on and/or participate in the Accreditation Committee and the Council, and influence or control the decisions thereof. Certain of these law schools compete with DSOL for law student applicants, faculty, donations, internships and other employment opportunities for students, retentions in connection with special studies and expert engagements, goodwill, and other economic opportunities ("Competitor Law Schools").

32

99. Certain of these Competitor Law Schools compete with DSOL in a regional market, for students interested in attending law school in the southern Appalachian region and for other economic opportunities and goodwill available to law schools in the region.

100. Certain other of these Competitor Law schools compete with DSOL in a national market consisting of schools with an applicant pool of approximately similar caliber and similar institutional reputation.

101. In either case, the Competitor Law Schools have an incentive to deny accreditation to DSOL – either to keep a new accredited competitor out of the southern Appalachian region, to keep a new accredited competitor out of the broader band of law schools in which DSOL competes, or to set a precedent that new law schools that meet the ABA Standards and Rules will nevertheless be denied accreditation.

102. As detailed above, DSOL is in substantial compliance with the ABA Standards and Rules, specifically Standard 203, Standards 303(a), (c) and Interpretation 303-3 and Standard 501(b) and Interpretation 501-3. Accordingly, and in light of the approval Defendant ABA has granted to similarly-situated law schools, DSOL should be entitled to provisional accreditation, but has been intentionally denied.

103. In concert with the Competitor Law Schools, Defendant ABA has thus engaged in a group boycott of DSOL to deny it the ABA accreditation to which it is entitled.

104. The group boycott orchestrated by Defendant ABA substantially restrains and injures competition in the market, and will continue to do so absent the injunctive relief Plaintiff seeks.

105. The group boycott carries with it pernicious consequences for the marketplace for legal education, DSOL's students, and DSOL itself.

33

106.     The group boycott increases the price of legal education overall, as it does not allow an increase in the number of accredited law schools regardless of demand or eligibility.

107.     It increases the cost of legal services by illegitimately restricting the number of law school graduates entering the profession.

108.     The group boycott decreases the consistent quality of legal education by destroying any semblance of consistent minimum quality standards to secure accreditation.

109.     Defendant ABA's denial of provisional accreditation to DSOL harms DSOL's students by preventing them from sitting for the bar examination in many jurisdictions, or at a minimum by complicating the process and requiring the expenditure of time and money to secure that right.

110.     Because ABA accreditation has also become a proxy for a quality legal education, refusing to provisionally accredit DSOL affects the economic value of a DSOL graduate's degree.

111.     The group boycott also harms DSOL itself, as it complicates the hiring of faculty and staff, renders it more difficult for DSOL to secure donations and economic opportunities for the school and its faculty, puts DSOL at a disadvantage in competing for law school applicants because of the perceived value of a DSOL education or degree, and makes DSOL ineligible for many federal programs.  In the long term, failure to secure ABA accreditation harms DSOL.

112.     Defendant ABA's conduct constitutes an unreasonable restraint of trade under either the "quick look" or rule of reason tests.

113.     Alternatively, DSOL participates in a regional and national market for legal education – regionally, defined by competitor schools in the southern Appalachian region, and

34

nationally, consisting of schools of approximately similar reputation and caliber of student body and applicant pool.

114. In each of these markets, Defendant ABA maintains substantial market power as the "gatekeeper" for determining what schools will receive ABA accreditation, a status important for the myriad reasons detailed above. Together with the competitor law schools, the ABA completely dominates and controls these markets.

115. Defendant ABA has advanced no substantial, consistent justification for denying DSOL accreditation, particularly in light of its own Site Team Report, and the ABA has approved of other law schools with similar student body profiles and other material characteristics.

116. And to the contrary, the ABA's refusal to extend provisional accreditation to DSOL is anticompetitive, as it does not assure in any way that the public will receive better-quality, or lower-cost, legal services as a result of the refusal to accredit DSOL. To the contrary, as discussed above, the public interest will be harmed by the refusal to approve DSOL.

117. Even if the refusal to accredit DSOL is not the product of an intentional group boycott, the ABA's application of its Standards and Rules in these circumstances is unreasonable and in violation of Section 1 as an unreasonable restraint of trade.

118. By ABA's refusal of provisional accreditation, DSOL is further harmed by not being allowed to appear and be listed as an approved school on the LSAC. Such an omission limits the prospective students who would apply to DSOL when they seek to have their test scores sent to approved schools where they may apply.

35

119.     In addition to damages, permanent injunctive relief is required to prevent the harm highlighted here, because monetary damages alone will be inadequate to compensate DSOL for the irreparable harm it will continue to suffer absent such relief.

120.     Monetary damages are, however, sought against the ABA in excess of $1,000,000.00 for the injury to DSOL.

## COUNT IV
### Antitrust – 15 U.S.C. § 2

121.     Plaintiff realleges the foregoing paragraphs as if rewritten fully herein.

122.     Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits monopolization, attempts to monopolize, or conspiracies to monopolize interstate commerce. A violation of Section 2 is punishable as a felony, and is subject to a private right of action for treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

123.     As discussed more fully above, Defendant ABA enjoys monopoly power in accrediting law schools, and monopoly power in the attendant phenomena that accompany the granting of that designation, such as (as but one example) making law schools and law students eligible for certain federal programs.

