**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | |
|---|---|
| LINCOLN MEMORIAL UNIVERSITY, ) | |
| DUNCAN SCHOOL OF LAW, ) | |
| ) | Case No. 3:11-CV-608 |
| Plaintiff, ) | |
| ) | Honorable Thomas A. Varlan |
| v. ) | |
| ) | Magistrate C. Clifford Shirley |
| THE AMERICAN BAR ASSOCIATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## <u>DECLARATION OF HULETT H. ASKEW</u>

Patricia J. Larson*
Stephanie Giggetts*
American Bar Association
321 N. Clark Street
Chicago, IL 60654
(312) 988-5000

Howard H. Vogel
TN BPR # 001015
O'Neil, Parker & Williamson, PLLC
7610 Gleason Drive, Suite 200
Knoxville, TN 37919
(865) 546-7190

Anne E. Rea*
Michael P. Doss*
Linda R. Friedlieb*
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Attorneys for Defendant
American Bar Association

*Pro hac vice applications pending

# TABLE OF CONTENTS

I. Introduction .................................................................................................1

II. Accreditation ..............................................................................................1

III. The Section, Council, and Accreditation Committee ...........................................3

IV. Standards, Interpretations, and Rules.............................................................3

V. Provisional Approval of Law Schools ...............................................................4

VI. Appeal of a Council Decision ........................................................................8

VII. The Founding of Duncan and Events Leading to
Its Application for Provisional Approval ...........................................................9

VIII. The March 2011 Site Visit and Site Report ....................................................12

IX. Duncan's Response to the Site Report and Updated Data ...................................15

X. The September 2011 Accreditation Committee Meeting ...................................17

XI. The October 12, 2011 Report and Recommendation of the
Accreditation Committee ..............................................................................18

XII. Duncan's Response to the Accreditation Committee's Recommendation ...............28

XIII. The December 2, 2011 Council Meeting .........................................................33

XV. Subsequent Events ....................................................................................40

XIV. Exhibits ...................................................................................................41

I, Hulett H. Askew, hereby state and declare as follows:

## I.    Introduction

1.     My name is Hulett H. Askew.  I am the Consultant on Legal Education ("Consultant") to the American Bar Association ("ABA").  In that capacity, I am the director of the ABA's Section of Legal Education and Admissions to the Bar Accreditation Project ("Section").  I assumed this position on September 1, 2006.  Prior to being named Consultant, I served as Director of Bar Admissions for the Supreme Court of Georgia from 1990 through June 2006.

2.     From 1990-96, I concurrently served as Executive Director of the Georgia Chief Justice's Commission on Professionalism.  From 1983-90, I served as the Director of the Civil Division of the National Legal Aid & Defender Association in Washington, DC.  Prior to that, I worked for the Legal Services Corporation in Washington, D.C. and Atlanta, Georgia, from 1976 to 1983.  From 1972-75, I served as Deputy Regional Director and then Regional Director of Legal Services for the Office of Economic Opportunity in Atlanta, Georgia.

3.     The facts set forth in this Declaration are based on my personal knowledge, my review of records of the regularly conducted activities of the Section, and my review of publicly available information.  If called to testify as a witness, I can testify competently to the matters and facts set forth in this Declaration.  This Declaration is submitted in support of Defendant American Bar Association's Brief in Opposition to Plaintiff's Motion for Temporary Restraining Order in the above-captioned case.

## II.    Accreditation

4.     A law school's decision to seek accreditation (known as "approval") from the Section is entirely voluntary.  Although the Section provides the results of its accreditation

process to bar admission authorities, the Section's recommendations on accreditation are not

binding on these authorities. While many state authorities consider graduation from a law school

approved by the Section to be a way of satisfying the legal education requirement for taking the

bar examination, the decision whether to consider Section approval and the weight to be

accorded such approval always rests with the state authorities, not the Section. The Section's

accreditation decisions make determinations about the quality of legal education programs and

choices available in law school education, so that current and prospective law students, as well as

the public that uses the services of law school graduates, can make better informed decisions.

5.     The Tennessee Board of Law Examiners ("TBLE") does not require that law

students graduate from a Section-accredited school in order to be eligible to take the Tennessee

bar examination. Instead, the TBLE permits applicants to take the bar examination if they have

graduated from a law school in Tennessee that the TBLE has accredited or from a law school

accredited by the Section. *See* Ex. 21 at ABA493, available online at

http://www.state.tn.us/lawexaminers/BLERequi.html (last visited Jan. 2, 2012).[1]

6.     There are presently six law schools in Tennessee. The other five in addition to

Duncan are the University of Tennessee College of Law, University of Memphis School of Law,

Vanderbilt University Law School, Nashville School of Law, and Belmont University College of

Law. Although Duncan, the Nashville School of Law, and Belmont University College of Law

are not currently accredited by the Section, they are accredited by the TBLE and their graduates

are therefore eligible to take the Tennessee bar examination. The Nashville School of Law has

been in operation for a century and has never been accredited by the Section. *See* Ex. 16 at

---

[1] Unless otherwise stated, all exhibits referenced in this Declaration are contained in Defendant
American Bar Association's Appendix to Brief in Opposition to Plaintiff's Motion for
Temporary Restraining Order, filed concurrently herewith.

ABA477, ABA481, available online at http://nashvilleschooloflaw.net/?page_id=6 (last visited Jan. 2, 2012).

7.      In addition to Tennessee, other states including Alabama, New York, West Virginia, and California permit applicants to take the bar examination without graduating from a Section-accredited law school.

## III.    The Section, Council, and Accreditation Committee

8.      Since 1952, the U.S. government — first through the U.S. Department of Health, Education, and Welfare and since 1972 through the U.S. Department of Education — has recognized the Council ("Council") of the Section as the national accrediting agency for programs that lead to the first professional degree in law.  In this function, the Council and the Section are "separate and independent" from the ABA, as required by Department of Education regulations.  34 C.F.R. § 602.14(b).

9.      The Council comprises 21 members, including judges, practicing attorneys, law school deans and faculty, at least three public members, and a law student.  Current members of the Council include The Honorable Charles R. Wilson, U.S. Court of Appeals for the Eleventh Circuit; The Honorable Solomon Oliver, Jr., Chief Judge, U.S. District Court for the Northern District of Ohio; The Honorable Christine M. Durham, Chief Justice, Supreme Court of Utah; The Honorable Rebecca White Berch, Chief Justice, Arizona Supreme Court; and retired United States Army General Leo A. Brooks, Sr.  The Accreditation Committee ("Committee") has 19 members, also comprising judges, practicing attorneys, law school deans and faculty, and public members.

## IV.    Standards, Interpretations, and Rules

10.     The Section's Standards for Approval of Law Schools ("Standards") describe the requirements a law school must meet to obtain and retain provisional and full approval by the

3

Section.  A true and correct copy of the current version of the Standards is Exhibit 1 at ABA1-60.  In applying the Standards, the Council and the Accreditation Committee are guided by interpretations ("Interpretations"), which accompany the Standards in Exhibit 1.

11.     A true and correct copy of the Section's Rules of Procedure for Approval of Law Schools ("Rules"), which implement the Standards, is Exhibit 2 at ABA 61-89.

12.     The Standards, Interpretations, and Rules are adopted only after undergoing an extensive public comment and review process and being concurred in by the ABA's House of Delegates (the "House").  As part of this process, the Section has a committee, the Standards Review Committee, which is responsible for reviewing the Standards, Interpretations, and Rules and drafting proposed revisions.  The Section then circulates these proposed revisions to the chief judge of every state supreme court, the deans of every Section-approved law school, the chairs of the board of bar examiners of every state, and members of the Section.  After notice and comment, the Standards Review Committee forwards its recommendations to the Council.  The Council reviews the recommendations of the Standards Review Committee, publishes them for notice and comment, and holds a public hearing on each recommended change before adopting final revisions to the Standards, Interpretations, and Rules.  The adopted revisions are then put before the House of Delegates of the ABA, which may either concur in the Standards, Interpretations, and Rules or refer them back to the Council for reconsideration.

## V.     Provisional Approval of Law Schools

13.     A law school may not apply for provisional approval by the Council until it has been in operation for at least one year.  *See* Ex. 2, Rule 4(c) at ABA65.  To receive provisional approval, a law school must both (i) establish that it is in substantial compliance with each of the Standards and (ii) present a reliable plan for bringing itself into full compliance with the Standards within three years after receiving provisional approval.  Ex. 1, Standard 102(a) at

4

ABA12. Regarding the first requirement of substantial compliance, Interpretation 102-1 provides that "[s]ubstantial compliance with each Standard is measured at the time a law school seeks provisional approval." *Id*., Interpretation 102-1 at ABA13.

