UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

LINCOLN MEMORIAL UNIVERSITY    )
DUNCAN SCHOOL OF LAW,    )
    )
    Plaintiff,    )
    )
v.    )    No.:  3:11-CV-608
    )    (VARLAN/SHIRLEY)
THE AMERICAN BAR ASSOCIATION,    )
    )
    Defendant.    )

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on plaintiff's Motion for Temporary Restraining Order and for Preliminary and Permanent Injunction [Doc. 2]. Defendant the American Bar Association ("defendant" or the "ABA") filed a response in opposition [Doc. 19]. Although plaintiff did not file a reply, plaintiff filed numerous documents in support of its motion [Docs. 26–28, 33]. The Court heard oral argument from all parties on January 5, 2012 [Doc. 30]. After the hearing, plaintiff filed a notice of supplemental authority [Doc. 32], and defendant responded [Doc. 34]. The Court has thoroughly considered all the filings in this case as well as the arguments advanced orally by the parties. For the reasons stated herein, the Court denies plaintiff's request for injunctive relief.

# I. Background

## A. History of Lincoln Memorial University Duncan School of Law

Plaintiff Lincoln Memorial University Duncan School of Law ("plaintiff" or "DSOL") is located in Knoxville, Tennessee, and is part of Lincoln Memorial University ("LMU"), which was established in 1888 and chartered by the State of Tennessee in 1897 [Doc. 5]. LMU is a Level V institution accredited by the Southern Association of Colleges and Schools-Commission on Colleges ("SACS-COC") and is approved to award associate, baccalaureate, master's, educational specialist, and doctoral degrees [*Id.*]. It was founded upon Abraham Lincoln's principles of dedication to individual liberty, responsibility, and improvement of self, and has adopted a purpose of providing educational opportunities, developing community leaders, and expanding economic and social forces within the southern Appalachian region [*Id.*].

In 2007, at LMU's annual strategic planning retreat, LMU faculty and administration discussed establishing a juris doctorate ("J.D.") program [*Id.*]. Later that year, LMU formed a preliminary steering committee to further explore the establishment of such program [*Id.*]. In January 2008, LMU informed the Tennessee Board of Law Examiners ("TBLE") that it would seek approval of a new law school [*Id.*]. In April of the same year, LMU also notified SACS-COC of its intent to offer a J.D. program [*Id.*]. At the same time, it requested TBLE's approval for graduates of LMU's law school to sit for the Tennessee Bar Examination [*Id.*]. LMU submitted feasibility studies devoted to the consideration of its proposed degree offering and administrative structure to both accrediting authorities [*Id.*]. In February 2009,

TBLE notified LMU that its law school graduates could sit for the Tennessee Bar Examination [*Id.*]. Likewise, in April 2009, LMU received approval from SACS-COC to offer a J.D. program [*Id.*].

On August 15, 2009, DSOL conducted orientation of its inaugural class and began classes two days later [*Id.*]. The 2009 entering class consisted of students pursuing a part-time course of study, and they are expected to graduate in May 2013 [*Id.*]. In August 2010, DSOL began classes for full-time students as well, and the entering class of full-time students is likewise expected to graduate in May 2013 [*Id.*].

### B. American Bar Association Accreditation Process

Since 1952, the Council of the Section of Legal Education and Admissions to the Bar (the "Council") has been the national agency for the accreditation of law schools [Doc. 20 ¶ 8].[1] The Council is aided by the Accreditation Committee (the "Committee"),[2] which reviews accreditation materials, including site reports and school submissions, holds hearings, finds facts, reaches conclusions, and makes recommendations to the Council [*Id.* ¶¶ 17–19].

The Section of Legal Education and Admissions to the Bar (the "Section") employs Standards for Approval of Law Schools ("Standards"), which describe the requirements a law school must meet to obtain and retain provisional and full approval by the Section [Doc. 20

---

[1]The Council consists of twenty-one members, including judges, practicing attorneys, law-school deans, law-school faculty, at least three public members, and a law student [Doc. 20 ¶ 9].

[2]The Committee consists of nineteen members, including judges, practicing attorneys, law-school deans, law-school faculty, and public members [Doc. 20 ¶ 9].

3

¶ 10; Doc. 21-1]. In applying the Standards, the Council and the Committee are guided by interpretations ("Interpretations"), which accompany the Standards [*Id.*]. The Section's Rules of Procedure for Approval of Law Schools ("Rules") implement the Standards [*Id.* ¶ 11; Doc. 21-2]. The Standards, Interpretations, and Rules govern provisional approval and full approval of law schools, [Docs. 21-1, 21-2], and they are adopted after a notice and public comment process and published on the Section's website [Doc. 20 ¶ 10–12].

A school's decision to seek accreditation from the Council is voluntary, and the Council's decisions are not binding on state bar admission authorities [*Id.* ¶ 4]. Tennessee, for example, does not require bar applicants to have graduated from a law school approved by the Council [*Id.* ¶ 5; Doc. 21-21 at 1].[3] A law school, however, may not apply for provisional approval until it has been in operation for at least one year [Doc. 20 ¶ 13; Doc. 21-2 at 5]. To receive provisional approval, a law school must both (i) establish that it is in substantial compliance with each of the Standards, and (ii) present a reliable plan for bringing the law school into full compliance within three years [Doc. 20 ¶¶ 13–24; Doc. 21-1 at 12]. The burden of proof is on the applicant [Doc. 20 ¶ 14]. Once granted provisional approval, a law school has up to five years to qualify for full approval, which requires full compliance with all of the Standards [*Id.* ¶ 15; Doc. 21-1 at 12, 14].

To apply for provisional approval, a law school must complete an application and submit a self-study and other materials to the Consultant on Legal Education to the ABA (the

_____

[3]Likewise, Alabama, New York, California, and West Virginia permit applicants to take the bar examination without graduating from a Section-accredited law school [Doc. 20 ¶ 7].

4

"Consultant") [Doc. 20 ¶ 16; Doc. 21-2 at 3–5]. The Consultant then appoints a site evaluation team to visit the school and prepare an informational report [*Id.*]. The law school is given an opportunity to respond to the site report, and the site report and any response by the school are then provided to the Committee, along with other materials submitted by the school [*Id.*].

After receiving the site report and the school's submissions, the Committee holds a hearing at which representatives from the school, including legal counsel, have the right to appear [Doc. 20 ¶ 18; Doc. 21-2 at 6]. The hearing is transcribed and representatives of the school are permitted to make both opening and closing remarks and to answer questions posed by members of the Committee [Doc. 20 ¶ 18]. Following the hearing, the Committee makes findings of fact and states conclusions regarding whether the law school is in substantial compliance with each of the Standards and whether it has presented a reliable plan for coming into full compliance within three years [*Id.* ¶ 19]. Based upon its findings and conclusions, the Committee makes a recommendation to the Council as to whether the school should be granted provisional approval [*Id.*; Doc. 21-2 at 3]. The Committee's findings of fact, conclusions, and recommendation are set forth in writing and are provided to the school, which has an opportunity to submit a written response [Doc. 20 ¶ 19].

The Council then considers the Committee's recommendation regarding provisional approval [*Id.* ¶ 20]. The Council has available to it the full record that was before the Committee; the Committee's letter reporting its findings of fact, conclusions, and recommendation; the transcript of the Committee hearing; and any response by the law

5

school [*Id.*; Doc. 21-2 at 6–7]. The Council itself holds a hearing, which is transcribed, and representatives of the law school, including legal counsel, have the right to appear [*Id.*].

Under Rule 8(a), the Council shall adopt the Committee's findings of fact unless the Council determines that they are not supported by substantial evidence in the record [Doc. 20 ¶ 21; Doc. 21-2 at 6–7]. The Council, however, is not bound by the Committee's conclusions or recommendation; rather, the Council "may adopt, modify or reject the Committee's conclusions or recommendations, or it may refer the matter back to the Committee for further consideration" [*Id.*].

