**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | | |
|---|---|---|
| LINCOLN MEMORIAL UNIVERSITY DUNCAN SCHOOL OF LAW, | ) ) ) | Case No. 3:11-CV-608 |
| Plaintiff, | ) ) | Hon. Thomas A. Varlan |
| v. | ) ) | Magistrate Judge C. Clifford Shirley |
| THE AMERICAN BAR ASSOCIATION, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT
## AMERICAN BAR ASSOCIATION'S MOTION TO DISMISS

Defendant American Bar Association ("ABA") submits this Memorandum in support of

its Motion to Dismiss the Complaint of Lincoln Memorial University Duncan School of Law

("Duncan" or "the School") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 8(a).  In

its Memorandum Opinion and Order dated January 18, 2012, this Court denied the School's

motion for preliminary injunction after extensive review of the administrative record.  Doc. 35.

For substantially the same reasons, and consistent with the standard of "great deference" to

which decisions of accrediting bodies like the Council of the Section of Legal Education and

Admissions to the Bar ("Council") are entitled, this Court should now dismiss the School's

Complaint in its entirety as a matter of law.[1]

The School's federal due process claim (Count I) should be dismissed because the

---

[1] The ABA notes that it has concurrently filed a Motion to Stay the litigation in this matter, based
on the School having filed an appeal of the Council's December 2011 decision underlying this
case to the Appeals Panel, which appeal was publicly announced on or about January 19, 2012.
To comply with the Court's January 11, 2012 Order (Doc. 31) that the ABA respond to the
Complaint by February 8, 2012, and in the event the Court does not grant the motion to stay, the
ABA is also filing its Motion to Dismiss and this supporting Memorandum.

administrative record, which the Court properly may consider, establishes as a matter of law that the Council did not abuse its discretion or reach a decision that was arbitrary and unreasonable, but rather "conform[ed] its actions to fundamental principles of fairness." *See* Doc. 35 at 22 (quoting *Thomas M. Cooley Law Sch. v. ABA*, 459 F.3d 705, 713 (6th Cir. 2006)). The School's derivative state-law due process claim (Count II) should be dismissed because Tennessee courts apparently have not recognized such a claim when based on a private accreditation decision and, even if recognized, the claim would be preempted by federal law. *Cooley*, 459 F.3d at 712.

The School's antitrust claims under Sections 1 and 2 of the Sherman Act (Counts III and IV) should also be dismissed. First, the School fails to identify any cognizable "antitrust injury" arising from the Council's decision. Second, the School's claims that the ABA conspired with unidentified law schools to restrain competition should be dismissed under the "rule of reason" analysis and, together with its claim that the ABA improperly "monopolized" law school accreditation, should be dismissed as based on nothing more than conclusory assertions which fail to comply with Fed. R. Civ. P. 8. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Finally, Count V should be dismissed because it fails to articulate any separate claim for relief. Because the School has thus failed to state any claim upon which relief can be granted, the Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS AND ALLEGATIONS

### A. Lincoln Memorial University Duncan School of Law

In 2008, Lincoln Memorial University ("LMU") prepared a feasibility study for a new law school. Doc. 26-2 at 5-33. [2] The study predicted "great demand" for legal education that

---

[2] For purposes of this motion to dismiss, the Court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett*

*(Footnote continued)*

would allow LMU "to fill its classes with students whose academic credentials surpass those of many ABA-approved law schools in times of low demand." *Id.* at 19-20. In 2009, before any students were admitted, LMU "received approval from [the Southern Association of Colleges and Schools – Commission on Colleges ("SACS-COC")] to offer a J.D. degree," and approval from the Tennessee Board of Legal Examiners ("TBLE") for its future graduates to take the Tennessee bar examination. Compl. ¶¶24, 26; Doc. 26-9 at 38, 40-41. Because the School was not yet operating, these approvals were based only upon plans for the School.

Duncan enrolled its first class of part-time students in Fall 2009, and its first class of full-time students in Fall 2010. Compl. ¶4. SACS-COC visited the School in March 2010 and produced a report. Compl. ¶26; *see* Doc. 26-9 at 42-66. The report was based on limited information because Duncan had only been in operation for one semester and "final outcomes of student success [were] basically 2 1/2 years away." Doc. 26-9 at 64; *compare* Compl. ¶¶26-27.

### B. The Council of the Section of Legal Education and Admissions to the Bar

Since 1952, the Council has been the national agency for the accreditation of law schools. *See* Compl. ¶5. Accreditation decisions are governed by published Standards and Rules of Procedure for Approval of Law Schools, which are accompanied by Interpretations of the Standards and the Section's Internal Operating Practices. Docs. 21-1, 21-2, 21-3.[3] The

---

*v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008); *see also Youssefi v. Renaud*, 794 F. Supp. 2d 585, 591 (D. Md. 2011) ("[T]he Court may review the administrative record attached to Defendants' motion to dismiss, and the motion need not be treated as one for summary judgment."). The administrative record materials referenced in the Complaint and filed by Duncan in this matter (Doc. 26, 27, 28, 33) are therefore properly before the Court.

[3] The Court may consider the published Standards and Rules of Procedure for Approval of Law Schools in the context of a motion to dismiss. *See Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002); *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).

Standards, Interpretations, and Rules govern both provisional and full approval of law schools.

To receive provisional approval, a school must both (i) establish that it is in substantial compliance with each of the Standards, and (ii) present a reliable plan for bringing the law school into full compliance within three years. Doc. 21-1, Standard 102(a); *see also* Compl. ¶33.