124.     As detailed above, DSOL is in substantial compliance with the ABA Standards and Rules, specifically Standard 203, Standards 303(a), (c) and Interpretation 303-3 and Standard 501(b) and Interpretation 501-3. Accordingly, and in light of the approval Defendant ABA has granted to similarly-situated law schools, DSOL should be entitled to provisional accreditation, but has been intentionally denied.

125.     This denial constitutes an abuse of Defendant ABA's market power, for which DSOL, its students and its faculty have been, and will continue to be, injured. Prospective

36

students taking the LSAT cannot find DSOL on the approved list of schools. DSOL is precluded from having these students see its name as an approved school costing DSOL prospective students.

## COUNT V

126.    The arbitrary and capricious action by the ABA in failing to grant provisional accreditation will prohibit certain individuals who would attend DSOL from attending. ABA's action limits DSOL's student base to Tennessee (specifically East Tennessee). In reality, the student population for DSOL would be derived from: 1) the Appalachian area, made up of Tennessee, Kentucky, Virginia, West Virginia, Georgia, and North Carolina, and 2) around the nation for students of a caliber similar to many peer law schools. The ABA's action not only deprives students the opportunity to attend DSOL but also causes DSOL to lose those students unless they limit their practice to Tennessee. DSOL would suffer damages by the loss of student population and the increase of costs to provide a quality legal education to a regionalized area. DSOL has been damaged in excess of $100,000.00 by the acts of the ABA and expects future damages to be in excess of $1,000,000.00. Further, under Counts III and IV, said amount of damages should be tripled.

**WHEREFORE,** Plaintiff Lincoln Memorial University Duncan School of Law demands judgment against the Defendant, as follows:

(a) Plaintiff be granted a permanent injunction ordering the ABA to grant DSOL provisional accreditation as a school of law pursuant to the ABA Standards and Rules of Procedure for Approval of Law Schools;

37

(b) Plaintiff be awarded compensatory monetary damages in excess of $1,000,000 as established at trial and that said monetary damages be tripled as provided for under the law;

(c) Plaintiff be awarded reasonable attorneys fees;

(d) Plaintiff be awarded all other legal and equitable relief to which it may be entitled; and

(e) In addition to damages, permanent injunctive relief is required to prevent the harm highlighted here, because monetary damages alone will be inadequate to compensate DSOL for the irreparable harm it will continue to suffer absent such relief.

(f) Plaintiff demands a jury trial on all counts triable to a jury.

## VERIFICATION

I, Sydney A. Beckman, Vice President and Dean of Duncan School of Law, have

reviewed the foregoing Verified Complaint and Demand for Jury Trial and declare under penalty

of perjury that the facts stated therein are true and correct.

Executed on December 21, 2011, in Knoxville, Tennessee.


Sydney A. Beckman
Vice President, Dean
Duncan School of Law

STATE OF TENNESSEE )
                                           )
COUNTY OF KNOX        )

Personally appeared before me, Mary A. Miller , a notary public in and for
state and county, the within named Sydney A. Beckman, Vice President, Dean, Duncan School
of Law, with whom I am personally acquainted, and who acknowledged that he/she/they
executed the within instrument for the purposes therein contained.

SWORN to and subscribed before me this 21st day of December , 2011.


Mary A. Miller
Notary Public

My Commission Expires: 6-2-2014

39

Respectfully submitted,

**WATSON ROACH BATSON ROWELL
& LAUDERBACK**

Robert H. Watson, Jr. (001702)
Attorneys at Law
1500 Riverview Tower
900 South Gay Street
P.O. Box 131
Knoxville, TN 37901-0131
Telephone: (865) 637-1700
Facsimile: (865) 525-2514
rwatson@watsonroach.com


**BLANK ROME LLP**

Michael L. Cioffi (0031098)
1700 PNC Center
201 East Fifth Street
Cincinnati, OH 45202
Telephone: (513) 362-8700
Facsimile: (513) 362-8702
cioffi@blankrome.com

40

## CERTIFICATE OF SERVICE

I hereby certify that on Thursday, December 22, 2011, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by certified U.S. mail, return receipt requested. Parties may access this filing through the Court's electronic filing system:

> The American Bar Association
> c/o Registered Agent R. Thomas Howell, Jr.
> 321 Clark Street
> Chicago, Illinois 60654

Dated December 22, 2011.

ROBERT H. WATSON, JR., BPR NO. 1702
Attorney for Plaintiff
WATSON, ROACH, BATSON,
ROWELL & LAUDERBACK, P.L.C.
Attorneys at Law
1500 Riverview Tower
900 South Gay Street
P.O. Box 131
Knoxville, Tennessee 37901-0131
(865) 637-1700

41