14.     In addition to establishing that it is in substantial compliance, a law school must establish that it has a reliable plan to come into full compliance with each of the Standards within three years. Ex. 1, Standard 102(a) at ABA12. To satisfy this requirement, "a law school must clearly state the specific steps that it plans to take to bring itself into full compliance and must show that there is a reasonable probability that such steps will be successful." *Id*., Interpretation 102-2 at ABA13. The burden of proof is on the school to establish that it meets these requirements.

15.     Once a school is granted provisional approval, it has up to five years to qualify for full approval, which requires "full compliance" with all of the Standards. *Id*., Standards 102(b), 103(a) at ABA12, ABA14. A law school that is provisionally or fully approved must be "operated in compliance with the Standards." *Id*., Standard 101 at ABA11.

16.     To apply for provisional approval, a law school must complete an application and submit a self-study and other materials to the Consultant. *See generally* Ex. 2, Rules 2(b), 4(b)(1)-(9) at ABA 63-65. The Consultant then appoints a site evaluation team to visit the school and prepare an informational report. The law school is given an opportunity to respond to the site report, and the site report and any response by the school are then provided to the Accreditation Committee, along with other materials submitted by the school.

17.     The site team members do not make factual findings or conclusions for the Section. Instead, these are made by the Accreditation Committee and the Council of the Section, which are the bodies officially recognized by the Department of Education for law school

accreditation. The site team's role is to "report facts and observations that will enable the Committee and Council to determine compliance." *See* Ex. 2, Rule 2(d) at ABA63. However, the facts reported by the site team are not the factual findings of the Section. That is, in part, because each site team is different and, as such, the impressions of different site teams are inherently non-comparable. Instead, the site report is one of the inputs considered by the Accreditation Committee in making its factual findings, along with documents and materials submitted by the school before and after the site report and statements of the school representatives at the Committee hearing. It is the Accreditation Committee, which has extensive experience in reviewing different site reports and a full understanding of the accreditation process, that is responsible for placing the site team's observations and report in context and for making the factual findings for the Section. *Id.*, Rule 3(b) at ABA63-64.

18.     After receiving the site report and the school's submissions, the Accreditation Committee holds a hearing at which representatives of the school, including legal counsel, have the right to appear. Ex. 2, Rule 6 at ABA66. The hearing is transcribed and representatives of the school are permitted to make both opening and closing remarks and to answer questions posed by members of the Accreditation Committee.

19.     Following the hearing, the Accreditation Committee makes findings of fact and states conclusions regarding whether the school is in substantial compliance with each of the Standards and has presented a reliable plan for coming into full compliance within three years. Based upon its findings and conclusions, the Committee makes a recommendation to the Council as to whether the school should be granted provisional approval. *See* Ex. 2, Rule 3(b) at ABA63 ("The Committee shall make findings of fact and state conclusions with respect to the law school's compliance with the Standards. If the matter falls within the provisions of Rule 5(a)

6

[which includes granting provisional approval, *see id.*, Rule 5(a)(1) at ABA65], the Committee also shall make recommendations to the Council."). The Committee's findings of fact, conclusions, and recommendations are set forth in writing and are provided to the school, which has an opportunity to submit a written response.

20. The Council then considers the Accreditation Committee's recommendation regarding provisional approval. The Council has available to it the full record that was before the Committee; the Committee's letter reporting its findings of fact, conclusions, and recommendations; the transcript of the Committee hearing; and any response by the school. Ex. 2, Rule 8(c) at ABA66-67. The Council holds a hearing, which is transcribed, and representatives of the school including legal counsel have the right to appear. *Id.*, Rule 6(a) at ABA66.

21. Under Rule 8(a), the Council shall adopt the Committee's findings of fact unless the Council determines that they are not supported by substantial evidence in the record. Ex. 2, Rule 8(a) at ABA66. However, the Council is not bound by the Committee's conclusions or recommendations. Instead, the Council "may adopt, modify or reject the Committee's conclusions or recommendations, or it may refer the matter back to the Committee for further consideration." *Id.*, Rule 8(b) at ABA66.

22. The conclusions and action of the Council are set forth in writing and are provided to the school. Ex. 2, Rule 8(e) at ABA67. As required by Internal Operating Practice 5, and consistent with the DOE regulations, 34 C.F.R. § 602.26, the Council notifies the public of its decision regarding an application for provisional approval within 24 hours of notifying the school by posting this information on the ABA's web site and issuing a memorandum. Ex. 3, Internal Operating Practice 5(a), (c) at ABA92-93.

7

23.     A decision of the Council regarding provisional approval does not take effect until the period for appeal has expired.  If an appeal is filed, the decision of the Council is stayed pending the outcome of the appeal.  Ex. 2, Rule 10 at ABA68-70; *see also* Ex. 4 at ABA107.

24.     A law school that has been denied provisional approval may reapply for provisional approval 10 months after the date of the letter from the Consultant reporting the Council's conclusions, and the Chair of the Council may authorize an earlier reapplication for good cause shown.  Ex. 2, Rule 11(b) at ABA71.

## VI.     Appeal of a Council Decision

25.     The Higher Education Opportunity Act (Public Law 110-315), enacted August 14, 2008, requires accreditation agencies such as the Council to provide an opportunity for institutions or programs "to appeal any adverse action under this section, including denial, withdrawal, suspension, or termination of accreditation, taken against the institution or program, prior to such action becoming final at a hearing before an appeals panel…."  20 U.S.C. § 1099b(a)(6)(C).  The Department of Education regulations implementing this appeals requirement provide, *inter alia,* that the appeals panel shall have "the authority . . . to affirm, amend, or reverse" the adverse actions.  34 C.F.R. § 602.25(f)(1)(iii).

26.     In response to these legislative and regulatory requirements, the Section modified its appeals process in 2010.[2]  Utilizing the public comment and review process described above, the Council adopted Rule 10 of the Section's Rules of Procedure, which was concurred in by the ABA House of Delegates.  Rule 10 specifically provides for appeal of a decision of the Council denying provisional approval.  Ex. 2, Rule 10(a)(1) at ABA68.  The newly formed Appeals Panel has not yet heard any appeals.

---

[2] Previously, a school could appeal the decision of the Council to the ABA House of Delegates. Ex. 1, Preface at ABA6.

27. Under Rule 10, an appeal must be submitted within 30 days after the date of the letter reporting the adverse decision of the Council. Ex. 2, Rule 10(b) at ABA68. The law school has the burden of demonstrating "that the Council's decision was arbitrary and capricious and not supported by the evidence on record, or inconsistent with the Rules of Procedure and that inconsistency prejudiced its decision." *Id.*, Rule 10(e) at ABA68.

28. The appeal is referred to the Appeals Panel, which consists of three persons experienced and knowledgeable in the Standards, Interpretations, and Rules, who serve a one-year term and are subject to a conflict-of-interest policy. Ex. 2, Rule 10(g) at ABA68-69; Ex. 3, Internal Operating Practice 19 at ABA100-02.

29. The Appeals Panel holds a hearing within 45 days of its receipt of the appeal. The law school is informed of the time, date, and place of the hearing, and it has a right to have representatives of the school, including legal counsel, appear and present written and/or oral statements to the Appeals Panel. Ex. 2, Rule 10(h) at ABA69. The hearing is transcribed by a court reporter.

30. The Appeals Panel issues a written decision within 30 days of the hearing. The Appeals Panel can take one of four actions: (1) affirm the adverse decision of the Council; (2) reverse the adverse decision of the Council; (3) amend the adverse decision of the Council; or (4) remand the adverse decision of the Council for further consideration. Ex. 2, Rule 10(i) at ABA69-70. Unless the Appeals Panel remands for further consideration by the Council, the decision of the Appeals Panel is effective upon issuance. *Id.*, Rule 10(i) at ABA70.

## VII. The Founding of Duncan and Events Leading to Its Application for Provisional Approval

31. Lincoln Memorial University is a private university with its main campus in Harrogate, Tennessee, approximately 55 miles north of Knoxville. In November 2007, the

9

University formed a preliminary steering committee to explore conceptual development of a proposed law school. Ex. 6, Findings of Fact 1-2 at ABA209.

32.     In November 2008, LMU completed a 29-page feasibility study regarding a new law school ("the Study"). Ex. 14 at ABA446-74. The Study posited that the question of whether more lawyers were needed could not be answered without research "to determine need, demand, impact on the area, and other related issues." *Id*. at ABA447. The Study examined the need for legal services based on a number of projections for increases in Tennessee's population and GDP, the retirement of lawyers, and the need among poor and low income residents in Eastern Tennessee. *Id*. at ABA447-49.