The conclusions and action of the Council are set forth in writing and are provided to the school [Doc. 20 ¶ 22; Doc. 21-2 at 7]. Then, within twenty-four hours, the Council must notify the public of its decision by posting the information on the ABA's website and issuing a memorandum [Doc. 20 ¶ 22; Doc. 21-3 at 3–4]. *See also* 34 C.F.R. § 602.26. The decision of the Council does not take effect until the period for appeal has expired [Doc. 20 ¶ 23]. If an appeal is filed, then the decision is stayed pending the outcome of the appeal [*Id.*; Doc. 21-2 at 8–10; Doc. 21-4 at 5]. A law school that has been denied provisional approval may reapply for provisional approval within ten months after the date of the letter reporting the Council's decision, and the Chair of the Council may authorize an earlier reapplication for good cause shown [Doc. 20 ¶ 24; Doc. 21-2 at 11].

The appeals process is provided for by Rule 10 [Doc. 20 ¶ 26; Doc. 21-2 at 8]. The process was revised in 2010 in response to legislative and regulatory requirements [Doc. 20 ¶ 26]. In particular, the Higher Education Opportunity Act ("HEA"), enacted on August 14,

6

2008, required accreditation agencies such as the Council to provide an opportunity for institutions or programs "to appeal any adverse action under this section, including denial, withdrawal, suspension, or termination of accreditation, taken against the institution or program, prior to such action becoming final at a hearing before an appeals panel . . . ." 20 U.S.C. § 1099b(a)(6)(C). The DOE regulations implementing this language provide that the appeals panel shall have "the authority . . . to affirm, amend, or reverse" an adverse action. 34 C.F.R. § 602.25(f)(1)(iii).

An appeal must be submitted within thirty days after the date of the letter reporting the adverse decision of the Council [Doc. 20 ¶ 27; Doc. 21-2 at 8]. To obtain relief, a law school must demonstrate "that the Council's decision was arbitrary and capricious and not supported by the evidence in the record, or inconsistent with the Rules of Procedure and that inconsistency prejudiced its decision" [*Id.*]. The appeal is referred to what is known as the Appeal Panel, which consists of three persons experienced and knowledgeable in the Standards, Interpretations, and Rules, who serve one-year terms and are subject to a conflict-of-interest policy [Doc. 20 ¶ 28; Doc. 21-2 at 8–9; Doc. 21-3 at 11–12]. The Appeals Panel holds a hearing within forty-five days of its receipt of the appeal, and the law school has a right to have representatives of the school, including legal counsel, appear and present written and/or oral statements [Doc. 20 ¶ 29; Doc. 21-2 at 9]. The Appeals Panel is to issue a written decision within thirty days of the hearing, and it can take one of four actions: (1) affirm the adverse decision of the Council; (2) reverse the adverse decision of the Council; (3) amend the adverse decision of the Council; or (4) remand the adverse decision of the

Council for further consideration [Doc. 20 ¶ 30; Doc. 21-2 at 9–10]. Unless the Appeals Panel remands for further consideration, the decision of the Appeals Panel is effective upon issuance [*Id*.].

### C.     DSOL's Application for Provisional Approval

In January, 2011, DSOL applied for provisional approval [Doc. 5; Doc. 20 ¶ 40; Doc. 21-10; Docs. 27–28, 33]. As part of the application, DSOL submitted a certification letter from the president of LMU and dean of the law school; a completed site-evaluation questionnaire; a copy of the law school feasibility study commissioned by LMU; a copy of the law school's self-study; financial operating statements; a statement detailing LMU's and the law school's ownership interests in any land used by the law school; a request for a site evaluation; and an application fee [Doc. 5].

In March 2011, a site team visited DSOL and prepared a report [Doc. 5; Doc. 20 ¶ 41; Doc. 21-9]. A copy of the report was sent to DSOL, which was invited to comment and asked to submit updated data on the 2011 entering class and academic dismissals/readmissions [Doc. 20 ¶ 48; Doc. 21-9]. On August 6, 2011, DSOL submitted the requested information and provided line-by-line responses and clarifications to various points in the site report [Doc. 20 ¶ 48; Doc. 21-8; *see also* Doc. 28-8].

On September 29, 2011, the Committee held a hearing on DSOL's application for provisional approval [Doc. 5; Doc. 20 ¶ 53]. DSOL was given fifteen minutes for its opening and closing remarks [Doc. 20 ¶ 54]. In a question-and-answer session that lasted almost two hours, the members of the Committee raised various issues during the hearing, including the

8

significant declines in student enrollment, the drop in credentials of the entering classes, and DSOL's readmission of a large percentage of academically dismissed students [*Id.*; Doc. 21-7 at 16–86].

On October 12, 2011, the Consultant sent a letter to DSOL, enclosing the 23-page recommendation of the Committee [Doc. 20 ¶ 58; Doc. 21-6]. The recommendation contained 96 findings of fact, addressing a range of topics from the history and organization of LMU and DSOL to faculty, students, and finances [Doc. 21-6]. Based upon these findings of fact, the Committee concluded that DSOL was not in substantial compliance with each of the Standards and had not presented a reliable plan for bringing itself into full compliance within three years [*Id.*]. Specifically, the Committee concluded that DSOL had not established substantial compliance with four Standards and two Interpretations: Standard 203, Standard 303(a) and (c) and Interpretation 303-3, Standard 501(b) and Interpretation 501-3, and Standard 511 [*Id.*]. The Consultant's letter informed DSOL of the Council meeting set for December 2011, invited DSOL's appearance, and explained the format of the meeting [Doc. 21-6].

In response to the decision of the Committee, DSOL submitted a 48-page "hearing brief," which argued that the Committee's recommendation was not supported by substantial evidence and was contradicted by the site report as well as by the decisions of the TBLE and SACS-COC [Doc. 20 ¶ 83; Doc. 1-1; Doc. 28-10]. On December 2, 2011, the Council considered DSOL's application for provisional approval [Doc. 20 ¶ 93]. At the hearing, DSOL was represented by eight representatives, including the dean of the law school,

9

Sydney Beckman, and Dr. James Dawson, the president of LMU [*Id.*; Doc. 21-5]. The Chair and Vice Chair of the Committee were also present, but they did not participate in the Council's discussion with the school or in the Council's deliberation and vote [Doc. 20 ¶ 93; Doc. 21-5]. Although typical meetings to consider a school's application for provisional approval last one hour, the meeting with DSOL lasted two hours [Doc. 20 ¶ 94; Doc. 21-5]. DSOL had fifteen minutes to make opening and closing remarks, and DSOL representatives responded to questions and comments of the Council regarding numerous issues [Doc. 20 ¶ 94; Doc. 21-5].

On December 20, 2011, the Consultant sent a letter to Dr. Dawson and Dean Beckman reporting the Council's decision [Doc. 20 ¶ 103; Doc. 21-4]. The letter set forth the record that was considered by the Council, summarized the conclusions reached by the Committee, and set forth the conclusions of the Council [*Id.*]. The Council concluded that DSOL "has not established that it is in substantial compliance with each of the Standards" and "has not presented a reliable plan for bringing the School into full compliance with the Standards within three years after receiving provisional approval" [Doc. 21-4 at 3]. Specifically, the Council concluded that DSOL failed to establish substantial compliance with Standard 203, Standard 303(a) and (c) and Interpretation 303-3, and Standard 501(b) and Interpretation 501-3 [*Id.* at 3–4]. Thus, the Council accepted the Committee's recommendation except with respect to Standard 511 and denied DSOL's application for provisional approval [*Id.*]. Within twenty-four hours, the Council notified the public of its decision regarding DSOL's

application for provisional approval by posting a memorandum on the Section's website and sending it to various authorities [Doc. 2 Ex. A].