### C. The School's Application for Provisional Approval

The School submitted an application for provisional approval on January 10, 2011, which exceeded 400 pages. Compl. ¶28. In March 2011, a Site Team visited the School, and, on July 14, 2011, issued its report. Compl. ¶29. The Site Team Report stated on the first page:

> *The site evaluators do not make the official findings or conclusions for the Section of Legal Education and Admissions to the Bar of the American Bar Association. These are made by the Accreditation Committee and the Council of the Section.*

Doc. 28-11 at 4; *cf.* Compl. ¶30. The Site Team reported that the School had projected that it would enroll 100 new full-time and 60 new part-time students in 2010, but it enrolled just 55 new full-time and 36 new part-time students. Doc. 28-11 at 12. The Site Team also observed that "the qualitative aspects of the admission profiles for its first two entering classes are somewhat low," and it provided a chart showing that, while applications to the School had declined from 2009 to 2010, its acceptance rate had increased from 51% to 71% and its yield had dropped. *Id.* at 43-44. The Site Team further reported the School's "concern 'that the 2010-2011 data indicates the median admission LSAT scores for the academic program declined from the 2009-2010 academic year.'" *Id.* at 45 (quoting the School's Site Evaluation Questionnaire). In fact, the Site Team reported that LSAT scores declined not only at the median but also at the 75th and 25th quartiles, and UGPAs declined in every quartile as well. *Id.* The Site Team concluded that the School's recruiting "needs to be monitored in order to ensure that [the School] is only admitting students who can complete the educational program and be admitted to the

bar." *Id*. The Site Team also reported that the director of the academic success program was being replaced by a law librarian. *Id*. at 28.

On August 6, 2011, the School responded to the Site Report (Docs. 28-8, 28-9) and did not dispute any of the foregoing facts. Doc. 28-8. The School provided updated admissions data, which showed that applications to the School had decreased 27% from 2010 to 2011 and that LSAT scores and UGPAs had not improved. *Id*. at 6. Despite the steep decline in applications, the School did not project any change in enrollment for 2012-2013, which the Site Team had reported to be 80 full-time and 25 part-time students. Doc. 28-11 at 12.

The School also disclosed for the first time that it had readmitted 6 of 18 students who had been academically dismissed and sought readmission. Doc. 28-8 at 55. This was in contrast to the School's previous report to the Site Team that it "has not readmitted any of its own students who have been previously disqualified for academic reasons." Doc. 28-11 at 45. The School's standard for readmission following involuntary academic withdrawal required that the Academic Standards Committee "affirmatively find" that "[e]xtraordinary circumstances contributed to the student's inability to meet the academic requirements" and that those "circumstances … have been remedied or no longer exist." Doc. 28-11 at 24.

## 1. The Accreditation Committee Meeting and Recommendation

In late September 2011, the Accreditation Committee met and considered "a record which included [Duncan's] application, the site evaluation report and supplemental letters." Compl. ¶32. The School made a presentation and responded to questions in an appearance that lasted for approximately two hours. Doc. 28-11 at 71-159.

The Committee then prepared a 23-page Recommendation, which the School received on October 12, 2011. Doc. 28-11 at 204-28. After discussing 96 separate findings of fact, the Committee concluded that the School had "not established that it [was] in substantial compliance

with each of the ABA Standards for Approval of Law Schools, and [had] not presented a reliable plan for bringing itself into full compliance … within three years." Compl. ¶33; Doc. 28-11 at 227. Specifically, the Committee concluded that the School had failed to establish substantial compliance with Standard 203, Standard 303(a) and (c) and Interpretation 303-3, Standard 501(b) and Interpretation 501-3, and Standard 511.[4] Compl. ¶34; Doc. 28-11 at 227-28. The Committee therefore "did not recommend to Defendant ABA's Council that it grant provisional ABA approval" to the School. Compl. ¶36; Doc. 28-11 at 227.

**Standard 203—Strategic Planning and Assessment:** The Committee concluded that the School had failed to establish substantial compliance with Standard 203, which provides:

> a law school shall demonstrate that it regularly identifies specific goals for improving the law school's program, identifies means to achieve the established goals, assesses its success in realizing the established goals and periodically re-examines and appropriately revises its established goals.

Doc. 21-1 at 20. The Committee's conclusion was based on six findings of fact that identified specific deficiencies in the School's strategic planning and assessment. Doc. 28-11 at 227, 207-09 (Nos. 6-8, 10-11, 13). In connection with the School's 2008 feasibility study, for example, the Committee found that the School's Dean admitted "that there has not been any formal revisiting of the findings and assumptions in the original Feasibility Study." *Id.* at 208. The Committee further found that the School "did not present any evidence that it has revisited the predicted growth in LSAT takers beyond February 2009, and whether any decreases in LSAT takers for 2010, 2011, and beyond may affect strategic planning and the Law School's success in realizing its established goals." *Id.* at 207. The Committee made similar findings that the School failed to present evidence that it had revisited other assumptions, including those pertaining to

---

[4] The Council did not accept the Committee's recommendation as to Standard 511. Compl. ¶38. That Standard, accordingly, is not discussed in this brief.

post-graduation employment of its students. *Id.* at 208. It also found that Duncan's "inability to reach projected enrollment targets has caused the Law School to revise projected enrollments downward, and appears to have caused a drop in the LSAT of the entering classes, negatively affecting student selectivity." *Id.* at 209; *see also id.* at 218. The Committee found: "This poses strategic planning challenges that the record does not establish the Law School has sufficiently addressed at this time." *Id.* at 209. *Cf.*, Compl. ¶¶34, 35(a), 41-50.