33.     With respect to the demand for legal education, the Study concluded that an "indicator" of "whether there is an unmet need for additional legal education" was the number of LSAT test takers. It cited data showing that during the aggregate three-year period from 2005-2007 there were more than 5,000 LSAT takers from Tennessee colleges. Ex. 14 at ABA450, ABA451-54 (Table I). The Study concluded that this was a time of "great demand" for legal education:

> Should today's "seller's market" for law schools continue, even before gaining ABA approval LMU should be able to fill its classes with students whose academic credentials surpass those of many ABA-approved law schools in times of low demand.

*Id*. at ABA460-61.

34.     The Study briefly acknowledged "the economic slowdown that has taken place," but concluded that "[l]aw school applications generally increase during recessions," and "the easy availability of student loans may encourage" students to apply to law schools, "particularly during a recession." Ex. 14 at ABA460-61. The Study concluded that "it is very likely that the number of LSAT takers will go up in December 2008 and February 2009." *Id*. at ABA461.

10

35.     On a national basis that prediction was initially correct, but the trend has already reversed itself and the number of LSATs takers has decreased significantly.  For example, during the 2010-2011 school year alone, the number of LSAT tests taken decreased by 9.6%.  *See* Ex. 18 at ABA486, available online at http://www.lsac.org/LSACResources/Data/LSAC-volume-summary.asp (last visited Jan. 2, 2012).  In addition, in 2011, the number of applicants to Section-accredited law schools was the lowest since the Law School Admissions Council started keeping data in this form in 2002.  In 2011, according to preliminary numbers, there were only 78,900 applicants, a 9.9 percent decrease over 2010.  *Id*.

36.      In August 2009, Duncan School of Law ("Duncan") enrolled its first class in a part-time program.  In the fall of 2010, Duncan began a full-time program in addition to its part-time program.

37.     About 75-85% of Duncan's students are from Tennessee.  Ex. 5 at ABA178.  The Dean expects that most of the School's graduates will remain in Tennessee.  *Id*.  Graduates of Duncan are permitted to take the Tennessee bar because Duncan has been accredited by the TBLE.  Ex. 22 at ABA495; Ex. 13 at ABA444.  They also can take the bar examination in West Virginia, another state central to the Appalachian region, which allows applicants to take the bar if they can take the bar in the state where their law school is located.  Ex. 27 at ABA571 (Rule 3.0(b)(2)(a)), available online at http://www.state.wv.us/wvsca/bd%20of%20law/lawprac.htm#Rule%202.0.%20General%20requirements%20for%20admission (last visited Jan. 2, 2012).

38.     Duncan charged its full-time students $28,665 tuition for the 2011-2012 school year.  The estimated total cost for attending Duncan (including books, a room and board allowance, fees, etc.) as a full-time student for the 2011-2012 school year was $49,975.  Ex. 15 at ABA475, available online at http://www.lmunet.edu/law/financialaid/cost.shtml (last visited

Jan. 2, 2012).[3]  Duncan projects that its graduates will have an educational debt load between $80,000 and $100,000.  Ex. 6, Finding of Fact 7 at ABA 210-11; *see also* Ex. 5 at ABA143.

39.     The University of Tennessee also has a law school located in Knoxville, Tennessee, approximately one mile from Duncan.  Ex. 7 at ABA309.  The in-state tuition charged by UT-Knoxville for the 2011-2012 school year was $14,044.  Ex. 20 at ABA492, available online at http://www.law.utk.edu/administration/expenses.shtml (last visited Jan. 2, 2012).

**VIII.   The March 2011 Site Visit and Site Report**

40.     On January 2, 2011, Duncan applied for provisional approval.  Ex. 10 at ABA416. As part of the application, Duncan included its 2008 feasibility study, which at the time was more than two years old and reflected assumptions that were out-of-date and had not been realized.  Ex. 14 at ABA446-74.

41.     In March 2011 a site team visited Duncan and prepared a report.  Duncan had projected that it would have 100 new full-time students and 60 new part-time students for the 2010-2011 academic year.  Ex. 9 at ABA355.  However, the site team reported that Duncan enrolled just 55 new full-time students and 36 new part-time students during this period — a shortfall of 45% in full-time and 40% in part-time student enrollment.  *Id*.  Duncan then scaled back its projections for the 2011-2012 academic year to 55 full-time and 20 part-time students. *Id*.  Again, according to supplemental material Duncan submitted after receiving the site report, it failed to meet its full-time target, enrolling just 42 full-time students and 20 part-time students in the fall of 2011.  Ex. 8 at ABA326.

---

[3] For part-time students, tuition depends upon the number of credits.  For part-time students in the 2011-2012 academic year, tuition for a first-year student taking 9 credit hours was $17,856 and total costs were $36,716.  Ex. 15 at ABA475, available online at http://www.lmunet.edu/law/financialaid/cost.shtml (last visited Jan. 2, 2012).

42.     In short, in both years of operation with full- and part-time classes, Duncan had failed to meet its enrollment projections, even after reducing its projections substantially for its operations for 2011-2012. Notwithstanding these declining figures, the site team reported that Duncan was still projecting 2012-2013 enrollment of 80 full-time students. Ex. 9 at ABA355.

43.     Regarding the credentials of the students who attended Duncan, the site team commented that "it is apparent that the qualitative aspects of the admission profiles for its first two entering classes are somewhat low." Ex. 9 at ABA387. The site team provided a chart showing that, from 2009 to 2010, applications were down slightly but Duncan's rate of acceptance of new applications rose dramatically from 51% to 71%. *Id.* at ABA386-87. At the same time, Duncan's yield (the percentage of acceptances compared to offers) had dropped from 64.8% to 53.3%, leaving Duncan with only 90 entering students compared to the 160 originally projected (100 full-time + 60 part-time). *Id.* The LSAT scores and UGPA numbers of the entering classes also had dropped. *Id.* Quoting from Duncan's own Site Evaluation Questionnaire (SEQ), the site team cautioned:

> [Duncan's] SEQ acknowledges that there is concern "that the 2010-2011 data indicates the median admission LSAT scores for the academic program declined from the 2009-2010 academic year" and that "the Administration believes its recruitment efforts need to be more proactive." In fact LSAT scores not only declined at the median but at the 75th (152 to 151) and 25th (146 to 144) quartiles as well. UGPAs also declined at each quartile. *Accordingly, the progress, or lack thereof, in these efforts needs to be monitored in order to ensure that DSOL is only admitting students who can complete the educational program and be admitted to the bar.*

*Id.* at ABA388 (quoting Duncan Site Evaluation Questionnaire) (emphasis added).[4]

---

[4] Standard 501 provides that "[a] law school shall not admit applicants who do not appear capable of satisfactorily completing its educational program and being admitted to the bar." Ex. 1 at ABA45.

13

44.     The site team also reported on Duncan's programs for academic support, noting that the faculty member who had been its Director of Academic Success was leaving and the new Director of Academic Success was a law librarian admitted to practice in 2005. Ex. 9 at ABA371; *see also* Ex. 8 at ABA328, ABA34-46. There was no indication that this person had any training or experience in the field of academic support.

45.     Regarding the readmission of students who had failed academically and been dismissed, the site team reported that Duncan "has not readmitted any of its own students who have been previously disqualified for academic reasons." Ex. 9 at ABA388. However, Duncan subsequently acknowledged that the School readmitted fully one-third of all students who had been academically dismissed (6 of 18). *See* ¶ 50, *infra;* Ex. 6 (Accreditation Committee Finding of Fact 63) at ABA222-23; Ex. 8 at ABA324, ABA343. The site team's comments regarding the readmission of students appear to have been made without this additional data.

46.     Duncan asserts that the "ABA Site Team found DSOL to be in compliance with all ABA Standards." Complaint ¶ 30. That is incorrect. Rule 2(d) makes clear that the site team does "not determine compliance or non-compliance with the Standards." Ex. 2 at ABA63.

47.     Duncan also asserts that the site team was the "fact finder" for the Section. This also is incorrect. As I explained, while the site team reports its observations, it does not make factual findings for the Section. *Supra* ¶ 17. Under Rule 3(b), that responsibility is vested in the Accreditation Committee, which has experience reviewing many site reports and is charged with assuring that the Standards are applied appropriately to the schools. Ex. 2 at ABA63-64. Duncan was specifically informed of this on the cover page of the Site Report, which prominently states in underlined italicized type:

*The site evaluators do not make the official findings or conclusions for the Section of Legal Education and Admissions to the Bar of the American Bar Association. These are made by the Accreditation Committee and the Council of the Section.*

Ex. 9 at ABA347 (emphasis in original).

## IX. Duncan's Response to the Site Report and Updated Data

48. A copy of the site report was sent to Duncan, which was invited to comment and asked to submit updated data on the 2011 entering class and academic dismissals/readmissions. Ex. 9 at ABA414-15. On August 6, 2011, Duncan submitted voluminous information and provided line-by-line responses and clarifications to various points in the site report. Ex. 8 at ABA322-346 (excerpts).