### D.     The Instant Lawsuit and the Motion for Injunctive Relief

Within two days of receiving the Council's decision, plaintiff commenced this action [Doc. 1]. Plaintiff seeks judicial review of the decision pursuant to the Administrative Procedure Act ("APA") and the common law of the State of Tennessee, which plaintiff asserts require that an accreditation decision by defendant be in accord with due process [*Id*.]. Plaintiff also seeks judicial review pursuant to Sections 1 and 2 of the Sherman Act and the Clayton Act [*Id*.].

Along with the complaint, plaintiff filed a Motion for Temporary Restraining Order and For Preliminary and Permanent Injunction [Doc. 2]. Pursuant to Rule 65 of the Federal Rules of Civil Procedure, plaintiff moves the Court for a temporary restraining order ("TRO") and a preliminary injunction ordering the ABA to post on its website a statement that it has been ordered by the Court to remove the memorandum from its website and to replace it with a statement that defendant has been further ordered by the Court to hold any decision about plaintiff's accreditation in abeyance until further instructed by the Court [*Id*.]. Plaintiff also seeks the Court to order defendant to send this statement to all of those who received the memorandum [*Id*.].

Plaintiff additionally seeks a permanent injunction requiring defendant to grant plaintiff provisional accreditation [*Id*.]. To that end, plaintiff requests that the Court

consolidate the hearing on its motion for a TRO and preliminary injunction with a trial on the merits as provided for by Rule 65(a)(2) [*Id.*].[4]

## II.    Analysis

Rule 65 of the Federal Rules of Civil Procedure permits a party to seek injunctive relief if he believes he will suffer irreparable harm or injury during the pendency of the action. Fed. R. Civ. P. 65. In determining whether to grant a movant's request for injunctive relief the Court must consider four factors: (1) whether the movant would suffer irreparable harm without the injunction; (2) whether issuance of the injunction would cause substantial harm to others; (3) whether the public interest would be served by the issuance of the

---

[4]The Court addressed plaintiff's request to consolidate at the outset of the hearing on this matter. The Court denied the request to consolidate for various reasons. First, plaintiff's motion for injunctive relief failed to address the likelihood of success of all of the claims in this case. Second, defendant's express choice not to address plaintiff's request for a permanent injunction indicated to the Court that it opposed the request to consolidate. Third, plaintiff requested a jury trial and defendant is entitled to rely upon that request absent waiver, which the Court found was not present. Fourth, the Court noted that the Supreme Court has indicated that consolidation is generally inappropriate. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

The Court also observed that plaintiff's motion was framed as one for a TRO and a preliminary injunction as well as a permanent injunction. Under Sixth Circuit law, a TRO "is meant to preserve the status quo until a court can make a reasoned resolution of a dispute." *Black v. Cincinnati Fin. Corp.*, No. 1:11-CV-210, 2011 WL 1640962, at *1 (S.D. Ohio May 2, 2011) (citing *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996)). A TRO may be issued without notice to the adverse party and generally is of short duration (generally no more than fourteen days), tending to terminate with a ruling on a preliminary injunction. *Id.* (citing *Workman v. Bredesen*, 486 F.3d 896, 922 (6th Cir. 2007)); Fed. R. Civ. P. 65(b). If a defendant is on notice as here, however, a request for a TRO may be treated as a motion for a preliminary injunction. *Id.*; Fed. R. Civ. P. 65(a)(1). Given that defendant was on notice and had an opportunity to respond in opposition, and given that the Court denied plaintiff's request to consolidate the hearing with a trial on the merits, the Court ruled that it would consider plaintiff's motion as one for a preliminary injunction only, and instructed the parties to argue accordingly. Thus, this memorandum opinion and order does not address plaintiff's request to consolidate, nor plaintiff's request for a TRO.

12

injection; and (4) whether the movant has demonstrated a strong likelihood of success on the merits. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted); *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (citation omitted). The factors are to be balanced and are "not prerequisites that must be met." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation omitted). A stronger showing of likelihood of success on the merits is required if the other factors militate against granting relief, but a lesser showing of likelihood of success on the merits is required when the other factors support granting relief. *Performance Unlimited, Inc. v. Questar Publ'rs, Inc.*, 52 F.3d 1373, 1385–86 (6th Cir. 1995) (citations omitted).

## A.    Strong Likelihood of Success on the Merits[5]

For the reasons explained herein, the Court finds that plaintiff has not demonstrated a strong likelihood of success on the merits with respect to its due process claims because it appears that plaintiff was required to exhaust the administrative remedy available to it. Alternatively, the Court finds that plaintiff has not demonstrated at this time that the decision to deny provisional approval violated due process.

---

[5]The Court observes that plaintiff provides no argument in its memorandum in support of its motion that it is likely to succeed on the merits of its antitrust claims. Further, while there was some discussion of the antitrust claims by plaintiff during the hearing, plaintiff's argument focused on the accreditation process and procedures, not the antitrust claims. Accordingly, this memorandum opinion and order does not address the likelihood of success of plaintiff's antitrust claims and focuses only on whether plaintiff has established a strong likelihood of success regarding its due process claims related to the accreditation process and procedures.

13

### 1. Exhaustion of Administrative Remedies

Defendant argues that plaintiff is not likely to succeed on the merits because it has not exhausted its right to appeal the decision of the Council. Plaintiff makes four counter points regarding exhaustion: (1) that the relevant statute, regulation, and Rule do not require exhaustion; (2) exhaustion is not required because the accreditation review process constitutes a restraint on trade; (3) exhaustion would be futile; and (4) exhaustion would cause an unreasonable delay in obtaining a judicial hearing on the merits.

The parties do not dispute the governing statute, 20 U.S.C. § 1099b, regulation, 34 C.F.R. § 602.25(f), and Rule, Rule 10, but rather, whether they require exhaustion. Section 1099b provides that accrediting agencies must provide an opportunity for an institution to appeal an adverse action, including the denial of accreditation, prior to such action becoming final "at a hearing before an appeals panel." 20 U.S.C. § 1099b(a)(6)(C); *see also* 34 C.F.R. § 602.25(f) (requiring same). The appeals panel must "not include current members of the agency's or association's underlying decisionmaking body that made the adverse action," and "is subject to a conflict of interest policy." *Id.* Pursuant to the implementing regulations, the appeals panel has the authority "to affirm, amend, or reverse adverse actions of the original decision-making body." 34 C.F.R. § 602.25(f). Rule 10 provides that a law school may appeal the Council's decision denying provisional approval and dictates that an appeal will stay the Council's decision pending review by the appeals panel [Doc. 21-2 at 7].

"Generally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems,' [as with § 1099b(a)(6)(C),] those procedures

are to be exclusive." *Free Enter. Fund v. PCAOB*, 130 S. Ct. 3138, 3150 (2011) (quoting

*Witney Nat'l Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S. 411,

420 (1965)). Exhaustion bars disappointed applicants from foregoing administrative

remedies because they would prefer a judicial one, and ensures that the expert agency "has

had a full opportunity to consider a petitioner's claims," avoids "premature interference with

the agency's processes," and allows the agency "to compile a record which is adequate for

judicial review." *Bi Xia Qu v. Holder*, 618 F.3d 602, 609 (6th Cir. 2010) (discussing

exhaustion in the context of an immigration case).

Plaintiff asserts that neither the language of § 1099b and 34 C.F.R. § 602.25(f), nor

Rule 10, expressly require exhaustion and cites *Darby v. Cisneros*, 509 U.S. 137 (1993), in

support of its position that it accordingly need not pursue an appeal. Plaintiff contends that

*Darby* stands for the proposition that:

> [A]n appeal to "superior agency authority" is a prerequisite to judicial
> review *only* when expressly required by statute or when an agency rule
> requires appeal before review and the administrative action is made
> inoperative pending that review. Courts are not free to impose an
> exhaustion requirement as a rule of judicial administration where the
> agency action has already become "final" under § 10(c).