**Standards 303(a) and (c); Interpretation 303-3—Academic Standards:** The Committee concluded that Duncan had failed to establish substantial compliance with Standards 303(a) and (c) and Interpretation 303-3 (Doc. 28-11 at 227), which provide:

> Standard 303(a): A law school shall have and adhere to sound academic standards, including clearly defined standards for good standing and graduation.

> Standard 303(c): A law school shall not continue the enrollment of a student whose inability to do satisfactory work is sufficiently manifest so that the student's continuation in school would inculcate false hopes, constitute economic exploitation, or detrimentally affect the education of other students.

> Interpretation 303-3: A law school shall provide the academic support necessary to assure each student a satisfactory opportunity to complete the program, graduate, and become a member of the legal profession. This obligation may require a school to create and maintain a formal academic support program.

Doc. 21-1 at 30-31. These conclusions were based upon findings of fact relating to Duncan's (i) low standards for continuing enrollment of students in academic distress, (ii) failure to demonstrate adequate academic support, and (iii) readmission of a high percentage of students who were dismissed for academic failure. Doc. 28-11 at 227, 214-15, 217-20. The Committee discussed the School's standards for academic probation and dismissal, the fact that the Director of Academic Success has "no prior academic support experience," and that the School "has limited data on which to assess the effectiveness of its Academic Success Program." *Id.* at 214-15. The Committee also found that despite its "extraordinary circumstances" requirement the School had readmitted one-third of the 18 academically dismissed students who had sought

readmission.  *Id.* at 214, 219-20.  *Cf.* Compl. ¶¶34, 35(b), 51-56.

**Standards 501(b) and Interpretation 501-3—Admissions:**  The Committee concluded

that the School had failed to establish substantial compliance with Standard 501(b) and

Interpretation 501-3.  Doc. 28-11 at 227-28.  These provide:

> Standard 501(b): A law school shall not admit applicants who do not appear
> capable of satisfactorily completing its educational program and being admitted to
> the bar.
>
> Interpretation 501-3: Among the factors to consider in assessing compliance with
> Standard 501(b) are the academic and admission test credentials of the law
> school's entering students, the academic attrition rate of the law school's students,
> the bar passage rate of its graduates, and the effectiveness of the law school's
> academic support program.

Doc. 21-1 at 45.  These conclusions were based upon Duncan's admissions and first-year class

profiles, which showed that entering student LSAT scores and UGPA had dropped in every

quartile while the acceptance rate increased to 71%.  Doc. 28-11 at 43-45.  *Cf.* Compl. ¶¶34,

35(c), 57-64.  The Committee also cited the academic dismissal and readmission findings

discussed *supra*, at 7-8.  Doc. 28-11 at 227-28, 217-20.

## 2.    The Council's Meeting and Decision

The School appeared at the Council's meeting in early December 2011.  Prior to that

meeting, the School submitted a 48-page Hearing Brief, in which the School asserted that the

Council should reject the Committee's recommendation.  Compl. ¶37 & Ex. A.  At the meeting,

the School made a "15-minute presentation."  Compl. ¶37.  Thereafter, the School responded to

questions from the Council, and the meeting lasted two hours.  Doc. 28-11 at 229-322.

On December 20, 2011, the School received notification that the Council had accepted

the Committee's recommendation except as to Standard 511, and the School therefore would not

be granted provisional approval.  Doc. 28-11 at 370-78.  The Council made this decision

consistent with Rule 8(a) of the Standards and Rules of Procedure for the Approval of Law

Schools, which provides: "In considering a recommendation of the Committee, the Council shall adopt the Committee's findings of fact unless the Council determines that the findings of fact are not supported by substantial evidence on the record." Doc. 21-2 at 6.

Based on the record consisting of the full record before the Accreditation Committee, the transcripts of the School's testimony before the Committee and before the Council, and the School's November 18 response (*see* Doc. 28-11 at 372), the Council concluded that Duncan failed to establish substantial compliance with the following Standards:

> **Standard 203.** Duncan "has not demonstrated that it regularly identifies specific goals for improving the Law School's program, identifies means to achieve the established goals, assesses its success in realizing the established goals, and periodically re-examines and appropriately revises the established goals." *Id.*
>
> ♦ "[T]he Law School has failed to establish that it has re-examined its goals and the means to achieve them in light of unanticipated economic conditions, affecting the assumptions in its feasibility study." *Id.*
>
> ♦ "The Law School has not established that it has determined the cause or evaluated the impact of the failure to meet its enrollment projections on its ability to meet its mission or to ultimately succeed as an institution." *Id.*
>
> ♦ "[T]he Law School has failed to establish that it has re-evaluated and revised its goals given that, as currently appears based on past enrollment and present projections, it may be a significantly smaller law school than anticipated when it was founded." *Id.*
>
> **Standard 303(a), (c); Interpretation 303-3.** "[A]lthough the Law School has adopted and adheres to clearly defined academic standards, the Law School has not demonstrated that the standards are sound." *Id.* at 373.
>
> ♦ "The Law School has not demonstrated that its standards for academic dismissal and readmission are sufficiently rigorous as to ensure that the Law School does not continue the enrollment of students whose inability to do satisfactory work is manifest." *Id.*
>
> ♦ "While the Law School has established an academic support program, it has not established that the program is effective. The program is not currently directed by a person with specific experience in academic support…." *Id.*
>
> **Standard 501; Interpretation 501-3.** The Law School has not demonstrated "that it is not admitting applicants who do not appear capable of completing the educational program and being admitted to the bar." *Id.*
>
> ♦ Factors include the "comparatively low entering academic and admission test credentials of a significant percentage of the Law School's students, the attrition

rates of its inaugural classes, the failure of the School to establish the effectiveness of the academic support program, and the fact that the Law School's graduates have yet to sit for a bar examination." *Id.*

In the December 20, 2011 letter providing the Council's decision, the School was also informed that the School had a right pursuant to the Section's Rule of Procedure 10 to appeal the Council's decision to the Appeals Panel, but was required to do so within 30 days. Doc. 28-11 at 374. The School was also informed that if the School timely filed an appeal the Council's decision would be stayed pending the appeal's conclusion; otherwise the Council's decision would become effective on that 30th day. *Id.*

On January 19, 2012, the School timely appealed the Council's decision to the Appeals Panel. That appeal remains pending.