49. As part of its August 2011 response, Duncan provided updated admissions data on the 2011 entering class. It showed that the number of applications Duncan had received had decreased 27%, from 239 in 2010 to 174 in 2011. Ex. 8 at ABA326. From 2010 to 2011, the size of the entering class also had dropped by almost one-third, from 90 to 62 students. *Id.* In conjunction with Duncan's earlier failures to meet its enrollment projections, these significant decreases in the number of applications and entering students raised questions about whether Duncan was realizing it goals and assumptions and pointed to a need for re-assessment of Duncan's planning. *See* Ex. 1, Standard 203 at ABA20. Although Duncan has engaged in strategic planning and considered ways to improve the school on a variety of fronts, Duncan has failed to present evidence that it has done more than simply adjust its budgets in response to the substantially lower-than-projected enrollment.

50. Duncan also reported in its August 2011 response that it had readmitted 6 of 18 students who were academically dismissed. Ex. 8 at ABA324, ABA343. The readmission of one-third of the academically dismissed students raised serious questions about Duncan's adherence to its policies. Duncan requires that students be academically dismissed when their

15

cumulative GPA falls below 1.25 (below a "D+" grade), but students may also be academically dismissed under other circumstances, including, for example, where the student is placed on academic probation for a semester and fails to improve his or her GPA to above a 2.0. A student who has been academically dismissed may re-enroll only by successfully petitioning Duncan's Academic Standards Committee, which must affirmatively find all of the following:

> 1. Extraordinary circumstances contributed to the student's inability to meet the academic requirements of the law school;
> 2. The student's failure to meet the standards for continuing his or her studies does not indicate a lack of capacity to complete the program of study and, in fact, the student possesses that capacity; and
> 3. The circumstances resulting in the student's academic disqualification have been remedied or no longer exist.

Ex. 9 at ABA367.

51.     In sum, Duncan's Academic Standards Committee is permitted to overlook the academic failure of students only for "extraordinary" circumstances which will not recur. That Duncan found such "extraordinary" circumstances to be present (and resolved) for fully one-third of its academically dismissed students raised questions as to whether Duncan was applying its written standards properly.

52.     Once re-enrolled, the student must achieve a 2.0 GPA in the next semester or be dismissed again, and to be in good standing a student at Duncan must maintain a *cumulative* GPA of at least 2.0. Students who were academically dismissed with cumulative GPAs below 1.25 would have to perform at a superior level (earning "A" and "B" grades) after being readmitted to meet the cumulative 2.0 standard. Even students who were academically dismissed with cumulative GPAs between 1.25 and 2.0 would have to perform at a superior level in order to continue enrollment. The uncertainty as to whether students would be able to improve their performance so substantially following readmission raised questions about whether

Duncan had "sound academic standards" and whether Duncan was not complying with the Standards by continuing to enroll students whose inability to do satisfactory work was sufficiently manifest. *See* Ex. 1, Standard 303(a), (c) at ABA30.

X. **The September 2011 Accreditation Committee Meeting**

53.     On September 29, 2011, the Accreditation Committee held a hearing on Duncan's application for provisional approval. Six representatives of LMU/Duncan attended. The hearing was chaired by Diane Bosse, Chair of the Board of Law Examiners for the State of New York.

54.     Duncan was given 15 minutes for its opening and closing remarks. Dean Beckman used his opening remarks to describe his time practicing as a lawyer in Texas and to show the Accreditation Committee photographs of Duncan's building and its classrooms. Ex. 7 at ABA239-46. In his opening remarks, he did not address the issues on which Duncan had been asked to submit updated information, including the significant declines in student enrollment, the drop in credentials of the entering classes, or Duncan's readmission of a large percentage of academically dismissed students. The members of the Accreditation Committee raised these issues with Duncan's representatives in a question-and-answer session that lasted almost two hours. *Id.* at ABA247-317.

55.     **Failure to Reassess Plans**. In response to the Committee's questions, Duncan's representative agreed that "the world has changed a lot since [LMU's] original Feasibility Study was done." Ex. 7 at ABA248. Duncan's representative further admitted that it had not done any formal re-evaluation of the data projecting population growth, retirement of lawyers, rising GNP, median income of lawyers in Eastern Tennessee and other factors contained in the Feasibility Study. *Id.* at ABA250-51, ABA315-16. These concerns went to the strategic planning for Duncan as a law school and its goals, assessments, and plans for the future.

56.     Duncan's representative projected that students would carry a debt load of $80,000-$100,000 upon graduation. Ex. 7 at ABA316-17. One committee member expressed concern as to whether Duncan's graduates could obtain employment that would allow them to repay their law school debt. *Id*. at ABA315-17. Duncan's representative offered an anecdote about Legal Aid of East Tennessee laying off seven staff people including lawyers due to budget cuts. *Id*. at ABA249-50. Rather than demonstrating employment opportunities for Duncan's graduates, this story suggested that there might be *fewer* paying positions for lawyers furthering Duncan's mission of providing low cost or free legal services. Duncan's representative also conceded that he had no data suggesting there would be increased public funding for legal services during the next 5-10 years in Eastern Tennessee. *Id*. at ABA315.

57.     **Readmission of Academically Dismissed Students and Academic Support**. The Committee and Duncan's representatives discussed the readmission of 6 of 18 students who had been academically dismissed. Ex. 7 at ABA274-77. According to Duncan, all students are required to take an initial academic support course in their first semester, and all first-year students who do not achieve a 2.33 in their first semester are required to take a second course in their second semester. *Id*. at ABA270-271. Aside from the second academic support course, once a student is on academic probation there are no additional support programs or initiatives, other than meeting more frequently with the Director of Academic Success and faculty advisors. *Id*. at ABA273-74. Duncan's representative confirmed that the new Director of Academic Success had no prior experience heading up an academic support program. *Id*. at ABA286-87.

**XI.     The October 12, 2011 Report and Recommendation of the Accreditation Committee**

58.     On October 12, 2011, I sent a letter to Dr. Dawson and Dean Beckman enclosing the 23-page Recommendation of the Accreditation Committee. That letter and Recommendation are attached as Exhibit 6 at ABA207-31.

18

59.     The Accreditation Committee's Recommendation contained 96 separate and detailed Findings of Fact addressing a range of topics from the history and organization of LMU and Duncan to faculty, students, and finances. Ex. 6 at ABA209-30. Based on these Findings of Fact, the Committee concluded that Duncan was not in substantial compliance with each of the Standards and had not presented a reliable plan for bringing itself into full compliance within three years. *Id.* at ABA230-31. Specifically, the Committee concluded that Duncan had not established substantial compliance with four separate Standards and, in some cases, accompanying Interpretations.

60.     **Standard 203—Strategic Planning and Assessment.** The Committee concluded that Duncan had failed to establish substantial compliance with Standard 203, which provides that

> a law school shall demonstrate that it regularly identifies specific goals for improving the law school's program, identifies means to achieve the established goals, assesses its success in realizing the established goals and periodically re-examines and appropriately revises its established goals.

Ex. 1, Standard 203 at ABA20; *see* Ex. 6 at ABA230.

61.     The Committee's recommendation was based upon six specific Findings of Fact (Nos. 6-8, 10-11, and 13), which related to Duncan's failure to present evidence that it had re-examined its projections and assumptions on a number of issues and whether any changes to them might affect Duncan's strategic planning and success in realizing its goals.

62.     *Feasibility Study.* The 2008 feasibility study Duncan submitted with its January 2011 provisional approval application was more than two years out-of-date and contained assumptions and forecasts, some of which did not reflect the reality of Duncan's experiences and environment. The Dean admitted "that there has not been any formal revisiting of the findings and assumptions in the original Feasibility Study." Ex. 6, Finding of Fact 7 at ABA211; *see also*

19

Ex. 7 at ABA250-51, ABA315-16. Duncan argues that it was only required under Rule 4(b)(4) to produce one feasibility study, but the Committee did not find that Duncan was required to prepare more than one feasibility study. Instead, the Committee's findings were based on Standard 203, which requires ongoing strategic planning and reassessment of the School's ability to realize established goals.

63.     For example, Duncan's feasibility study was based in part on an estimate of the number of Tennessee LSAT takers between 2005 and 2007 and a projection that those numbers would increase for the December 2008 and February 2009 LSAT. However, the Committee found that Duncan "did not present any evidence that it has revisited the predicted growth in LSAT takers beyond February 2009, and whether any decreases in LSAT takers for 2010, 2011, and beyond *may affect strategic planning and the Law School's success in realizing its established goals*." Ex. 6, Finding of Fact 6 at ABA210 (emphasis added). Similarly, the Committee found that Duncan failed to revisit its assumptions pertaining to the demand for lawyers and legal services. As discussed above, *see* Paragraph 35, on a national basis the number of LSAT test takers dropped by almost 10% in 2011.