509 U.S. at 154 (emphasis in original). The Court, however, finds this rule inapplicable to

the instant case. In expressing this rule, the Supreme Court was clear that such applies only

where the APA applies. For the reasons explained below, *see infra* Section 2.b., the APA

does not apply here. Thus, in this non-APA case,

> appropriate deference to Congress' power to prescribe the basic
> procedural scheme under which a claim may be heard in a federal court

15

requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme.

*Id.* at 153 (citing *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded on other grounds*, 42 U.S.C. § 1997(e)). In determining whether exhaustion is required, a court must "balance the interest on the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy*, 503 U.S. at 146.

After reviewing the text of § 1099b and 34 C.F.R. § 602.25(f), the Court finds that it is likely that exhaustion is required before a law school complaining that it should have been awarded provisional approval may bring a civil suit in federal court.[6] Although plaintiff contends that the applicable statute, regulation, and Rule do not expressly require exhaustion, the fact that they do not does not appear dispositive. Although the Employee Retirement Income Security Act ("ERISA") is likewise silent as to whether exhaustion of administrative remedies is a prerequisite to bringing a civil action, the Sixth Circuit has held that "[t]he

_____

[6]The Court pauses here to note that defendant relies upon, and expressly mentioned during the hearing, *Staver v. Am. Bar Ass'n*, 169 F. Supp. 2d 1372 (M.D. Fla. 2001), in support of its position that exhaustion is required. After reviewing *Staver*, the Court finds it insignificant in determining whether exhaustion is required before commencing a lawsuit about an adverse accreditation decision because the facts are distinguishable from the instant case. In *Staver*, the Council denied Barry Law School ("Barry") provisional accreditation, and Barry appealed the decision. 169 F. Supp. 2d at 1375. Before the appeal was concluded, however, Barry agreed with the Council to drop its appeal and continue its application before the Council. *Id.* Graduates and current students of Barry, among others, commenced litigation against the ABA prior to the Council rendering a decision on Barry's application, and in light of this, the district court found that the plaintiffs' claims were not ripe. *Id.* at 1373, 1377. Given that the Council has made a decision concerning plaintiff's application for provisional approval in this case, the Court finds *Staver* provides little guidance on whether it should require exhaustion in this case.

administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court." *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 504 (6th Cir. 2004) (quoting *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991)). Indeed, failing to require exhaustion could easily render the provisions of 20 U.S.C. § 1099b(a)(6)(C) and 34 C.F.R. § 602.25(f) superfluous. *See Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1092 (6th Cir. 1981) ("To conclude . . . that a party may seek judicial review . . . without first attempting to obtain temporary relief from the Secretary . . . would render the administrative relief provisions superfluous."). Moreover, although Rule 10 states that a law school applicant "may" appeal, nothing in Rule 10 authorizes an applicant to forego an appeal and seek judicial review.

Plaintiff expressly acknowledges that it did not exhaust its administrative remedy—indeed, plaintiff submitted to the Court at the hearing that it had no intention at that time of filing an appeal even if it were unsuccessful on its request for injunctive relief.[7] Hence, plaintiff is thus unlikely to succeed on the merits in this action unless the failure to exhaust is excused. Plaintiff provides three reasons why exhaustion should be excused in this case. The Court finds none of the reasons, however, likely excuses the exhaustion requirement. *See McCarthy*, 503 U.S. at 146–48 (identifying three sets of circumstances in which an individual's interests weigh heavily against requiring exhaustion: (1) where requiring exhaustion would give rise to undue prejudice in a later court action; (2) where

---

[7]The parties submitted to the Court that the time to appeal expires on January 19, 2012.

there is some doubt as to whether the agency was empowered to grant effective relief; and (3) where the administrative body is shown to be biased or has otherwise predetermined the issue before it).

First, plaintiff argues exhaustion is not required because it challenges "the ABA's accreditation scheme itself" as violating the Sherman Act [Doc. 5 at 14]. However, plaintiff's motion focuses entirely on the accreditation decision and procedures, not the antitrust claims, and a review of the antitrust claims reveals that they do not challenge the appeals process itself. Thus, it appears there is no reason not to require exhaustion.

Second, plaintiff's assertion that the appeal process would unreasonably delay the opportunity to obtain a judicial hearing unlikely provides a viable excuse for failing to exhaust the administrative process. Both parties agree that the appeals process must be completed within 105 days from the date the appeal is filed. Plaintiff seems to argue that this time frame is too long because it would preclude its students from applying for the summer 2013 bar examination. This consideration, however, holds little weight because as defendant points out, the law school states on its website in bold-faced italicized type that it "makes no representation to any applicant that it will be approved by the American Bar Association prior to the graduation of any matriculating student" [Doc. 20 ¶ 114]. Consequently, no current or prospective student of the law school could have any expectation that it could sit

18

for the bar examination in any state that requires the applicant graduate from a Section-accredited law school, nor would he or she expect to do so by a certain date.[8]

Finally, plaintiff argues exhaustion would be futile. Although the Sixth Circuit recognizes that exhaustion may be excused where resorting to exhaustion "would simply be futile or the remedy inadequate," *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998), "[a] plaintiff must show that it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision," *id.* (citation omitted). Plaintiff asserts that the Appeals Panel, along with the Committee, the Council, and the Consultant, are "part of a conspiracy to restrain free commerce and preclude competition among law schools in violation of the Sherman Act," but plaintiff provides no evidence, only a conclusory assertion, that this is the case. Rather, federal law dictates that the Appeals Panel not be comprised of any "current members of the agency's or association's underlying decisionmaking body that made the adverse decision," and it is subject to a conflict of interest policy. 20 U.S.C. § 1099b(a)(6)(C); 34 C.F.R § 602.25(f)(1). The Court also recognizes that the Appeals Panel has the authority to affirm, amend, or reverse the decision of the Council, 34 C.F.R. § 602.25(f)(1), and the applicable standard of review is whether the Council's decision "was arbitrary and capricious and not supported by the evidence on record, or inconsistent with the Rules of Procedure and that inconsistency

---

[8]The Court recognizes, however, that graduates of DSOL can sit for the bar in Tennessee and West Virginia, two states that fall within the southern Appalachian region, an area of focus for LMU and its graduates [*See* Doc. 5]. *See* Appalachian Regional Commission, http://www.arc.gov.index.asp (last visited January 18, 2012) (defining the Appalachian region).

prejudiced its decision," [Doc. 21-2 at 8], a standard similar to that of this Court. Moreover, it was represented to the Court that the current sitting Appeals Panel was appointed prior to the decision of the Council underlying this case; thus, there is no reason to speculate that the Chair of the Council would appoint individuals who might tend to affirm the Council's decision in a case arising subsequent to the composition of the Appeals Panel. Given all of this, the Court does not find it is certain that plaintiff's denial of provisional accreditation would be upheld on appeal nor that, if successful, plaintiff's remedy would be inadequate. Indeed, the fact that the Council did not adopt the Committee's conclusion regarding Standard 511 indicates to the Court that the Appeals Panel likewise would not simply affirm the Council's decision, but provide meaningful review.

In sum, it appears that exhaustion is required, and because plaintiff did not exhaust the administrative remedy available to it and because plaintiff did not make a strong showing that exhaustion is excused, it further appears plaintiff is unlikely to succeed on the merits of its due process claims.

### 2. Due Process Claims

Although the Court finds that plaintiff is not likely to succeed because it failed to exhaust its administrative remedy, assuming exhaustion is not required or that plaintiff was excused from the exhaustion requirement, it nevertheless appears that plaintiff is unlikely to succeed on the merits of its federal-common-law and state-law due process claims.