## D. The School's Complaint

On December 22, 2011, prior to filing its appeal under the Section's Rule 10, the School filed its Complaint in this Court asserting a federal common law due process claim (Count I), a state due process claim under Tennessee common law (Count II), an antitrust claim under Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count III), an antitrust claim under Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count IV ), and an unnamed count (Count V) asserting various injuries allegedly arising from the Council's decision. As discussed *infra* at 19, the antitrust allegations are entirely derivative of the School's due process claims.

## ARGUMENT

"[A] civil complaint only survives a motion to dismiss if it 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). The Court must accept all well-pleaded allegations of fact as true but "need not accept as true legal conclusions or unwarranted factual inferences … and conclusory

allegations or legal conclusions masquerading as factual allegations will not suffice." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (citation and internal quotation marks omitted). Further, Federal Rule of Civil Procedure 8 requires facts that, if true, show the pleader is entitled to relief, not "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). Applying this standard, Duncan's Complaint should be dismissed in its entirety.

## I.  DUNCAN'S FEDERAL DUE PROCESS CLAIM (COUNT I) IS REFUTED BY THE ADMINISTRATIVE RECORD AND SHOULD BE DISMISSED.

In Count I of its Complaint, the School alleges that it was denied due process under federal common law because it was in substantial compliance with the Section's Standards (Compl. ¶89); the Council's decision that the School was not in substantial compliance with each of the Standards was "arbitrary and capricious" (Compl. ¶90); and the School was not given a meaningful opportunity to be heard before the Council (Compl. ¶91).

The administrative record, however, readily establishes that the Council's decision satisfies the Sixth Circuit's highly deferential review standard under *Thomas M. Cooley Law Sch. v. ABA*, 459 F.3d 705, 713 (6th Cir. 2006) (citation omitted): it was not "arbitrary or unreasonable" and it did not breach "fundamental principles of fairness." . As this Court recognized in its Memorandum Opinion and Order, judicial review of the decisions of accrediting agencies such as the Council "'is limited to protecting the public interest,' and 'great deference should be afforded the substantive rules of these bodies and courts should focus on whether an accrediting agency such as the ABA followed a fair procedure in reaching its conclusions.'" Doc. 35 at 22 (quoting *Cooley,* 459 F.3d at 713). Finally, as noted by this Court, it is the School's burden under Standard 102(a) to demonstrate substantial compliance with the

Standards.  Doc. 35 at 26 (citing Doc. 21-1 at 12).

Because the administrative record establishes that the Council's decision was supported by substantial evidence and was not arbitrary and unreasonable, and that the School was given a meaningful opportunity to be heard, Count I of the School's Complaint should be dismissed.

### A. The Administrative Record Contains Substantial Evidence Supporting The Council's Conclusion That The School Was Not In Substantial Compliance With Each Of The Standards.

The conclusory allegations in the School's Complaint are belied by the extensive administrative record, which contains substantial undisputed evidence supporting the Council's conclusion that the School had not demonstrated that it was in substantial compliance with each of the Standards.  While the Council determined that the School failed to establish substantial compliance with three separate Standards and two Interpretations, failure to comply with any single Standard would require the same decision from the Council.  *See* Doc. 21-1 at 12, Standard 102(a) (requiring "substantial compliance with *each* of the Standards") (emphasis added).

As to Standard 203 (Strategic Planning and Assessment), the Council's conclusion was based on six separate findings of fact, discussed *supra* at 6-7.  Each was supported by evidence in the record that included, *inter alia*, the School's admission that it had not evaluated how changed economic conditions affecting the numbers of potential applicants, employment prospects for graduates, and other key assumptions in its feasibility study would affect the Law School's future and ability to meet its goals and that the School had not sufficiently addressed strategic planning challenges posed by the undisputed decreases in enrollment and in the qualifications of entering students.  Doc. 28-11 at 207-209.

The School quotes the Site Team Report as stating, *inter alia,* that the School has a "culture of assessment at every level—institutional, programmatic, curricular, teaching,

student—(indeed every aspect of the law school operation)." Compl. ¶35(a). These types of general allegations do not refute the undisputed evidence in the record showing that the School had not addressed the particular issues focused on by the Council. *See* Doc. 28-11 at 372; *see also* Doc. 28-11 at 227, 207-09. Indeed, School representatives made clear during the hearings before the Committee and Council that the School had not addressed these issues. *See* Doc No. 28-11 at 87-90, 154-56; Doc No. 28-11 at 240-42, 250-57, 263-68.