64.     As another example, the Committee found that "[p]art of the mission of the Law School is to prepare young lawyers to serve a population that cannot afford legal services," but Duncan's representative "noted at the hearing that Legal Aid of Eastern Tennessee has had to lay off lawyers, due to budget cuts" and he was "unaware of any anticipated increase in public funding for legal services." Ex. 6, Finding of Fact 7 at ABA210; *see also* Ex. 7 at ABA249-50, ABA315. Moreover, students were expected to graduate from Duncan with an education debt load of about $80,000 to $100,000. Ex. 6, Finding of Fact 7 at ABA210-11. The Committee found that the School had not presented evidence that it had reassessed these assumptions and

"*and whether such reassessment may affect strategic planning and the Law School's success in realizing its established goals*." Ex. 6, Finding of Fact 8 at ABA211 (emphasis added).

65.     *Enrollment Projections and Criteria.*  Further, as discussed above (¶ 41) and found by the Committee, Duncan's original projections assumed enrollment of 100 new full-time students and 60 new part-time students for the 2010-2011 school year.  However, only 55 new full-time students and 36 new part-time students enrolled.  Duncan further failed to meet its scaled-back projection of 55 new full-time and 20 new part-time students for 2011-2012, enrolling only 42 new full-time students.  Nevertheless, at the time of the site visit, Duncan was predicting a new entering class of 80 full-time students and 25 part-time students.  Ex. 6, Finding of Fact 10 at ABA211.

66.     The Committee further found that the "Law School's inability to reach projected enrollment targets has caused the Law School to revise projected enrollments downward, and appears to have caused a drop in the LSAT of the entering classes, negatively affecting student selectivity."  Ex. 6, Finding of Fact 13 at ABA212; *see also id.*, Finding of Fact 59 at ABA221 (chart of Admissions and First Year Class Profiles showing decline in LSAT and UGPA).  The Committee found: "*This poses strategic planning challenges that the record does not establish the Law School has sufficiently addressed at this time*."  *Id.*, Finding of Fact 13 at ABA212 (emphasis added).

67.     **Standards 303(a) and (c) and Interpretation 303-3—Academic Standards and Achievement.**  The Committee concluded that Duncan had failed to establish substantial compliance with Standards 303(a) and (c) and Interpretation 303-3.  Ex. 6 at ABA230.  Standard 303(a) provides that "[a] law school shall have and adhere to sound academic standards,

including clearly defined standards for good standing and graduation." Ex. 1 at ABA30.

Standard 303(c) provides:

> A law school shall not continue the enrollment of a student whose inability to do satisfactory work is sufficiently manifest so that the student's continuation in school would inculcate false hopes, constitute economic exploitation, or detrimentally affect the education of other students.

*Id*. Interpretation 303-3 provides:

> A law school shall provide the academic support necessary to assure each student a satisfactory opportunity to complete the program, graduate, and become a member of the legal profession. This obligation may require a school to create and maintain a formal academic support program.

*Id*. at ABA31.

68.     The Committee's conclusion was based upon five specific Findings of Fact (Nos. 40-42, 59, and 63), which pertained to Duncan's (i) low standards for continuing enrollment of students in academic distress, (ii) failure to demonstrate adequate academic support for such students, and (iii) readmission of a high percentage of students who were dismissed for academic failure.

69.     *Enrollment Standards*.  The Committee found that even though Duncan requires a 2.0 cumulative GPA to remain in good standing, students may be allowed to continue their enrollment until their cumulative GPA falls below a 1.25, which requires automatic dismissal. Ex 6, Finding of Fact 40 at ABA217.  In other words, a student is not automatically dismissed until his or her cumulative GPA is between a "D" and "D+" level.  *See id*., Finding of Fact 39 at ABA217.  To increase a cumulative GPA as low as 1.25 – or even a GPA between 1.25 and 2.0, which requires academic probation – to a cumulative 2.0 GPA requires a student to obtain "A" and "B" grades, which Duncan had not demonstrated was likely to occur.

22

70. *Academic Support*.  The Committee found that the Director of Academic Success has "no prior academic support experience."  Ex. 6, Finding of Fact 42 at ABA217.  The Committee further found that Duncan "has limited data on which to assess the effectiveness of its Academic Success Program."  *Id*. at ABA218.  The findings with respect to academic support were relevant both in light of the low qualifications of the students admitted by Duncan and Duncan's low standards for continuing enrollment of students.

71. *Academic Dismissals*.  The Committee cited Duncan's "extraordinary circumstances" standard for readmission (Ex. 6, Finding of Fact 41 at ABA217), but found that the Academic Standards Committee at Duncan had readmitted six of 18 previously dismissed students.  *Id*., Finding of Fact 63 at ABA222-23.

72. **Standard 501(b) and Interpretation 501-3**—The Committee concluded that Duncan had failed to establish substantial compliance with Standard 501(b) and Interpretation 501-3, which pertain to admission policies and practices.  Ex. 6 at ABA230-31.  Standard 501(b) provides:  "A law school shall not admit applicants who do not appear capable of satisfactorily completing its educational program and being admitted to the bar."  Ex. 1 at ABA45. Interpretation 501-3 provides:

> Among the factors to consider in assessing compliance with Standard 501(b) are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program.

*Id*. at ABA45.

73. The Committee's conclusion was based upon specific Findings of Fact (Nos. 59 and 63).  Finding of Fact 59 discussed the admissions and first-year class profiles, including LSAT scores and undergraduate GPA, as summarized in a chart reproduced here:

23

| ADMISSIONS AND FIRST YEAR CLASS PROFILES | | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Completed Applications | | 243 | 239 | 174 |
| Offers of Admission | | 125 | 169 | 117 |
| Acceptance Rate (Percent) | | 51% | 71% | 67% |
| Number of Matriculants | | 81 | 90 | 62 |
| Yield (Percent of Offers) | | 64.8% | 53.3% | 53.3% |
| LSAT | 75th Percentile | 152 | 151 | 151 |
| | 50th Percentile | 149 | 147 | 147 |
| | 25th Percentile | 146 | 144 | 144 |
| UGPA | 75th Percentile | 3.5 | 3.38 | 3.31 |
| | 50th Percentile | 3.05 | 2.97 | 2.99 |
| | 25th Percentile | 2.8 | 2.7 | 2.66 |
| Women Number | | 36 | 45 | 25 |
| Percent | | 44.4% | 50% | 40% |
| Minorities Number | | 7 | 8 | 5 |
| Percent | | 8.6% | 8.8% | 8% |

Ex. 6, Finding of Fact 59 at ABA221. Duncan asserts that this chart misrepresents the statistics because it compares 2009, when Duncan had only a part-time program, with 2010 and 2011 when it had both full-time and part-time students. Complaint, Ex. A at 27. However, there is no basis for treating full-time and part-time students differently when it comes to admissions criteria. Further, even when those statistics are examined separately, the statistics of the part-time class admitted in the fall of 2010 are below those of the 2009 part-time class:

| Part-Time Class Comparison – 2009-2010 | | |
|---|---|---|
| | Part-Time Class Admitted 2009 | Part-Time Class Admitted 2010 |
| LSAT – 75th Percentile | 152 | 150 |
| LSAT – 50th Percentile | 149 | 146 |
| LSAT – 25th Percentile | 146 | 142 |
| UGPA – 75th Percentile | 3.5 | 3.41 |
| UGPA – 50th Percentile | 3.05 | 3.06 |
| UGPA – 25th Percentile | 2.8 | 2.71 |

Ex. 6, Finding of Fact 59 at ABA221; Ex. 25 at ABA566.

74. Duncan complains that the Committee inappropriately relied upon the low and declining LSAT scores of Duncan's students in concluding that Duncan had not demonstrated compliance with Standard 501(b). Complaint ¶¶ 60-62. However, as the site report noted, the results for Duncan's entering classes went down in *every quartile* (75th percentile, median and 25th percentile) for *both* LSAT scores and UGPA. Ex. 9 at ABA388. Further, this occurred at a time when the acceptance rate was increasing to an extremely high level (71%). *Id*. at ABA386. All of these trends were in the same direction—less selective admissions criteria resulting in the admission of a less-qualified pool of admitted applicants. These facts raised a serious concern as to whether Duncan was lowering its admissions standards to compensate for the decrease in applicants, and enrolling students who were not capable of completing the educational program and passing the bar.

75. Indeed, in its own assessment Duncan acknowledged that

the Administration and Faculty are concerned that the 2010-2011 data indicates the median admission LSAT scores for the academic program declined from the

25

2009-2010 academic year compared to the 2010-2011 academic year in contravention of the proposed movement toward higher LSAT medians.