### a. State-Law Due Process Claim

Plaintiff's state-law due process claim appears preempted by federal law. *See Thomas M. Cooley Law School v. Am. Bar Ass'n*, 459 F.3d 705, 712–13 (6th Cir. 2006) ("[I]t is all but impossible to see how federal courts could apply state law to the actions of accrediting agencies when state courts have been silenced by the provision for exclusive jurisdiction." (quoting *Chicago School of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schs. and Colls.*, 44 F.3d 447, 449 (7th Cir. 1994))); 20 U.S.C. § 1099b(f) (providing for the exclusive federal jurisdiction of any suit by a school protesting the denial of accreditation by "an accrediting agency or association approved by the Secretary" of Education). Thus, it seems plaintiff is not likely to succeed on the merits of this claim.

### b. Federal-Common-Law Due Process Claim

In *Thomas M. Cooley Law School v. American Bar Association*, the Sixth Circuit examined what principles of law a court reviews a decision by an accrediting agency. The Sixth Circuit rejected the notion that the Administrative Procedures Act (the "Act"), 5 U.S.C. § 701, provides the proper framework for reviewing an accreditation process because the Secretary of Education delegated its authority regarding law school accreditation to the ABA, "which is not a government entity and thus is not governed by the Act." 459 F.3d at 712 (citing 5 U.S.C. §§ 701(b), 702). The Sixth Circuit found "[d]espite this delegation, however, the ABA does act on behalf of the Secretary and wields the quasi-governmental power of deciding which law schools are eligible for federal funds." 459 F.3d at 712. "Thus, while the Act does not specifically apply to the ABA, principles of administrative law are

21

useful in determining the standard by which [courts] review the ABA's decision-making process." *Id.* (citation omitted).

In particular, the Sixth Circuit found that "the standard of review that has developed in the common law" applies to accreditation decisions; that is, a court reviews "only whether the decision of an accrediting agency such as the ABA is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence." *Id.* at 712–13 (citations omitted). Although recognizing "[t]his standard of review resembles the review applied under the Act," the Sixth Circuit "emphasize[d], however, that while principles of federal administrative law provide guidance in our analysis, judicial review of accreditation decisions is more limited than review under the Act." *Id.* at 713. Because accrediting agencies are private organizations, "judicial review is limited to protecting the public interest," and "great deference should be afforded the substantive rules of these bodies and courts should focus on whether an accrediting agency such as the ABA followed a fair procedure in reaching its conclusions." *Id.* Courts therefore "are not free to conduct a *de novo* review or substitute [their] judgment for that of the ABA or its Council." *Id.* "Rather, in analyzing whether the ABA abused its discretion or reached a decision that was arbitrary or unreasonable, [courts] focus on whether the agency 'conform[ed] its actions to fundamental principles of fairness.'" *Id.* (alteration in original and citation omitted).

At the hearing, plaintiff brought to the attention of the Court a recent decision of the United States Supreme Court, *Judulang v. Holder*, 565 U.S. —, 132 S. Ct. 476 (2011), which plaintiff claims clarified the standard of review applicable to this type of case. In *Judulang*,

22

the Supreme Court was required to decide whether the policy of the Board of Immigration Appeals ("BIA") for applying a certain statutory provision in deportation cases is arbitrary or capricious under the Act. 132 S. Ct. at 483. Noting the scope of review under this standard is "narrow," the Court found that "courts retain a role, an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Id.* at 483–84. Further, it found that "[w]hen reviewing an agency action, we must assess, among other matters, whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 484 (citation and internal quotation marks omitted). "That task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Id.* (citation omitted).

Although during the hearing plaintiff categorized *Judulang* as a "watershed" case that redefined the applicable standard of review here, the Court does not agree. *Judulang* does not appear to have changed the standard of review under the Act; rather, it appears to have merely applied the standard to find that the BIA failed to exercise its discretion in a reasoned manner. *Judulang* also does not address the review of a decision of a quasi-governmental accrediting agency like the Section. Accordingly, the Court reviews plaintiff's federal-common-law due process claim under the framework announced in *Cooley*.

### (1)    Full and Fair Opportunity to be Heard

Plaintiff asserts that it was denied due process because of the "cursory nature of the Council hearing," and specifically, because it was given only fifteen minutes to present its case [Doc. 5]. The record, however, demonstrates that this contention likely lacks merit.

Although plaintiff was afforded fifteen minutes to present its opening and closing remarks during the Council hearing, plaintiff appeared before the Council for a total of two hours, [Doc. 19 at 17], and the transcript from the hearing indicates that plaintiff was given the opportunity for responding to questions from the Council in detail [Doc. 21-5]. Also, plaintiff submitted a forty-eight page "hearing brief" prior to the hearing in addition to other written materials. Given this record, the Court finds it difficult to discern how the law school may have been denied a full and fair opportunity to be heard. Further, the relevant regulation does not provide that, in order to satisfy due process, the accrediting agency must afford applicants a hearing. *See* 34 C.F.R. § 602.25. Finally, the Court recognizes that the Sixth Circuit has previously indicated that a law school "was afforded ample process at each of the ABA hearings [where] it was notified well in advance, afforded the opportunity to submit evidence to support[] its case, and permitted to appear before the body with counsel present." *Cooley*, 459 F.3d at 715. It appears nothing less was afforded here.

In addition, the cases cited by plaintiff in support of its argument are distinguishable. In *St. Andrews Presbyterian College v. The Southern Association of Colleges and Schools, Inc.*, No. 1:07CV640, 2007 U.S. Dist. LEXIS 87953 (M.D.N.C. Nov. 29, 2007), a school filed suit against an accrediting agency as a result of the agency removing the school from its membership. In granting the school's motion for a preliminary injunction, the court found that the school was not afforded a meaningful opportunity to be heard. First, the school was not afforded time to file a response to a report before a hearing on the matter. 2007 U.S. Dist. LEXIS 87953 at *12. Second, a compressed time line of events leading up to the

hearing hampered the school's ability to present counter-arguments or correct errors. *Id.* at *14. Third, the president of the school was given only ten minutes to make introductory remarks at the hearing and was afforded no opportunity to provide corrections or clarifications unless it was in response to a question. *Id.* at *16. Fourth, there was a voluminous record and the committee members were afforded only a limited time to review the record prior to the hearing, and the committee had a large number of matters to decide at the meeting during which the hearing took place. *Id.* at *16–17. Similar facts are not present in the instant case.

In *Western State University of Southern California v. American Bar Association*, 301 F. Supp. 2d 1129 (C.D. Cal. 2004), a law school sought a preliminary injunction prohibiting the ABA from implementing a final decision to withdraw the school's provisional accreditation or remove it from the list of accredited schools. In granting the motion, the court found that serious due process questions were raised regarding the one day period of review between the school's appeal to the Council and the hearing. 301 F. Supp. 2d at 1136. Also, the ABA's rules provided that the Council had to deliver to the House of Delegates its report within a certain number of days, and the Council failed to do so. *Id.* at 1137. In addition, the ABA failed to fully inform the school of the definitions guiding defendant in its actions. *Id.* at 1136–37. Thus, the court found that the ABA may have failed to follow its own rules, which precluded the law school to a fair and effective appeal. Again, similar facts are not present in the instant case.

In sum, the Court finds plaintiff is not likely to succeed on the merits of its argument that it was denied a full and fair opportunity to be heard.

### (2)    Substantial Evidence

Plaintiff submits that the Council's decision that plaintiff did not establish that it is in substantial compliance with each of the Standards and did not present a reliable plan for bringing the school into full compliance with the Standards within three years is not supported by substantial evidence in the record. At the outset, the Court observes that, pursuant to Standard 102(a), it was plaintiff's burden to demonstrate substantial compliance with the Standards [*See* Doc. 21-1 at 12]. The Court further reiterates that judicial review in this case is limited and that the Court must focus on whether "the ABA followed a fair procedure in reaching its conclusions." *Cooley*, 459 F.3d at 713.

***Standard 203.*** Standard 203, which addresses strategic planning and assessment, provides:

> In addition to the self study described in Standard 202, a law school shall demonstrate that it regularly identifies specific goals for improving the law school's program, identifies means to achieve the established goals, assesses its success in realizing the established goals and periodically re-examines and appropriately revises its established goals.