As to Standards 303(a) and (c) and Interpretation 303-3 (Academic Standards and Achievements), the Council's conclusion was based on five separate findings of fact, discussed *supra* at 7-8. Each was supported by evidence in the record that included, *inter alia,* the School's readmission of one-third of students who were dismissed for academic failure and applied for readmission (Doc. 35 at 32 (citing Doc. 21-6 at 16; Doc. 21-8 at 3, 22)), the absence of empirical data related to the School's academic support program (Doc. 35 at 32 (citing Doc. 21-7 at 54, 56; 21-5 at 50-51)), and the lack of experience of the School's Director of Academic Support (Doc. 35 at 32-33 (citing Doc. 21-7 at 55-56; Doc. 21-8 at 7)). While the School in its Complaint quotes the statement in the Site Team Report that the School "adheres to clearly defined academic standards for good standing" (Compl. ¶51), the Council's conclusion, which was based on the entire administrative record, was that "although the Law School has adopted and adheres to clearly defined academic standards, *the Law School has not demonstrated that the standards are sound*." Doc. 28-11 at 373 (emphasis added). This record included the School's data regarding academic dismissal and readmission, which was not before the Site Team and which demonstrated that the School's standard was not sufficiently rigorous. *Id*. It also included undisputed evidence that the School's director of academic success was inexperienced and the School lacked data demonstrating the effectiveness of its academic support program. *Id.*

Determining whether academic standards are sound and whether academic support is effective is at the core of the accreditation function and of the Council's particular expertise.

As to Standard 501(b) and Interpretation 501-3 (Admissions), the Council's conclusion was based on two separate findings of fact, discussed *supra* at 8. These pertained to Duncan's first-year class profiles, which reflected low and declining admission statistics, including LSAT scores and UGPAs, and the School's standards for academic dismissal and readmission, discussed above. Doc. 28-11 at 373; Doc. 28-11 at 227-28, 217-20. The record as to the School's admission statistics and its readmissions is undisputed. While the School attempts to overcome the Council's conclusion by portraying the decline in credentials as insignificant (Compl. ¶61), a court may not "substitute its judgment for that of the … Council." *Cooley*, 459 F.3d at 713.

The School alleges, *inter alia*, that it was "blatantly arbitrary and capricious" for the Council to find a lack of compliance with Standard 501(b) based on the School's LSAT scores while the Counsel had accredited other schools that the School alleges has the same or lower scores. Compl. ¶61. However, as the Sixth Circuit has noted, courts "have refused to consider claims of disparate treatment of accreditation applicants." *Foundation for Interior Design Educ. Research v. Savannah Coll. of Art*, 244 F.3d 521, 528 (6th Cir. 2001) (citing *Marlboro Corp. v. Ass'n of Indep. Colls. & Sch., Inc.*, 556 F.2d 78, 80 n.2 (1st Cir. 1977); *Transport Careers, Inc. v. Nat'l Home Study Council*, 646 F. Supp. 1474, 1485-86 (N.D. Ind. 1986)). Further, accreditation decisions are based upon a totality of the circumstances and singling out one set of data (such as LSAT data) ignores other factors that are properly considered. Here, the Council's conclusion was based not only on facts related to LSAT scores and UGPAs, but also on the School's lack of proven academic support and readmission of academically dismissed students.

When academic support has not been proven to be effective, for example, it becomes more critical to enroll students who have the ability to complete the academic program successfully. For all of these reasons, as stated by the *Foundation for Interior Design* Court, where the record does not provide any credible indication that the accrediting agency acted in an arbitrary and unreasonable manner in denying accreditation, and where the record indicates that the accreditation decision was based on substantial evidence, a court should not "give consideration to the relative qualifications of other schools accredited by the [agency]." 244 F.3d at 529.

> **B.** **The Administrative Record Establishes That The Council's Decision Was Not Arbitrary And Unreasonable.**

In Count I of its Complaint, the School also asserts that the Council's decision was "arbitrary and capricious" because it was "not rationally related to the facts in the record as required by federal common law as embodied in the [Administrative Procedure Act], 5 U.S.C. § 701 *et seq.*" Compl. ¶90. However, as this Court previously concluded, "the APA does not apply here." Doc. 35 at 15. Rather, "'great deference should be afforded the substantive rules of [accrediting agencies].'" *Id.* at 22 (quoting *Cooley,* 459 F.3d at 713). Accordingly, "in analyzing whether the ABA abused its discretion or reached a decision that was arbitrary or unreasonable, [courts] focus on whether the agency 'conform[ed] its actions to fundamental principles of fairness." *Id.*

As discussed in Part A, the Council concluded that the School failed to demonstrate substantial compliance with Standard 203, Standards 303(a) and (c) and Interpretation 303-3, and Standard 501(b) and Interpretation 501-3. On each of these Standards, the Council's conclusion was based on substantial evidence in the administrative record. Further, the School had been given multiple opportunities to participate in the development of the administrative record. *See, e.g.,* Docs. 28-8, 28-9 (response to site team report); Doc. 28-11 at 71-159 (School appeared at

Committee hearing, which was transcribed); Compl. ¶37 & Ex. A (Hearing Brief); and Doc. 28-11 at 229-322 (School appeared at Council meeting, which was transcribed).

The School alleges in the Complaint, nevertheless, that the Council's decision must be "arbitrary and capricious" because two other entities—SACS-COC and TBLE—approved the School based on their standards. *See* Compl. ¶¶42-43, 52-53, 58-59. As this Court previously recognized in denying the School's motion for preliminary relief, however, "these accrediting agencies evaluated the law school at different times than the Committee or Council, that is prior to students arriving on campus and shortly after the law school commenced classes." Doc. 35 at 29; *see also* Compl. ¶¶24, 26; Doc. 26-9 at 38; Doc. 26-9 at 40-41. Moreover, the SACS-COC site team report, like the Section's Site Team Report, was based on limited information available at the time and contained both negative and positive comments. *See* Doc. 35 at 29; *see also* Doc. 26-9 at 42-66. Indeed, the SACS-COC site team report included statements that were fully supportive of the Council's subsequent decision. *See supra* at 3; Doc. 28-11 at 43-45. Finally, and most importantly, the Council cannot defer to other agencies' review: the Council is designated by the DOE as the national accrediting agency for law schools and must perform its duties consistent with its own standards and rules.