Ex. 25 at ABA567 (emphasis added).

76.    Duncan argues that a one-point decline in LSAT scores was insignificant. However, for the 75th percentile, the drop in scores from 152 to 151 was a drop of 4 percentage points (from 51.7% to 47.7% of test-takers scoring below that base).  Ex. 19 at ABA491 (reflecting aggregate score distribution 2008-2011), available online at

http://www.lsacnet.com/members/AdmissionResources/PDFs/admission-reference-manual.pdf

(last visited Jan. 2, 2012).  For the median or 50th percentile, the drop in scores from 149 to 147 was 7.2 percentage points (from 40.3% to 33.1% of test takers scoring below that score).  *Id*.  For the 25th percentile, a drop in scores from 146 to 144 represented a 6.4 percentage point drop (from 29.5% to 23.1% percent of test takers scoring below that level).  *Id*.  For the 2010 part-time class, the 25th percentile LSAT score was 142, indicating that only around 17.9% of test takers scored below that mark.  *Id*.

77.    Duncan also complains that eight other schools may have LSAT scores at or below Duncan's, but the Council and Committee evaluate law schools based on the totality of the circumstances.[5]  A law school that enrolls students with low LSATs and UGPAs can adequately prepare them to complete the academic program and pass the bar examination by providing superior academic support and rigorously enforcing standards for academic dismissal of underperforming students.  As discussed above, Duncan took neither of these steps.  Duncan

_____

[5] Pursuant to Rule of Procedure 25, with limited exceptions, "all matters relating to the accreditation of a law school shall be confidential. This shall include proceedings and deliberations of the Accreditation Committee and Council."  Ex. 2, Rule of Procedure 25(a) at ABA86.  For this reason, I cannot discuss any confidential matters of other law schools pertaining to accreditation.

failed to present evidence that its academic support programs were effective. Its Director of Academic Success was a former law librarian who had no background in the area of academic support. Ex. 8 at ABA344-46.

78. Finding of Fact 63 pertained to the academic dismissal of 18 students and readmission of 6, and the number of students on academic probation. Ex. 6 at ABA222-23. All of these facts raised questions as to whether Duncan was admitting students who were capable of completing Duncan's program and being admitted to the bar.

79. **Standard 511—Student Support Services.** The Committee further concluded that Duncan had failed to establish substantial compliance with the career counseling component of Standard 511. Ex. 6 at ABA231. Standard 511 provides:

> A law school shall provide all its students, regardless of enrollment or scheduling option, with basic student services, including maintenance of accurate student records, academic advising and counseling, financial aid counseling, and an active career counseling service to assist students in making sound career choices and obtaining employment. If a law school does not provide these types of student services directly, it must demonstrate that its students have reasonable access to such services from the university of which it is a part or from other sources.

Ex. 1 at ABA50.

80. The Committee's conclusion was based upon specific Findings of Fact (Nos. 7 and 67). As discussed above (Paragraphs 62 and 64), Finding of Fact 7 discussed predictions with respect to the future need for attorneys in the Knoxville area, the recognition that public funding for attorneys was not known to be increasing, and the Dean's expectation that graduates would have between $80,000 and $100,000 in debt. Ex. 6, Finding of Fact 7 at ABA210-11. Finding of Fact 67 recognized that there was only one professional working in the Career Services office, with the expectation of hiring a career counselor, and there was no data

regarding whether "the career services … are effective in assisting students to make sound career choices." *Id*., Finding of Fact 67 at ABA223.

81.     My October 12, 2011 letter notified Duncan of the Council meeting set for December 2011, invited Duncan's appearance, and explained the format of the meeting. Ex. 6 at ABA207.

## XII.     Duncan's Response to the Accreditation Committee's Recommendation

82.     A school faced with a recommendation by the Committee not to grant provisional approval may withdraw its application, address the deficiencies identified, and resubmit a new application for provisional approval. Following the Committee's recommendation, on or about October 27, 2011, I met with Dean Beckman and laid out that option. Duncan did not pursue that course.

83.     Instead, Duncan submitted a 48-page "hearing brief" arguing that the Committee's Recommendation was not supported by substantial evidence and was contradicted by the site report as well as by the decisions of two other accrediting agencies — the TBLE and the Southern Association of Colleges and Schools—Commission on Colleges ("SACS-COC"). Complaint, Ex. A.

84.     In its hearing brief and in this litigation, Duncan asserts that the site report is "the opposite" of the Accreditation Committee's conclusions and that the Committee's conclusions are therefore "arbitrary, capricious and irrational." Complaint ¶ 35 & Ex. A at 1-4. However, the site team identified key facts that the Accreditation Committee (and later the Council) focused on in their review. The Accreditation Committee's recommendation was based on extensive materials in addition to the site report, including Duncan's appearance at the Committee hearing. Ex. 6 at ABA209. Rather than being inconsistent, the site report supports the Committee's Findings of Fact and the Committee's and Council's conclusions.

28

- **Failure to Reassess Plans.** Duncan points to a handful of general statements in the site report about Duncan's focus on goals and assessments. Complaint ¶ 35(a). However, none of those statements addressed the specific issues identified by the Accreditation Committee and the Council relating to the School's ongoing strategic planning and reassessment of its ability to realize established goals, including with respect to the decrease in LSAT takers, the loss of sources of employment for graduates and their debt load, the significant declines in enrollment and the impact of enrolling students with lower selectivity (including lower LSAT scores). Ex. 6, Findings of Fact 6, 7, 8, 13 at ABA210-12. Duncan conceded at its appearance before the Committee that it had not done any such re-examination. *See, e.g.,* Ex. 7 at ABA 249, ABA251. These factual findings were supported by substantial evidence and provided the basis for the Council's expressed concerns about Duncan's failure "to establish that it has re-examined its goals and the means to achieve them in light of unanticipated economic conditions" and the impact of its "failure to meet its enrollment projections on its ability to meet its mission or to ultimately succeed as an institution." Ex. 4 at ABA105 ¶ 1.

- **Failure to Adhere to Academic Standards.** Duncan points to the following statement in the site report: "DSOL adheres to clearly defined academic standards for good standing." Complaint ¶ 35(b). However, Standard 303(a) also requires that a law school adhere to "sound academic standards." In this regard, the Council concluded that "although the Law School has adopted and adheres to clearly defined academic standards, the Law School has not demonstrated that the standards are sound." Ex. 9, ABA367. This was based on specific information from the site team about Duncan's standards for academic dismissal and the fact that, while Duncan had created programs

29

for academic support, assessment of those programs was only "planned or ongoing." *Id*. at ABA367, ABA369. It also was based on information not presented to the site team, which raised serious questions as to whether Duncan adheres to its standards which permit readmission only for "extraordinary circumstances." Ex. 8 at ABA324, ABA343; *see also* Ex. 9 at ABA414-15. These observations were consistent with and supported the Committee's specific Findings of Fact and the Council's conclusions.

- **Decline in Admissions Standards**. Duncan also quotes the portion of the site report that noted that "the qualitative aspects of the admissions profiles for [Duncan's] first two entering classes are somewhat low." Complaint ¶ 35(c). The site team reported that "the progress, or lack thereof, in these efforts needs to be monitored in order to ensure that DSOL is only admitting students who can complete the educational program and be admitted to the bar." Ex. 9 at ABA388. All three entities — the Site Team, the Committee, and subsequently the Council — consistently raised concerns about the fact that when faced with applications below projected levels, Duncan increased its acceptance rate and enrolled students whose credentials were low, raising questions as to whether they could succeed particularly given the lack of experience of Duncan's academic support director and the lack of measurable academic support results documented by the site team. *Compare* Ex. 9 at ABA387-88 with Ex. 6, Finding of Fact 59 at ABA221 with Ex. 4 at ABA106 (applying Standard 501(b) and Interpretations 501-3); *compare* Ex. 9 at ABA369 with Ex. 6, Finding of Fact 42 at ABA217-18 with Ex. 4 at ABA105-06 (applying Standards 303(a) and (c) and Interpretation 303-3, and Standard 501(b) and Interpretation 501-3).

30

85.   **Other Agencies' Accreditation Decisions.**   Pursuant to Internal Operating Practice 6(c) (Ex. 3 at ABA94), the Council takes into account actions by recognized accrediting agencies that have denied accreditation or pre-accreditation to a law school or its parent institution.   However, nowhere in the Section's Rules, Internal Operating Practices or Standards is the Council or Committee required to defer to accreditation by state or regional accrediting agencies.   To do so would be contrary to their role as the Department of Education's designated national accrediting agency for law schools.