[Doc. 21-1 at 20].

The Committee found that the law school had not established substantial compliance with this Standard and cited to findings of fact 6–8, 10–11, and 13 [*See* Doc. 21-6]. Finding of fact 7 included plaintiff's admission that it had not revisited its feasibility study nor how

26

changed conditions and the failure to meets its enrollment projections "may affect strategic planning and the Law School's success in realizing its established goals" [Doc. 21-6 at 4–5]. Finding of fact 7 also found that "[p]art of the mission of the Law School is to prepare young lawyers to serve a population that cannot afford legal services," but the law school acknowledged that "Legal Aid of Eastern Tennessee has had to lay off lawyers, due to budget cuts" and that it was unaware of any anticipated increase in funding for such legal services [*Id*. at 4]. Further, finding of fact 13 found that the law school's "inability to reach projected enrollment targets has caused the Law School to revise projected enrollments downward, and appears to have caused a drop in the LSAT of the entering classes, negatively affecting student selectivity," which "poses strategic planning challenges that the record does not establish the Law School has sufficiently addressed" [*Id*. at 6].

The Council agreed with the Committee that plaintiff failed to establish compliance with Standard 203, stating the following as its reasons:

> [T]he Law School has not demonstrated that it regularly identifies specific goals for improving the Law School's program, identifies means to achieve the established goals, assesses its success in realizing the established goals, and periodically re-examines and appropriately revises the established goals. Specifically, the Law School has failed to establish that it has re-examined its goals and the means to achieve them in light of unanticipated economic conditions, affecting the assumptions in its feasibility study. The Law School has not established that it has determined the cause or evaluated the impact of the failure to meet its enrollment projections on its ability to meet its mission or to ultimately succeed as an institution. Although the Law School as recalculated its pro forma budgets, the Law School has failed to establish that it has re-evaluated and revised its goals given that, as currently appears based on past enrollment and present projections, it

may be a significantly smaller law school than anticipated when it was founded.

[Doc. 21-4 at 3].

Plaintiff contends that these determinations are contradicted by the facts in the record, including various statements in the site team evaluation report and Dean Beckman and Dr. Dawson's testimony during the Council hearing, as well as the findings of the TBLE and SACS-COC. The Court cannot find at this time that plaintiff has established the Council's decision is not supported by substantial evidence in the record because, despite some positive statements in the site team evaluation report and some of the testimony from the Council hearing, there is other substantial evidence in the record upon which the Council relied to conclude that plaintiff did not establish compliance with Standard 203.

First, the feasibility study was conducted in 2008, but as both parties recognized, the economy significantly changed after that time and there is no evidence in the record to demonstrate that plaintiff ever reevaluated or updated its conclusions. Indeed, plaintiff acknowledged that the assumptions in the feasibility study were never updated [Doc. 21-7 at 18–21]. Also, in response to questioning from the Council, plaintiff gave no specifics regarding whether the law school had reexamined the impact that the economy would have on the law school's goals [Doc. 21-5 at 22–29].

Second, the site team evaluation report is only one part of the record and it contained facts unfavorable to the law school as well [*See*, *e.g.*, Doc. 21-9 at 41 (commenting that "it is apparent that the qualitative aspects of the admission profiles for its first two entering

28

classes are somewhat low")]. Further, the site team is not a fact-finding body, and the cover page of the site team report states that the site team does not make official findings or conclusions regarding accreditation [Doc. 20 ¶¶ 17–19; Doc. 21-9]. Thus, it seems the site team's "findings" are not to be afforded as much weight as those of the Committee or Council, despite that plaintiff claims the site team is the only body with personal, first-hand knowledge.

Third, plaintiff's contention that the conclusions of other accrediting agencies, including the TBLE and SACS-COC, support the argument that the Council's decision is not supported by substantial evidence likely lacks merit. These accrediting agencies evaluated the law school at different times than the Committee or Council, that is prior to students arriving on campus and shortly after the law school commenced classes [*See* Doc. 21-11 (indicating that SACS-COCs review was based on limited information because the law school had been in operation for only one completed semester and "final outcomes of student success are basically 2 ½ years away")]. Also, even though SACS-COC reevaluated the law school after students commenced classes, it found that only two key administrators had "extensive experience in legal education" [Doc. 21-11; Doc. 20 ¶¶ 86–91]. It also encouraged the law school "to provide support for those faculty members who have or will assume administrative responsibilities but who do not have extensive experience in legal education" [*Id.*].

***Standard 303(a) and (c) and Interpretation 303-3.*** Standard 303, which addresses academic standards and achievements, provides:

29

> (a) A law school shall have and adhere to sound academic standards, including clearly defined standards for good standing and graduation.
>
> . . . .
>
> (c) A law school shall not continue the enrollment of a student whose inability to do satisfactory work is sufficiently manifest so that the student's continuation in school would inculcate false hopes, constitute economic exploitation, or detrimentally affect the education of other students.

[Doc. 21-1 at 30]. Interpretation 303-3 provides guidance:

> A law school shall provide the academic support necessary to assure each student a satisfactory opportunity to complete the program, at graduate, and become a member of the legal profession. This obligation may require a school to create and maintain a formal academic support program.

[*Id*. at 31].

The Committee found that the law school failed to establish substantial compliance with this Standard and Interpretation and relied upon findings of fact 40–42, 59, and 63 in support [Doc. 21-6 at 24]. These findings of fact address to the law school's standards for continuing enrollment of students in academic distress, failure to demonstrate adequate academic support for such students, and readmission of a high percentage of students who were terminated for academic failure [Doc. 21-6 at 11–12, 14–15, 16–17]. The Committee also found that the Director of Academic Success had "no prior academic support experience" and that the law school "has limited data on which to assess the effectiveness of its Academic Support Program" [Doc. 21-6 at 11–12].

The Council agreed with the Committee, stating:

> [T]he Law School has not demonstrated that it has and adheres to sound academic standards, including the obligation not to continue the enrollment of a student whose inability to do satisfactory work is sufficiently manifest so that the student's continuation in school would inculcate false hopes, constitute economic exploitation, or detrimentally affect the education of other students; and the obligation to provide the academic support necessary to assure each student a satisfactory opportunity to complete the program, graduate, and become a member of the legal profession. Specifically, although the Law School has adopted and adheres to clearly defined academic standards, the Law School has not demonstrated that the standards are sound. The Law School has not demonstrated that its standards for academic dismissal and readmission are sufficient rigorous as to ensure that the Law School does not continue the enrollment of students whose inability to do satisfactory work is manifest. While the Law School has established an academic support program, it has not established that the program is effective. The program is not currently directed by a person with specific experience in academic support, and thus, without a demonstration of effectiveness of the program, it cannot be concluded that the Law School has demonstrated that it provides the academic support necessary to assure each student a satisfactory opportunity to complete the program, graduate, and become a member of the legal profession.

[Doc. 21-4 at 3–4].

Plaintiff contends that these conclusions are contradicted by the facts in the record, including various statements in the site team evaluation report. However, the Court finds that this contention does not demonstrate that plaintiff is likely to succeed on the merits because there are also mitigating statements in the site team evaluation report regarding these matters [Doc. 21-9 at 23, 25 (addressing the on-going assessment of the effectiveness of the Academic Support Program and noting that the faculty member who had been the director

31

of the program was leaving and the new director was a law librarian admitted to practice in 2005)].