Further, even if the School could point to countervailing facts, the result would not be a conclusion that the Council's decision was arbitrary and unreasonable because, in accreditation matters, courts "are not free to conduct a *de novo* review or substitute [their] judgment for that of the ABA or its Council." *Cooley,* 459 F.3d at 713; *see also Tenn. Clean Water Network v. Norton*, 2005 WL 2464675, at *9 (E.D. Tenn. Oct. 4, 2005) ("The Court may not substitute its judgment . . . for the judgment of [the agency.]"). Rather than reweighing the evidence, a court's role is limited to determining whether the facts on which the Council relied are sufficient to show

"reasoned decision-making." *Simms v. NHTSA*, 45 F.3d 999, 1004 (6th Cir. 1995); *Cooley*, 459 F.3d at 713 ("the standards of accreditation are not guides for the layman but for professionals in the field of education.") (citation omitted).

As this Court stated, "even if there is substantial evidence in the record that would have supported an opposite conclusion, [a court must defer to the agency] so long as substantial evidence supports the conclusion reached." Doc. 35 at 34-35 (quoting *Jones v. Commissioner*, 336 F.3d 469, 475 (6th Cir. 2003) (citation omitted)). Accordingly, where, as here, the Council's decision was based on reasoned decision-making, there is no basis on which the School might establish that the Council's decision was arbitrary and unreasonable.

### C.    The School Had A Meaningful Opportunity To Be Heard By The Council.

The School's final claim in Count I of its Complaint is that it was not given a meaningful opportunity to be heard before the Council. Compl. ¶91. This claim is contradicted by the School's own allegations. The School submitted a 48-page hearing brief (Compl. Ex. A), and made an in-person oral presentation directly to the Council. Compl. ¶37. Further, the School made written and oral presentations to the Committee and a written response to the Site Team Report, each of which was in the record before the Council. Compl. ¶28; Docs. 28-8, 28-9. As this Court determined, these opportunities to be heard were more than sufficient to satisfy due process. Doc. 35 at 24 (a law school is "afforded ample process" where it is "notified well in advance [of hearings]," is "afforded the opportunity to submit evidence to support[] its case, and permitted to appear before the body with counsel present") (internal quotation marks omitted).

For these reasons, Count I of the Complaint does not "state a claim to relief that is plausible on its face," *Courie,* 577 F.3d at 629, and it accordingly should be dismissed.

## II. DUNCAN'S STATE LAW DUE PROCESS CLAIM (COUNT II) IS PREEMPTED BY FEDERAL LAW AND SHOULD BE DISMISSED.

In Count II, the School alleges a "violation of due process" under Tennessee common law arising from the Council's accreditation decision. Compl. ¶¶92-95. However, Tennessee courts apparently have not recognized a common law due process claim arising from private accreditation decisions, and the Sixth Circuit has conclusively held that federal law alone "govern[s] disputes relating to decisions made by [accrediting] bodies" that are "approved by the [DOE] (such as the ABA)." *Cooley,* 459 F.3d at 712; *accord Foundation for Interior Design*, 244 F.3d at 532-33. Even if such a claim was recognized by the Tennessee courts and not preempted, it must nevertheless fail for the same reasons discussed in Part I.

## III. DUNCAN'S ANTITRUST CLAIMS (COUNTS III AND IV) HAVE BEEN REJECTED BY THE SIXTH CIRCUIT AND OTHER COURTS IN ACCREDITATION ACTIONS AND SHOULD BE DISMISSED.

In Count III, the School alleges that the Council's actions violated Section 1 of the Sherman Act, 15 U.S.C. § 1, in that unidentified "faculty and staff" from unspecified "Competitor Law Schools" served on the Committee and Council and allegedly conspired to deny Duncan's application for provisional accreditation in order to exclude Duncan from unidentified "regional" and "national" markets. Compl. ¶¶98-101. The School contends that this alleged "group boycott" affects "the economic value" of a Duncan degree, harms its ability to recruit and maintain faculty, donors and economic opportunities, and puts it at a disadvantage "in competing for law school applicants because of the perceived value of [the School's] education or degree." Compl. ¶¶110-11. Duncan does not allege that the judges, legal practitioners, and other non-academic members on the Committee and Council also engaged in this alleged illegal conspiracy or boycott. The School pleads no facts supporting its conclusory

allegations.[5]

In Count IV of its Complaint, the School claims that the Council's decision violated Section 2 of the Sherman Act, 15 U.S.C. § 2, because the ABA allegedly "enjoys monopoly power in accrediting law schools," and the denial of the School's application "constitutes an abuse" of this power. *Id*. ¶¶123-25. The School does not allege that the Council obtained or has maintained such power through any improper or anticompetitive conduct and, again, pleads no facts supporting its conclusory allegations.

The School expressly links its antitrust claims to its allegation that it was in "substantial compliance with the ABA Standards" and "should be entitled to provisional accreditation." Compl. ¶102; *see also id*. ¶¶123-25 (alleging that accreditation denial constituted an "abuse of Defendant ABA's market power" because it is "in substantial compliance with the ABA Standards"). In addition to lacking any factual basis, these antitrust claims fail for the same reasons as the federal due process claim: as discussed in Part I, *supra,* the Council's decision was supported by substantial evidence and was not arbitrary and unreasonable.