86.   **Tennessee Board of Examiners Approval.**   The TBLE accredits law schools separately from the Section.   The TBLE applies standards are set forth in Rule 7, Article II, Section 2.03 of the Rules of the Supreme Court of the State of Tennessee, Ex. 22 at ABA495-97, available online at http://www.tncourts.gov/rules/supreme-court/7 (last visited Jan. 2, 2012).

87.   The TBLE examined Duncan in 2008 and granted its approval on February 24, 2009.   Ex. 13 at ABA444-45.   This was six months prior to the admission of the first class of students at Duncan.   *See also* Ex. 14 at ABA470 (LMU acknowledging that "The [TBLE] accredits a new law school before it opens.").   The TBLE's approval was not based on any evidence about the actual operation of Duncan such as the actual applicant pools, the credentials and academic performance of the students admitted, the academic and career support services, and the application of the standards for academic dismissal and readmission of students.   In short, the TBLE's accreditation was based on plans and projections that Duncan presented and did not include any evaluation of the school's operation or whether the school has realized its plans and projections and adhered to its standards for admission and academic achievement.

88.   TBLE's approval also was explicitly "based upon the representations of LMU that the College of Law will seek accreditation by the American Bar Association."   Ex. 13 at

ABA444. Further, the TBLE stated that if LMU failed to obtain provisional accreditation from the Section by December 31, 2012, then TBLE "may withdraw and rescind the approval granted." *Id*. Thus, TBLE's approval was predicated on Duncan seeking and obtaining provisional approval from the Section.

89. **The SACS-COC Approval**. SACS-COC is a regional body for the accreditation of degree-granting higher education institutions in the Southern states. SACS-COC accreditation is not specific to law schools but rather encompasses institutions of higher education that award associate, baccalaureate, master's, or doctoral degrees. *See* Ex. 23 at ABA516, available online at http://www.sacscoc.org/about.asp (last visited Jan. 2, 2012). SACS-COC governs its accreditation processes by a set of "Principles of Accreditation." Ex. 24 at ABA517-64, available online at http://www.sacscoc.org/pdf/2010principlesofacreditation.pdf (last visited Jan. 2, 2012).

90. On April 27, 2009, based on a letter and submission of a prospectus, SACS-COC approved offering a JD program at LMU. Ex. 12 at ABA442-43. As with TBLE's accreditation, this approval occurred months before any students began studying at LMU and was based on information about LMU's plans, not about the actual operation of the law school (which is required for Section approval). Further, the accreditation was also based in part on TBLE's accreditation.

91. In 2010, SACS-COC had a substantive change committee visit Duncan to examine the school, and that committee produced a report. Ex. 11 at ABA417-41. At the time of this visit, Duncan had only a part-time class in its second semester. In many cases, the site report merely commented on how Duncan fit into the larger LMU framework (*see* Ex. 11 at ABA420-21, ABA425-26 (Principles 2.4, 2.5, 2.11.1)) or on its future plans (*id*. at ABA422,

ABA428 (Principles 2.7.2, 3.2.8)). However, in its limited comments, SACS-COC expressed

certain concerns that are similar to those expressed by the Council. For example, SACS-COC

noted that at the time of its site visit Duncan had a dean, an associate dean for academics, an

associate dean and director of the law library, and an assistant dean for assessment, all of whom

were lawyers but only two of whom had "extensive experience in legal education." *Id*. at

ABA427, Principle 3.2.8. SACS-COC "encouraged" Duncan "to provide support for those

faculty members who have or will assume administrative responsibilities but who do not have

extensive experience in legal education." *Id*. Further, SACS-COC noted that its review was

based on limited information because Duncan had only been in operation for one completed

semester and "final outcomes of student success are basically 2 1/2 years away." *Id*. at ABA439,

Principle 4.1.

92.     With respect to both TBLE and SACS-COC, the accreditation was based largely

on Duncan's proposals for its law school, not on its implementation of those proposals or its

condition when it applied for provisional approval by the Section. *See* Ex. 2, Rule 4(c) at

ABA65, Ex. 1, Interpretation 102-1 at ABA13. It would be inappropriate for the Council or the

Accreditation Committee to defer to these accreditation decisions for this additional reason.

## XIII.   The December 2, 2011 Council Meeting

93.     On December 2, 2011, the Council considered Duncan's application for

provisional approval. At the hearing, Duncan was represented by eight representatives,

including Dean Sydney Beckman and Dr. James Dawson, the president of Lincoln Memorial

University. Ex. 5 at ABA114. The Chair and Vice Chair of the Accreditation Committee were

also present, but did not participate in the Council's discussion with the School or in the

Council's deliberations and vote.

94.     Typically, a meeting to consider a school's application for provisional approval lasts one hour.  The meeting with Duncan lasted two hours and the transcript comprised 94 pages.  Ex. 5 at ABA116, ABA205.  Duncan says it was "given only 15 minutes to make its presentation."  Complaint ¶ 37.  That is not correct.  Duncan had 15 minutes to make *opening and closing remarks*.  Ex. 5 at ABA120.  Throughout Duncan's two-hour appearance, representatives of Duncan responded to questions and comments of the Council by making presentations on numerous issues relating to the School.

95.     **Standard 203.**  Duncan addressed the Committee's findings regarding Duncan's non-compliance with Standard 203.  Citing broad generalizations from the Site Report about Duncan's focus on assessment through LMU's strategic planning process, Duncan argued that the specific concerns of the Committee were "irrelevant" and outside the scope of Standard 203.  Ex. 5 at ABA123-124.  Duncan also argued that it had considered the impact of its decreased enrollment figures in the context of its budget.  *Id*. at ABA125.  One Council member acknowledged that Duncan had adjusted its budget but wanted to know what other steps Duncan had taken "apart from simply adjustment of the budget," asking

> how you've adjusted the strategic plan in light of trends in the economy, trends in the legal profession, and trends in application numbers and how that connects up with the mission of the school.  In particular, it wasn't clear to me how, if students are coming out with 80 to 100,000 dollars in debt, that they would actually be able to be employed in the way that you would hope that they would be employed.

*Id*. at ABA133-34.  Duncan's response focused on the financial adjustments the University was making but gave no specifics as to whether Duncan had re-examined the impact that these factors would have on Duncan's goals and its ability to meet them.  *Id*. at ABA134-40.

96.     Another Council member questioned Duncan regarding its student application yields, which for two consecutive years were significantly lower than predicted even though

Duncan was continuing to predict higher numbers, and asked what Duncan had learned from these errors and what changes it had made. Ex. 5 at ABA146-47; *see also id*. at ABA150-51. Duncan's representatives responded with a description of marketing initiatives. *Id*. at ABA147-50. The Council member questioned whether Duncan "can turn it around that fast," particularly in "a declining world of applicants and changes in potential applicants dealing with debt-related income," and questioned whether Duncan should alter its planning. *Id*. at ABA150-51.

97.     Another Council member, The Honorable Christine Durham, Chief Justice of the State of Utah, commented "it troubles me that given the nature of the impact on our profession and, particularly, since you have identified your mission to be services to a very particular community, both educational services and legal services, that you haven't undertaken any steps to get some empirical data that would suggest that the conditions exist in your market to justify the establishment of the new law school." *Id*. at ABA156. In particular, "your stated mission is to produce graduates who will go back to the underserved communities in East Tennessee and serve them, and yet the documentation suggests that paid employment that would support such a service has shrunk in the region rather than even been maintained and stabilized." *Id*. at ABA159. In response, Duncan's representative talked about potential work opportunities "shifting" around Appalachia and discussions with the School's Advisory Board who "have a lot of work." *Id*. at ABA159-60. However, Duncan did not show that it had engaged in any systematic re-assessment of employment opportunities for its graduates in the region.

98.     **Standard 303(a) and (c) and Interpretation 303-3**. The Council asked about Duncan's practice of retaining students with low GPAs between 1.25 and 2.0 and of readmitting 6 of 18 students who had previously been dismissed for academic failure. Ex. 5 at ABA194-95. A Council member noted "there's so much data on what or how successful a student is at certain

levels of performance" and questioned whether Duncan should be "willing to accept or readmit or allow the student to remain at 1.25 [GPA] when the chances are extraordinary that they will be able to succeed." *Id*. at ABA201.

99.     The Council member added that Duncan's students are "probably incurring debt along the way and so it's sort of a burden, an additional burden you're putting on the student because if they get dismissed, … [t]hey have failed out of school and they have the burden of debt, and you're telling me they're in Appalachia and their prospects for employment are very difficult." Ex. 5 at ABA201.  Duncan's representative asserted that the $80,000-$100,000 of student debt that Duncan projected was a "meaningless" number. *Id*. at ABA143.  Rather than focusing on the amount of debt a student would graduate with, Duncan urged that the focus should be on whether the student makes "enough money to service that debt on a monthly basis." *Id*. at ABA143-44.