Plaintiff also claims that it had clear standards regarding readmission of academically dismissed students. There also appears to be substantial evidence in the record, however, to support the Council's conclusions regarding such standards. For example, the law school's policy is that it could readmit students only for "extraordinary circumstances," but the data demonstrated that the school readmitted six of eighteen academically dismissed students and one of them was dismissed for a second time [Doc. 21-6 at 16; Doc. 21-8 at 3, 22]. Further, although plaintiff asserts that the site team evaluation report noted that the law school had "adequate policies and procedures in place to determine whether such students possess the ability to successfully complete law school studies," this statement was made prior to any students being readmitted [*See* Doc. 21-9 at 42]. The Council also asked for empirical data regarding the Academic Support Program, but plaintiff acknowledged that there was limited data on whether the program was proven effective [*See* Doc. 21-7 at 54, 56; Doc. 21-5 at 50–51].

Finally, plaintiff claims the finding regarding the Director of the Academic Success Program is without substantial evidence because the director is well-qualified and assisted by faculty. There appears to be substantial evidence in the record, however, to support the Committee's and Council's conclusions. First, while the director has at least four years experience in teaching legal writing and served as a reference librarian, which arguably could aid him in providing academic support, the law school acknowledged that the director lacked

32

any particular experience with respect to academic support [Doc. 21-7 at 55–56; Doc. 21-8 at 7]. Second, during the hearing, the Council focused on the fact that the faculty could be overloaded with responsibilities such that they could not assist the director in providing academic support [Doc. 21-5 at 76–79].[9]

**Standard 501(b) and Interpretation 501-3.**  Standard 501, which addresses admissions, provides:

> (b) A law school shall not admit applicants who do not appear capable of satisfactorily completing its educational program and being admitted to the bar.

[Doc. 21-1 at 45].  Interpretation 501-3 provides guidance:

> Among the factors to consider in assessing compliance with Standard 501(b) are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program.

[*Id.*].

The Committee found the law school was not in substantial compliance with this Standard and Interpretation in light of findings of fact 59 and 63 [Doc. 21-6 at 24–25]. Finding of fact 59 addressed admissions data and the first-year class profiles, which indicated increases in acceptance rates and decreases in yield from 2009 to 2010–11 and decreases in LSAT scores and UGPAs [*Id.* at 14–15].  Finding of fact 63 related to readmission of academically dismissed students [*Id.* at 16–17].

_____

[9]The Court recognizes from the record before it, however, the parameters and efforts of the Academic Support Program and that such has been both supported by DSOL faculty and an outgrowth of strategic planning sessions involving the faculty.

The Council agreed with the Committee, finding:

> [I]n light of the comparatively low entering academic and admission test credentials of a significant percentage of the Law School's students, the attrition rates of its inaugural classes, the failure of the School to establish the effectiveness of the academic support program, and the fact that the Law School's graduates have yet to sit for a bar examination, the Law School has not demonstrated that it is not admitting applicants who do not appear capable of completing the educational program and being admitted to the bar.

[Doc. 21-40 at 4].

Regarding finding of fact 59, plaintiff argues that the finding of fact fails to account for the fact that in 2010 and 2011, plaintiff began admitting both part-time and full-time students. Indeed, it does not appear that the findings of fact account for this difference. Plaintiff further points out that when one compares the statistics for 2010 and 2011, there is a *de minimis* or no decline in the relevant statistics. Plaintiff, however, does not explain why the fact that 2009 includes only part-time students should undercut the Committee's findings. Nevertheless, for the reasons previously explained, there is support for the Committee and Council's conclusions in light of finding of fact 63.

In sum, the Court finds that plaintiff has not demonstrated at this time a strong likelihood of success on the merits regarding its due process claim because the conclusions that plaintiff did not demonstrate substantial compliance with Standards 203, 303(a) and (c), and 501(b) and Interpretations 303-3 and 501-3 appear to be based upon substantial evidence in the record. This is especially the case given the standard enunciated in *Cooley* and the fact that this Court "must defer . . . even if there is substantial evidence in the record that would

34

have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached." *Jones v. Commissioner*, 336 F.3d 469, 475 (6th Cir. 2003) (citation omitted).

### (3)    Failure to Follow Own Rules

Plaintiff contends that it is likely to succeed on the merits of its due process claim because the Committee and Council failed to follow its own rules in reaching its accreditation decision with respect to plaintiff. Broadly, plaintiff argues the Committee and Council applied evaluation considerations that went beyond the scope of the Standards. For example, plaintiff argues that the Committee and Council should not have relied upon the feasibility study or the debt loads of students upon graduation because the Standards do not provide that they may rely upon such matters. Plaintiff further argues that nowhere in the Standards is there a requirement that the Director of the Academic Success Program be an individual whose past experience is limited to work in the field of academic success. It appears to the Court that plaintiff reads the Standards too narrowly and that consideration of these matters was appropriate given the broad language of the Standards. Indeed, with respect to the feasibility study, such was required to be submitted by Rule 4(b)(4) [Doc. 21-2 at 4].

Plaintiff also argues that the Council published its decision on its website in contravention of its own rules [Doc. 32]. However, it appears that the internal operating procedures expressly require that the Consultant:

Provide written notification to the Secretary of the Department of Education, the appropriate state licensing agency, and the appropriate accrediting agency, at the same time the Consultant notifies the law school in writing of any decision to deny, withdraw, suspend or remove the approval or provisional approval of the law school, or to place a law school on probation, but no later than thirty (30) days after the Council reaches the decision.

[Doc. 21-3 at 3–4]. They also require that the Consultant:

Provide written notification to the public within twenty-four (24) hours of the time the Consultant notifies the law school in writing of *any* decision to deny, withdraw, suspend or remove the approval or provisional approval of the law school, or to place a law school on probation.

[*Id.* at 4 (emphasis added)]. Given that the Council had notified plaintiff of its decision to deny provisional approval, it appears that it followed its own rules in publishing the memorandum on its website soon thereafter.

In sum, plaintiff has not made a strong showing that defendant failed to follow its own rules in reaching the decision to deny provisional approval.

### (4)    Disparate Treatment

Plaintiff asserts defendant imposed LSAT and UGPA requirements that resulted in plaintiff being treated differently than other similarly-situated, fully-accredited law schools with lower such scores. During the hearing, the parties focused on a Sixth Circuit decision, *Foundation for Interior Design Education Research v. Savannah College of Art & Design*, 244 F.3d 521 (6th Cir. 2001), each contending that it supported their argument. The Court has reviewed *Foundation* and does not find that it expressly precludes a disparate treatment claim, but strongly suggests that a disparate treatment claim will fail as it notes that "[c]ourts

36

. . . have refused to consider claims of disparate treatment of accreditation applicants." 244 F.3d at 528 (citation omitted); *see also id.* at 529 (finding the district court was correct in deciding not to give consideration to the relative qualifications of other schools accredited by the accrediting agency because the record did not provide any evidence that the agency acted arbitrarily and because the record indicated that the accreditation decision was based on substantial evidence). Moreover, as one Court of Appeals outside the Sixth Circuit has indicated, giving consideration to the relative qualifications of other schools accredited by an accrediting body "really amounts to a claim that the [accrediting body] was incorrect in its evaluation of either [the applicant] or the other schools." *Marlboro Corp. v. Ass'n of Indep. Colls. & Schs., Inc.*, 556 F.2d 78, 80 n.2 (1st Cir. 1977).

Nevertheless, even if a disparate treatment analysis were appropriate, accreditation decisions are made on the totality of the circumstances, and plaintiff's argument seemingly overlooks the range of facts the Committee and Council considered. As an example, although plaintiff's students may have similar or even better LSAT scores than students of an accredited school, the Council found the law school lacked an effective academic support program and readmitted one-third of its academically dismissed students despite its policy to readmit only for extraordinary circumstances, which are circumstances that may not have been present with respect to the accredited schools.

In sum, plaintiff has not shown a strong likelihood of success on the merits of its federal-common-law due process claim. In particular, focusing on whether defendant conformed its actions to fundamental principles of fairness, plaintiff has not demonstrated

at this time that the decision to deny provisional approval was arbitrary and unreasonable or an abuse of discretion, nor that it was not based on substantial evidence. This factor therefore weighs against granting injunctive relief.