Moreover, the Sixth Circuit and other courts have decisively rejected the School's alleged antitrust claims in the accreditation context. In *Foundation for Interior Design*, the Sixth Circuit conducted a comprehensive review of antitrust cases in the accreditation context and stated, "We have not found a case … in which a denial of school accreditation gave rise to a successful allegation of antitrust injury." 244 F.3d at 531; *see also Zavaletta v. ABA*, 721 F. Supp. 96, 98

---

[5] The School does, however, focus on alleged events that led to a 1996 consent judgment resolving certain antitrust claims brought by the Department of Justice against the ABA. Compl. ¶¶74–86. In addition to being irrelevant to the issues in this case, the School's allegations should be disregarded because they are inaccurate and incomplete. *See Mass. Sch. Of Law at Andover, Inc. v. ABA ("MSL")*, 107 F.3d 1026, 1040 n.19 (3d Cir. 1997) (noting that the allegations "never were proven because the case was settled, and therefore cannot be taken as true in this case.").

(E.D. Va. 1989) (challenge to ABA accreditation decision was "outside the ambit of the Sherman Act"); *Brandt v. ABA*, 1997 WL 279762 (N.D. Tex. May 15, 1997) (dismissing antitrust claims alleging lawyers were unable to become licensed in other states because law school was denied accreditation). Duncan's antitrust claims, similarly, should be dismissed as a matter of law.

A. **The School's Antitrust Claims Should Be Dismissed Because It Has Not Alleged Antitrust Injury.**

An antitrust injury is a necessary element of both the School's Section 1 and Section 2 antitrust claims. However, the School has not alleged, and cannot allege, "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Foundation for Interior Design*, 244 F.3d at 530 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* 429 U.S. 477, 489 (1977)). That is, a plaintiff must assert more than injury to itself "because the antitrust laws are designed for the protection of competition, not competitors." *Id.* (internal quotes and citation omitted); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) ("It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors*.'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

The School's asserted injuries—*e.g.,* lowering "the economic value" of a Duncan degree and difficulties with "hiring of faculty and staff" and recruiting law students (Compl.¶¶ 110-111)—are all alleged harms to the School as a competitor, not to competition, and thus do not qualify as antitrust injury. Indeed, in *Foundation for Interior Design,* the Sixth Circuit expressly held that neither "a loss of reputation" nor "a drop in school enrollment" from the denial of accreditation can constitute antitrust injury. 244 F.3d at 531; *see also MSL*, 107 F.3d at 1038 (stigma effect in marketplace from denial of accreditation, like loss of prestige from failure to approve a product or service, does not alone make out antitrust injury). Duncan instead must

allege facts establishing that there has been an "adverse impact on price, quality, or output" in

the law school market as a result of its denial of accreditation. *Betkerur v. Aultman Hosp. Ass'n*,

78 F.3d 1079, 1092 (6th Cir. 1996) (quoting *Capital Imaging Assocs. v. Mohawk Valley Assocs.*,

996 F.2d 537, 547 (2nd Cir. 1993)). It has not done so here.[6]

    The Sixth Circuit recently affirmed the dismissal of an analogous antitrust complaint

because it was "devoid of any allegation of the anticompetitive effect on the [relevant] market."

*Bassett v. NCAA*, 528 F.3d 426, 434 (6th Cir. 2008). In *Bassett,* a football coach had alleged that

the NCAA's adjudication of his misconduct was "unfair" and inconsistent with "due process."

*Id.* The court reasoned that it was not enough for the plaintiff to allege that he suffered injury

because he was banned from coaching; rather his claim had been properly dismissed for failure

to state a claim because he failed to allege facts tending to suggest that the broader market for

coaches was somehow affected. *Id.* Duncan's antitrust claims must fail for the same reasons:

the School's private harms do not amount to antitrust injury.

    Duncan also asserts that its ability to compete for law school applicants has been harmed

by the denial of accreditation because most states require graduation from an ABA-accredited

law school in order to sit for the bar, and because federally-secured student loans require

attendance at an ABA-accredited school. Compl. ¶¶6, 109. These requirements, however, are the

result of state action and thus are "immune from antitrust action." *MSL*, 107 F.3d at 1036 (citing

*Parker v. Brown*, 317 U.S. 341, 352 (1943)). As the Sixth Circuit has explained, "No cognizable

antitrust injury exists where the alleged injury is a byproduct of the regulatory scheme or federal

---

[6] Duncan alleges simply that the Council's decision "increases the price of legal education,"
"increases the cost of legal services," and "decreases the consistent quality of legal education."
Compl. ¶¶106-08. But unsupported by facts, such "mere conclusory statements[] do not suffice."
*Iqbal*, 129 S. Ct. at 1949.

law rather than of the defendant's business practices." *CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 573 (6th Cir. 2009) (internal quotation marks and citation omitted).

"The ABA does not decide who can take the bar examinations." *MSL*, 107 F.3d at 1036. That decision is made exclusively by the States' bar admission authorities and therefore, "[w]ithout state action, the ABA's accreditation decisions would not affect state bar admissions requirements." *Id.; see also Zavaletta*, 721 F. Supp. at 98 ("In accrediting a law school, the ABA merely expresses its educated opinion . . ., [which] is provided to state supreme courts and bar examiners, who have the sole power to determine if a school's graduates are entitled to . . . practice in their states."). Without state action, accordingly, the Council's accreditation decision has no impact on whether Duncan's students can sit for the bar in their chosen State.[7]

Similarly, the ABA does not decide whether students qualify for federal student loan assistance. Congress, by statute, and the Department of Education, by regulation, exclusively control those decisions, including whether attendance at an ABA-accredited school is required. *E.g.*, 20 U.S.C. § 1141(a). Without this state action, the Council's accreditation decision has no impact on whether Duncan's students qualify for federal student loan programs.