100.     A Council member questioned Duncan about what evidence it has that its academic success program is effective. Ex. 5 at ABA161.  Duncan's representative talked about the use of interactive technology and grade assessment, but did not point to specific evidence showing that its programs are effective. *Id*. at ABA161-70.  A Council member questioned whether Duncan could really expect its faculty to provide academic support given that they seemed "overloaded" with multiple burdens and numerous responsibilities, and expressed concern that faculty were being used in lieu of hiring adequate support in other areas, such as academic success and career services. *Id*. at ABA188-90.  In response, Duncan's representative said it would be up to the faculty to assess whether this situation proved to be too burdensome and did not address whether the resources dedicated to academic support were sufficient. *Id*.

101.    **Standard 501 and Interpretation 501-3.** The Council asked Duncan about its criteria for admissions, noting that it admitted about 70 percent of applicants. Ex. 5 at ABA180-81. During the meeting, Duncan's representative referred several times to an "uptick" in applications. However, when asked by a Council member, Duncan said that it had revised its 2012 entering class projections from 80 to 40 full-time students (a 50% drop), with 55 full-time students in subsequent years. *Id.* at ABA184-85.

102.    **Standard 511.** The Council also inquired about Duncan's career services office. Ex. 5 at ABA189-90. Duncan explained that it hired an additional career services professional to focus on externships. *Id.* at ABA190-93.

## XIV.   The Council's December 20, 2011 Decision Letter

103.    On December 20, 2011, I sent a letter to Dr. Dawson and Dean Beckman reporting the Council's action. Ex. 4 at ABA103-11. The letter specifically set forth the record that was considered by the Council and then summarized the conclusions reached by the Accreditation Committee and set forth the conclusions of the Council.

104.    The Council concluded that Duncan "has not established that it is in substantial compliance" with each of the Standards and "has not presented a reliable plan for bringing the School into full compliance with the Standards within three years after receiving provisional approval." Ex. 4 at ABA105. Specifically, the Council concluded that Duncan failed to establish substantial compliance with Standard 203; Standards 303(a) and (c) and Interpretation 303-3; and Standard 501(b) and Interpretation 501-3.

105.    With respect to Standard 203, the Council concluded that Duncan "has not demonstrated that it regularly identifies specific goals for improving the Law School's program, identifies means to achieve the established goals, assesses its success in realizing the established

goals, and periodically re-examines and appropriately revises the established goals." Ex. 4 at ABA105. "Specifically, the Law School has failed to establish that it has re-examined its goals and the means to achieve them in light of unanticipated economic conditions, affecting the assumptions in its feasibility study." *Id*. The Council also concluded: "The Law School has not established that it has determined the cause or evaluated the impact of the failure to meet its enrollment projections on its ability to meet its mission or to ultimately succeed as an institution." *Id*. The Council further concluded, "Although the Law School has recalculated its pro forma budgets, the Law School has failed to establish that it has re-evaluated and revised its goals given that, as currently appears based on past enrollment and present projections, it may be a significantly smaller law school than anticipated when it was founded." *Id*.

106.    With respect to Standards 303(a) and (c) and Interpretation 303-3, the Council concluded that Duncan had not "demonstrated that it has and adheres to sound academic standards." Ex. 4 at ABA105. This includes "the obligation not to continue the enrollment of a student whose inability to do satisfactory work is sufficiently manifest so that the student's continuation in school would inculcate false hopes, constitute economic exploitation, or detrimentally affect the education of other students." *Id*. It further includes "the obligation to provide the academic support necessary to assure each student a satisfactory opportunity to complete the program, graduate, and become a member of the legal profession." *Id*. at ABA105-06. Specifically, the Council concluded that

> although the Law School has adopted and adheres to clearly defined academic standards, the Law School has not demonstrated that the standards are sound. The Law School has not demonstrated that its standards for academic dismissal and readmission are sufficiently rigorous as to ensure that the Law School does not continue the enrollment of students whose inability to do satisfactory work is manifest. While the Law School has established an academic support program, it has not established that the program is effective. The program is not currently directed by a person with specific experience in academic support, and thus,

38

without a demonstration of effectiveness of the program, it cannot be concluded that the Law School has demonstrated that it provides the academic support necessary to assure each student a satisfactory opportunity to complete the program, graduate, and become a member of the legal profession.

*Id.* at ABA106.

107.    With respect to Standard 501(b) and Interpretation 501-3, the Council concluded that Duncan had not demonstrated "that it is not admitting applicants who do not appear capable of completing the educational program and being admitted to the bar." Ex. 4 at ABA106. This was based on a totality of the circumstances, including but not limited to the "comparatively low entering academic and admission test credentials of a significant percentage of the Law School's students, the attrition rates of its inaugural classes, the failure of the School to establish the effectiveness of the academic support program, and the fact that the Law School's graduates have yet to sit for a bar examination." *Id.*

108.    With respect to the fourth Standard at issue, Standard 511, the Council did not adopt the Committee's recommendation. After the Accreditation Committee hearing, Duncan hired an additional career services professional (Ex. 5 at ABA192), and the Council concluded "based on information provided during the hearing before the Council, including the fact that the School has hired an additional professional in the Career Services Office and experienced success placing students in summer placements in 2011, that the School has established it is in substantial compliance with Standard 511, with respect to the School's obligation to provide all students with an active career counseling service to assist them in making sound career choices and obtaining employment." Ex. 4 at ABA105.

109.    Thus, the Council accepted the Committee's Report and Recommendation (excluding the Committee's conclusion regarding Standard 511) and denied provisional approval to Duncan.

## XV.    Subsequent Events

110.    The Council's December 20, 2011 letter notified Duncan of its right to appeal the Council's decision and enclosed a copy of Rule 10.  Duncan has until January 19, 2012 (thirty days after the December 20, 2011 Council decision letter) to appeal.  If Duncan appeals, the decision of the Council will be stayed pending the appeal.

111.    The Section's rules also ensure that such review would be completed in a timely fashion.  The Appeals Panel must issue a final decision within 105 days from a school's appeal.  See Ex. 2, Rule 10(f) at ABA68 (Consultant must refer appeal within 30 days); Rule 10(i) at ABA69 (hearing occurs within 45 days of such charge and decision issues within 30 days thereafter).  If Duncan had appealed December 22, 2011, instead of filing suit, the Appeals Panel would have issued a decision no later than April 5, 2012.

112.    Alternatively, if Duncan elects not to appeal, the Council's decision would take effect as of January 19, 2012.  Pursuant to Rule 11(b), Duncan may reapply for provisional approval within the time period specified in the Rules.

113.    As required by Internal Operating Practice 5 of the Section of Legal Education and Admissions to the Bar (Ex. 3 at ABA92-93), and consistent with 34 C.F.R. § 602.26(b),(c), the Council notified the public of its decision regarding Duncan's application for provisional approval within 24 hours of Duncan's receipt of the Council's letter by posting a memorandum on the Section's web site and sending it to various authorities.  Dkt. No. 2, Ex. A.  The memorandum stated that the Council had denied Duncan's application for provisional approval and that Duncan has a right to appeal, and it provided a brief summary of the procedures for appeal.  *Id*.

114.     As required by Interpretation 102-7 (Ex. 1 at ABA13-14),  throughout the process Duncan has published and continues to publish the fact that is not accredited at this time on its website:

> *The Law School makes no representation to any applicant that it*
> *will be approved by the American Bar Association prior to the*
> *graduation of any matriculating student.*

Ex. 26 at ABA 568 (emphasis in original), available online at

http://www.lmunet.edu/law/accreditation.shtml (last visited Jan. 2, 2012).

## XIV.   Exhibits

115.     I certify that the documents contained in Defendant American Bar Association's Appendix to Brief in Opposition to Plaintiff's Motion for Temporary Restraining Order are true and correct copies of the Standards, Rules, Internal Operating Practices, correspondence to and from Duncan, materials submitted by Duncan as part of its application for provisional approval, reports and transcripts of proceedings involving Duncan, and printouts from the identified websites of the identified entities.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 3, 2012.

HULETT H. ASKEW

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of January, 2012, I caused to be filed electronically a copy of the foregoing pleading. The Court's electronic filing system will send notice of this filing to all parties indicated on the electronic filing receipt. I will cause all other parties to be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

<div style="margin-left: 40%;">

s/ Jeff R. Thompson
HOWARD H. VOGEL, BPR NO. 1015
JEFFREY R. THOMPSON, BPR NO. 20310
P. ALEXANDER VOGEL, BPR NO. 23944
**O'NEIL, PARKER & WILLIAMSON, PLLC**
7610 Gleason Drive, Suite 200
Knoxville, Tennessee 37919
(865) 546-7190 (telephone)
(865) 546-0789 (facsimile)
hvogel@opw.com
jthompson@opw.com
avogel@opw.com

</div>