## B. Irreparable Injury

Plaintiff cites a plethora of harms that would result in the absence of an injunction. These include among others: harm caused to plaintiff's reputation; that defendant's decision precludes the flow of any federal student loan funds to plaintiff's students; the likelihood that students and faculty will transfer to or seek positions at other law schools; the likelihood that recently admitted but non-matriculated students will choose to attend another law school; the inability of the school's future graduates to sit for certain state bar exams; the possibility that TBLE might withdraw its grant of approval for plaintiff's graduates to sit for the Tennessee bar exam; that LMU will find it difficult to financially maintain the law school; that plaintiff's students will not be able to compete for scholarships, occupational positions, externships, or internships; that faculty members will be precluded from presenting at conferences, seminars, and panel presentations open only to members of ABA approved law schools, which will curtail plaintiff's faculty from engaging in scholarship with their peers; and that plaintiff's very existence will be compromised [*See* Docs. 5, 7].

The Sixth Circuit has stated that a movant for injunctive relief must show harm that is "both certain and immediate, rather than speculative or theoretical." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with

our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (citation omitted)). Except for Dean Beckman's declaration that the law school has received numerous telephone calls and emails from potential applicants informing the law school that the accreditation decision is the single factor that has prevented their applications to the law school, most of plaintiff's assertions of irreparable injury are either unsupported or speculative. As an example, plaintiff has not provided the Court with any evidence that any faculty member has informed the law school that he or she would be leaving the law school as a result of the Council's decision.

In addition, most, if not all, of plaintiff's alleged injuries unfortunately arise from plaintiff's status as a law school unaccredited by the Section. Plaintiff, however, has been operating without accreditation from the Section since 2009, well before the Council denied plaintiff's application for provisional approval on December 20, 2011. Thus, plaintiff's injuries, including the reputational injury[10] and the injuries concerning the retention of students and faculty, will not necessarily be remedied by the preliminary injunctive relief plaintiff seeks. The Court also finds plaintiff's harms are not irreparable given that the law

---

[10]The Court notes that, although plaintiff represented to the Court that federal courts grant TROs to protect academic reputation when the denial of accreditation violates due process, the cases cited by plaintiff—*Florida College of Business v. Accrediting Council*, 954 F. Supp. 256, 257 (S.D. Fla. 1996), and *Edwards Waters College, Inc. v. Southern Association of Colleges & Schools*, 2005 U.S. Dist. LEXIS 39443, at *1-2 (M.D. Fla. Mar. 11, 2005)—are inapposite. Each of these cases involve schools that had their preexisting accreditation withdrawn.

school can re-apply for accreditation after ten months from the date of the letter reporting the Council's decision, or even sooner for good cause shown [Doc. 21-2 at 11].

Further, plaintiff's claim that its graduates will not be able to sit for the bar is somewhat undermined given that at least two states in the southern Appalachian region, the very region the law school seeks to serve, permit applicants to take the bar examination without graduating from a Section-accredited law school [Doc. 20 ¶¶ 7, 37].[11] Although the law school's website indicates that it is "determined to devote all necessary resources and in other respects to take all necessary steps to present a program of legal education that will qualify for approval by the American Bar Association," it also states in bold and italicized font: "The Law School makes no representation to any applicant that it will be approved by the American Bar Association prior to the graduation of any matriculating student" [Doc. 21-26]. Consequently, no student or prospective student, should have had any expectation that he or she would have been able to apply to sit for the bar examination in any state that requires a bar-examination applicant to have graduated from a Section-accredited law school.

Finally, the law school does not provide any basis to conclude that the alleged harms would be undone by removing the memorandum from the ABA's website and replacing it with the notice plaintiff suggests for two reasons. First, plaintiff's filing of this lawsuit, as recognized by both parties during the hearing, has garnered the attention of both local and

---

[11]The Court also recognizes that 75–85% of plaintiff's students are from Tennessee, and plaintiff expects that most of the school's graduates will remain in Tennessee [Doc. 20 ¶ 37]. Thus, any harm in this respect appears minimal.

national media [*See* Doc. 19 at 23]. Second, the memorandum makes clear that the Council's decision does not become effective until the appeals process, as outlined in Rule 10, is exhausted; thus, although not worded exactly as plaintiff would desire, it seems clear that those who read the memorandum will understand that the denial of provisional approval is not yet final [*See* Doc. 2 Ex. A].

In sum, plaintiff is not likely to suffer the type of irreparable injury necessary to obtain preliminary injunctive relief. This factor accordingly weighs in favor of denying plaintiff's motion.

### C. Substantial Harm to Others, Including Defendant

If the Court were to grant the requested preliminary injunctive relief, it seems as though defendant will suffer substantial harm. Particularly, defendant's free speech rights will be compromised, and the Supreme Court has noted that interference with free speech, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). [*See also* Doc. 19-1 (*Thomas J. Cooley Law Sch. v. Am. Bar Ass'n*, No. 1:04-CV-221 (W.D. Mich. July 11, 2005) (noting that enjoining publication of a Council decision regarding a law school raises "legitimate and not insignificant" First Amendment concerns)]. This Court previously has refused to enjoin speech harmful to the reputation of a business, concluding that such extraordinary relief could not issue unless the communication "threaten[ed] an interest more fundamental than the First Amendment itself," *Thompson v. Hayes*, 748 F. Supp. 2d 824, 831 (E.D. Tenn. 2010) (citation omitted); likewise, neither the law school's reputation nor its ability to attract and retain students, faculty, and

41

donors outweighs defendant's First Amendment right, *see Zavaletta v. Am. Bar Ass'n*, 721 F. Supp. 96, 98 (E.D. Va. 1989) ("[T]he ABA has a First Amendment right to communicate its views on law schools to governmental bodies and others." (citation omitted)); *see also Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 937 F. Supp. 435, 443-44 (E.D. Pa. 1996) (recognizing that the ABA rendering an opinion about whether the plaintiff met certain quality standards is protected speech). In sum, this factor favors denying the motion for injunctive relief because the requested injunction would likely cause substantial harm to defendant.

### D.    Public Interest

Plaintiff claims the requested injunction would protect the public from dissemination of misinformation based upon an arbitrary accreditation decision and requiring the Section to carry out its accreditation function according to its published rules and standards. Plaintiff's argument, however, is premised entirely on the assertion that it is likely to succeed on the merits, and for the reasons explained above, it appears that plaintiff is not likely to be successful.

Also, the Court finds that there is a public interest in having those who look to the Section's evaluation of legal education receive prompt and accurate information, and the requested injunction would harm this interest. *See Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) ("[T]he public as a whole has a significant interest in . . . protection of First Amendment liberties."). Moreover, retracting the decision of the Council could harm potential students of the law school because it could "mislead

students into believing that [plaintiff] has provided all necessary information to the [Section] to show that it meets the . . . accrediting standards," which may or may not be the case. *Philadelphia Wireless Technical Inst. v. Accrediting Comm. of Career Schs. and Colls. of Tech.*, No. 98-2843, 1998 WL 744101, at *8 (E.D. Pa. Oct. 23, 1998); *see also Micromax Sys., Inc. v. Nat'l Home Study Council*, No. 87-CV-2342, 1987 WL 14119, at *2 (D.D.C. Oct. 2, 1987) (noting with respect to a plaintiff's request that the court reinstate the plaintiff's accreditation pending a final decision in the case that "students . . . may decide to participate in the program not understanding that there is a pending question concerning accreditation"). Accordingly, the public interest weighs in favor of denying plaintiff's motion for preliminary injunctive relief.

## III.     Conclusion

In conclusion, and for the reasons stated above, the Court finds the factors a court must consider in determining whether to grant preliminary injunctive relief weigh against granting plaintiff's motion.  The Court therefore **DENIES** plaintiffs' request for injunctive relief [Doc. 2].

IT IS SO ORDERED.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

43