Finally, Duncan cannot allege antitrust injury free of state action by focusing on "stigma" resulting from denial of accreditation. Compl. ¶¶6, 110, 111. Duncan asserts that Council accreditation is a "proxy for a quality legal education." *Id*. ¶110. However, this is precisely because most states—although not Tennessee—require graduation from an ABA-accredited law school as a prerequisite to sitting for the bar exam, and because the federal government conditions certain funding on accreditation. *Id*. ¶111. Any such stigma, therefore, cannot

---

[7] In fact, Duncan's graduates may sit for the Tennessee bar based on TBLE's approval. Doc. 26-9 at 38.

provide the basis for a claim of antitrust injury because it, too, is the result of state action. *See MSL*, 107 F.3d at 1038.

**B.      The Antitrust Claims Should Be Dismissed Because The School Has Not Adequately Alleged An Unreasonable Restraint Of Trade, Conspiracy, Or Improper Monopolization.**

The School's antitrust claims also should be dismissed because the School has failed to allege any basis for a determination that the denial of accreditation was an unreasonable restraint of trade under the "rule of reason" analysis, or that it was the result of conspiracy or of improper monopolization.

Because "accreditation serves an important public purpose and can enhance competition," any alleged restraint of trade arising from accreditation activities is subject to a "rule of reason" analysis. *Foundation for Interior Design*, 244 F.3d at 530; *see also MSL,* 107 F.3d at 1033 (same); *Lie v. St. Joseph Hosp. of Mount Clemens, Mich.*, 964 F.2d 567, 570 (6th Cir. 1992) ("Far from having a direct anticompetitive effect . . . the peer review process, has a public purpose—policing the competence and conduct of doctors—and can enhance competition.") (internal quotation marks and citation omitted).

The rule of reason analysis "requires the court to analyze the actual effect on competition in a relevant market to determine whether the conduct unreasonably restrains trade." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 436 (6th Cir. 2008). To meet this standard, the Complaint must at the very least define the relevant market, describe the net economic effect of the alleged violations on competition within the identified market, and identify less-restrictive alternatives that would accomplish the same legitimate accreditation objectives. *See Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 469 (6th Cir. 2005); *see also Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719-20 (6th Cir. 2003) (failure to

identify relevant market is proper ground for dismissing Sherman Act claim). The allegations of the School's antitrust claims clearly do not meet the rule of reason test. Nor can Duncan avoid the requirements of the rule of reason analysis by alleging a "group boycott." *See, e.g., MSL,* 107 F.3d at 1040-41; *Zaveletta*, 721 F. Supp. at 98.

As to its allegation of conspiracy, Duncan does not identify the alleged "Competitor Law Schools" that participated in the alleged conspiracy, when it was formed, or the content of the alleged agreement except to assert that its purpose was to deny accreditation to Duncan. "'[C]onclusory allegations of agreement at some unidentified point do not supply facts adequate to show illegality.'" *Total Benefits,* 552 F.3d at 436 (quoting *Twombly*, 550 U.S. at 557). The Complaint thus does not offer "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 566; *see also, Travel Agent Com'n Antitrust Litig.*, 583 F.3d at 902-03 ("In the wake of *Twombly*, . . . [such] bare assertions of conspiracy no longer supply an adequate foundation to support a plausible § 1 claim.").

As to the Section 2 monopolization claim, the School's assertion that the ABA "enjoys monopoly power in accrediting law schools" (Compl. ¶123) cannot support an antitrust claim: "[M]onopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004). The Council's position as an accreditation body, however, is a consequence of state action by the Department of Education, and it is therefore immune from antitrust suit based on any alleged monopoly power. *See CBC Cos.*, 561 F.3d at 573 ("No cognizable antitrust injury exists where the alleged injury is a byproduct of the regulatory scheme or federal law rather than of the defendant's business practices.") (internal quotation marks and citation omitted).

In sum, Duncan has failed to "state a claim to relief that is plausible on its face," *Courie,* 577 F.3d at 629, as to its alleged antitrust claims. Counts III and IV should be dismissed.

## III. DUNCAN'S FINAL CLAIM (COUNT V) ARTICULATES NO SEPARATE CLAIM FOR RELIEF AND SHOULD BE DISMISSED.

The School's final claim, set out in Count V of the Complaint, does not articulate any separate claim for relief recognized under federal or Tennessee law. *See* Compl. ¶126. In Count V, therefore, the School has also failed to "state a claim to relief that is plausible on its face," *Courie,* 577 F.3d at 629, and accordingly this Count also should be dismissed.

## CONCLUSION

For the foregoing reasons, Duncan's Complaint should be dismissed in its entirety with prejudice.

Dated: February 8, 2012

Respectfully submitted,
By: s/ Howard H. Vogel

Patricia J. Larson*
Stephanie Giggetts*
American Bar Association
321 N. Clark Street
Chicago, IL 60654
(312) 988-5000

Howard H. Vogel (001015)
Jeffrey R. Thompson (20310)
P. Alexander Vogel (023944)
O'Neil, Parker & Williamson, PLLC
7610 Gleason Drive, Suite 200
Knoxville, TN 37919
(865) 546-7190

Anne E. Rea*
Michael P. Doss*
Linda R. Friedlieb*
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
*Attorneys for Defendant*

*Pro hac vice

## CERTIFICATE OF SERVICE

I certify that on February 8, 2012, I properly served all parties by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt and U.S. Mail.

By:      s/ Howard H. Vogel (0001015)